Adam E. Lang, (#022545)
Matt Jarvey (#031350)
Derek C. Flint (#034392)
Taryn J. Gallup (#035002)
SNELL & WILMER LLP
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone:   602.382.6000
Facsimile:   602.382.6070
Email: alang@swlaw.com
        mjarvey@swlaw.com
        dflint@swlaw.com
        tgallup@swlaw.com

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
Email: nkatyal@milbank.com
        jsterling@milbank.com

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
Email: GMainland@milbank.com
        APorter@milbank.com

*Attorneys for Plaintiff*
*KalshiEX LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KalshiEX LLC,<br><br>              Plaintiff,<br><br>       v.<br><br>Jackie Johnson, in her official capacity as Director of the Arizona Department of Gaming; Douglas Jensen, in his official capacity as Chief Law Enforcement Officer of the Arizona Department of Gaming; Arizona Department of Gaming; and Kristin K. Mayes, in her official capacity as Attorney General for the State of Arizona,<br><br>              Defendants. | Case No.<br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND DECLARATORY RELIEF** |

4938-8185-1542

**INTRODUCTION**

1.      This action challenges the State of Arizona's intrusion into the federal government's exclusive authority to regulate derivatives trading on exchanges overseen by the Commodity Futures Trading Commission ("CFTC").  7 U.S.C. § 2(a)(1)(A).  There is a substantial risk that the Attorney General of Arizona (the "Arizona AG") will bring an enforcement action against Plaintiff KalshiEX LLC ("Kalshi" or "Plaintiff") on behalf of the Arizona Department of Gaming ("ADG" or the "Department") with the intent to prevent Kalshi from offering event contracts for trading on its federally regulated exchange.  Plaintiff KalshiEX LLC ("Kalshi" or "Plaintiff") believes the State of Arizona will imminently bring an enforcement action against Kalshi with the intent to prevent Kalshi from offering event contracts for trading on its federally regulated exchange.

2.      Kalshi is a federally designated derivatives exchange, subject to the CFTC's "exclusive jurisdiction."  7 U.S.C. § 2(a).  It offers consumers the opportunity to trade in many types of event contracts.  These contracts are subject to exclusive federal oversight, and—critically—they are *lawful* under federal law.  Thus, they are also lawful under Arizona's own anti-gambling laws, which provide a carveout for "bona fide business transactions that are valid under the law of contracts including contracts for the purchase or sale at a future date of securities or commodities."  A.R.S. § 13-3301(6).

3.      Nevertheless, the ADG has sent Kalshi a cease-and-desist letter stating its belief that offering event contracts, including sports event contracts, based on future events without a license violated Arizona law.  The letter directed Kalshi to "cease gambling operations in Arizona and desist from engaging in those activities in the future" and threatened Kalshi with criminal penalties if it did not comply.  Ex. 1 at 2.  Defendants have additionally made numerous statements indicating they believe Kalshi is operating unlawfully under Arizona's anti-gambling laws by offering event contracts.  The agencies also threatened to revoke the license of any entity that partners with Kalshi anywhere in the United States.  And when Kalshi's counsel attempted to contact the Arizona AG to

obtain Defendants' written assurances of non-enforcement, Kalshi was met with silence, even though the Arizona AG had previously been willing to communicate with counsel and had previously assured Kalshi that Defendants would not pursue an enforcement action without providing prior notice.

4.    Federal law preempts Arizona from subjecting Kalshi to state law. Preemption exists under straightforward principles of express preemption, field preemption, and conflict preemption.  This Court should therefore grant Kalshi injunctive and declaratory relief on preemption grounds.

5.    Commodity futures regulation has long been under the exclusive purview of the federal government.  In 1936, Congress passed the Commodity Exchange Act ("CEA"), which enacted a federal regulatory framework for derivatives.  In 1974, Congress established the CFTC as a federal agency to oversee it.

6.    The text, purposes, and statutory history of the CEA leave no question that Congress sought to preempt state regulation of derivatives on exchanges overseen by the CFTC, known as "designated contract markets" or "DCMs."  The text of the statute gives the CFTC "exclusive jurisdiction" over trading on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).  During the drafting of the 1974 amendments to the CEA, Congress deleted a provision that would have granted states concurrent jurisdiction over futures trading.  *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).  One of Congress's avowed goals in creating the CFTC was to avoid the "chaos" that would result from subjecting exchanges to a patchwork of 50 different—and potentially conflicting— state laws.  *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113,* 93d Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark).  As the conference report to the 1974 amendments explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned."  H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.).  And the statute gives the CFTC comprehensive authority over regulated

SNELL & WILMER

exchanges, including the authority to approve or reject certain categories of event contracts as against the public interest.

7. For that reason, courts have easily found that the CEA preempts state laws in similar contexts. *See, e.g.*, *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 563–64 (6th Cir. 1998).

8. Commentators have likewise concluded with no difficulty that the CEA "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976). And commentators have specifically recognized that "the CEA preempts state bucket-shop laws and other anti-gambling legislation." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 721 (1982).

9. The CFTC itself agrees. It recently informed the U.S. Court of Appeals for the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583 (emphasis added). Just last month, the CFTC affirmed that it has exclusive jurisdiction to regulate derivatives markets like Kalshi, and it defended that authority against improper attacks from state regulators such as Arizona's. Amicus Brief of CFTC at 1, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Amicus Br.") ("Congress vested the CFTC with exclusive jurisdiction to protect that national interest by overseeing the regulation of futures, options, and swaps traded on federally regulated exchanges . . . [t]he *CFTC's jurisdiction supersedes State as well as Federal agencies* because commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, surveillance, and enforcement of financial instruments

- 4 -

traded in these markets to prevent the type of fragmented oversight" that would result from state enforcement) (citation modified) (emphasis added).

10.    Multiple courts have agreed that the CEA preempts state law as to Kalshi's contracts.  Last month, the U.S. District Court for the Middle District of Tennessee granted Kalshi a preliminary injunction barring officials in that state from taking action against Kalshi's exchange.  *KalshiEX v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026).  The court concluded "that Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies." *Id.*  The court further concluded that Kalshi would suffer irreparable harm because its constitutional rights were threatened and because "[a]bsent an injunction, Kalshi could either continue its operations in Tennessee and face potential civil and criminal liability" or attempt to comply and risk its position as a national exchange. *Id.* at *10.  The court further noted that Kalshi would be irreparably injured from the "substantial expenses and reputational harm" it would incur from attempting to comply with Tennessee's unconstitutional demands. *Id.* at *11.

11.    The U.S. District Court for the District of New Jersey likewise granted Kalshi's preliminary injunction in April 2025 to prevent similar state overreach.  The court enjoined state officials from attempting to prohibit Kalshi's event contracts, explaining that it was "persuaded . . . Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi. *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025).  Moreover, the court recognized that even the "express preemption provisions" of 7 U.S.C. § 16 "do[] not foreclose implied preemption elsewhere within the CEA." *Id.* at *5. In ruling for Kalshi, the court emphasized that even if Kalshi's contracts were "unlawful" under federal law "that would subject Kalshi to the review of the CFTC—not state regulators." *Id.*  The court also found that Kalshi faced irreparable harm because:

> [T]he prospect of facing civil or criminal enforcement or complying and compromising the integrity of its contracts imperils the reputation Kalshi has cultivated over several years . . . at minimum—Kalshi has identified harms to its reputation and goodwill that are both likely without injunctive relief and not able to be remedied following trial.

*Id.* at *7 (describing the circumstances as a "Hobson's choice" for Kalshi where "leaving it subject to state enforcement or obligating it to shift its business practices [are] consequences that are not cleanly undone").

12.     While some courts have found that the CEA does not prevent states from barring Kalshi's event contracts, those decisions are mistaken and have been appealed. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025); *KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, slip op. (S.D. Ohio Mar. 9, 2026).

13.     Even though Kalshi's contracts are subject to the CFTC's exclusive jurisdiction, Defendants have made clear that they (mistakenly) believe that Kalshi's contracts are instead subject to—and unlawful under—Arizona law. In May 2025, the ADG claimed that "Kalshi is not licensed [in Arizona] and its operation of event wagering in Arizona is illegal." Ex. 1, at 1. Additionally, in September 2025, the ADG wrote to "Event Wagering Operators" licensed in Arizona, taking the position that "[o]ffering or selling event contracts to persons located within Arizona without a license from the Department violates Arizona law." Ex. 2, at 1.

14.     Defendant Mayes has targeted Kalshi's contracts elsewhere, too. In her official capacity as Arizona's Attorney General and on behalf of the State of Arizona, Defendant Mayes has signed multiple amicus briefs that claim Kalshi is violating comparable state laws by offering sports event contracts. *See generally* Brief of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29 ("June Amicus"); Brief of Amici Curiae, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41-1 ("December Amicus"); Brief of Amici Curiae, *KalshiEX LLC v.*

*Hendrick*, No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1 ("January Amicus"); Brief of Amici Curiae, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Mar. 10, 2026), Dkt. No. 76.1 ("March Amicus"). Those amicus briefs argue that states, not the CFTC, have the sole power to regulate Kalshi's sports event contracts. *Id*. And although those cases were focused particularly on Kalshi's sports event contracts, the positions advanced by the amicus briefs could apply to *all* of Kalshi's contracts. CFTC Amicus Br. at 2–3, 17–18, 28–29 (explaining that arguments advanced by states in attempting to regulate sports event contracts apply beyond sports events, and this conduct improperly usurps the CFTC's exclusive authority while causing "market fragmentation [that] erode[s] the nationally uniform framework Congress established to reduce risk, promote transparency, and safeguard market integrity within the financial system.").

15.     Arizona state laws subject unlawful gaming transactions to civil and criminal penalties. Defendants' statements make abundantly clear that they think Kalshi's event contracts constitute unlawful gaming. Defendants have recently refused to provide Kalshi with assurances that they will refrain from bringing an enforcement action against Kalshi under preempted state law.

16.     Kalshi reasonably believes Defendants intend to bring an enforcement action against Kalshi unless Kalshi stops offering all event contracts—which, again, are offered for trade on its federally regulated exchange without objection from the CFTC—in Arizona. In doing so, Defendants would seek to subject Kalshi to the patchwork of state regulation that Congress created the CFTC to prevent, and Defendants would interfere with the CFTC's exclusive authority to regulate derivatives trading on the exchanges it oversees.

17.     Defendants' anticipated actions are preempted under the Supremacy Clause of the U.S. Constitution—both because Congress has expressly and impliedly occupied the field of regulating trading on CFTC-approved exchanges, and because Defendants' acts would squarely conflict with federal law. Kalshi is entitled to declaratory and injunctive

1    relief to prevent Arizona authorities from enforcing their preempted state laws against

2    Kalshi.

3         18.    Moreover, Defendants' threatened conduct contravenes Arizona's own anti-

4    gambling laws which exempt "bona fide business transactions that are valid under the law

5    of contracts including contracts for the purchase or sale at a future date of securities or

6    commodities" from the definitions of "gambling," "gamble," and "wager."  A.R.S. § 13-

7    3301(6).

8         19.    Accordingly, Defendants' anticipated actions threaten impending and

9    irreparable harm, not just to Kalshi, but to its customers and commercial counterparties.

10   Shutting down Kalshi's ability to offer event contracts in Arizona would threaten Kalshi's

11   viability and require devising complex technological solutions whose feasibility is entirely

12   untested and unclear.  It would also impair Kalshi's existing contracts with consumers and

13   business partners, subject Kalshi's users to uncertainty and loss, undermine confidence in

14   the integrity of Kalshi's platform, threaten its prospective business relationships, and

15   jeopardize Kalshi's status as a CFTC-approved exchange.  For these reasons, Kalshi

16   intends to seek injunctive relief to avoid the immediate and irreparable harm that would

17   result if Defendants were to commence an enforcement action.

18        **JURISDICTION AND VENUE**

19        20.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331

20   because the action arises under the Supremacy Clause of the United States Constitution.

21   The federal question presented is whether Arizona law is preempted by the CEA, 7 U.S.C.

22   §§ 1 *et seq.*, as applied to Kalshi's event contracts.

23        21.    The Eleventh Amendment imposes no bar to this Court's jurisdiction in this

24   suit for prospective declaratory and injunctive relief against state officials.  The "Eleventh

25   Amendment does not bar actions seeking only prospective declaratory or injunctive relief

26   against state officers in their official capacities." *L.A. Cnty. Bar Ass'n v. Eu*, 979 F.2d 697,

27   704 (9th Cir. 1992).

28

- 8 -

22.    Venue is proper under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2).  Defendants perform their duties in and thus reside in this District.  A substantial part of the events giving rise to the claim occurred in this District.

## PARTIES

23.    Plaintiff Kalshi is a financial services company with its principal place of business in New York.  Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts.  Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 *et seq.*

24.    Defendant Jackie Johnson is sued in her official capacity as Director of the ADG.

25.    Defendant Douglas Jensen is sued in his official capacity as Chief Law Enforcement Officer of the ADG.

26.    Defendant ADG is sued as the state agency that regulates legal gambling in the State of Arizona by conducting licensing, permitting, collecting, auditing, testing, programming, inspecting, investigating, prosecuting, and reporting activities with respect to covered entities.  The ADG oversees licensing, regulating, investigating and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming-related vendors in Arizona.  As the state's gaming regulator, the ADG has jurisdiction over all persons participating in casino gaming.

27.    Defendant Kristin ("Kris") Mayes is sued in her official capacity as the Arizona AG.

28.    Together, defendants Jackie Johnson, Douglas Jensen, ADG, and Kris Mayes would be responsible for enforcing any demand for Kalshi to comply with Arizona state law that is preempted by federal law.

SNELL
& WILMER

- 9 -

## FACTUAL ALLEGATIONS

### A. An Event Contract—Like Other Derivatives—Is a Recognized Financial Tool to Mitigate Risk.

29.     Derivatives contracts are financial tools used to mitigate risk. Event contracts are a quintessential example of a derivatives contract—they are a type of option. This form of derivatives contract identifies a future event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. Most commonly, event contracts involve a binary question: Every "yes" position has an equal and opposite "no" position. For example, a derivatives contract might center around whether an earthquake will take place in Los Angeles County before December 31, 2026. A purchaser may trade on either the "yes" or the "no" position on the contract. If an earthquake does take place in Los Angeles County before the end of the calendar year, then the "yes" positions would be paid out.

30.     Event contracts are traded on an exchange. Traders exchange positions with other traders in the marketplace. Importantly, event contracts do not reflect a "bet" against the "house." Because traders do not take a position against the exchange itself, traders' ability to hedge risk requires counterparties willing to assume risk in the hope of seeing a return. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place."). Kalshi's exchange links traders seeking to hedge or seeking returns based on the uncertainty associated with financially significant events.

31.     The value of an event contract is determined by market forces. An event contract's price will fluctuate between the time of its creation and the expiration date in accordance with changing market perceptions about the likelihood of the event's occurrence. During that period, individuals can buy and sell the contract at its fluctuating prices. The ultimate value of an event contract is determined at its expiration date. If the

underlying event occurs, the holder of the "yes" position is entitled to its full value. But if the underlying event does not occur, the holder of the "no" position gets the payment.

32.    Traders price event contracts by reference to available information at any given time. If new information comes to light portending an increase in the likelihood of the event's occurrence, then the event contract's price will increase. The market prices of event contracts thus reflect probabilistic beliefs about whether the underlying event will occur. Returning to the earthquake example, a "yes" contract that trades at 30 cents reflects that the market believes that there is a 30% chance of an earthquake this year. The 30% figure can be informed by datapoints the market deems significant, such as the time since the last earthquake in the area and the frequency of fault line tremors in preceding months surrounding Los Angeles County.

33.    Event contracts are a valuable means to hedge against event-driven volatility. Event contracts reflect real-time risk assessment and thus provide a nuanced and finely tuned opportunity for traders to mitigate their exposure to real-world events in an uncertain market. There is no other widely available financial instrument with this unique capability to capture the risks of an event with potential economic consequences, which is a benefit not only to those that wish to hedge risk or seek return, but also to market observers and other economic actors.

34.    To give just some of many examples, last month, researchers at the Federal Reserve published a paper for which the "results suggest that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is valuable to both researchers and policymakers."[1] Findings in that paper included that "Kalshi markets are well-behaved and broadly consistent with those from more established financial instruments," and that "in several episodes, they allocate probability mass in ways that may

---

[1] Anthony M. Diercks, Jared Dean Katz & Jonathan H. Wright, *Kalshi and the Rise of Macro Markets*, Finance and Economics Discussion Series Paper 2026-010, Board of Governors of the Federal Reserve System, at 1 (Feb. 18, 2026), https://www.federalreserve.gov/econres/feds/kalshi-and-the-rise-of-macro-markets.htm.

4938-8185-1542

reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."[2]  Further, Kalshi's "median and mode have a perfect forecast record on the day before the [Fed Open Market Committee] meeting, which represents a statistically significant improvement over the fed funds futures forecast,"[3] and, for headline consumer price index forecasts, "Kalshi provides a statistically significant improvement over the Bloomberg consensus forecast."[4]  And, "Kalshi provides real-time, distributional forecasts for macroeconomic variables such as GDP, core CPI, and unemployment—markets for which options data have historically been unavailable."[5]

35.    As another example, Kalshi recently announced a partnership with Tradeweb, a leading global operator of electronic marketplaces for rates, credit, equities, and money markets, which facilitates more than $2.6 trillion in notional value of instruments traded per day.[6]  The partnership is designed to expand institutional access to data from Kalshi's market and to facilitate trading by those same institutional investors on Kalshi's platform.[7]

36.    Late last year, the real estate investment firm Arrived announced its plans to utilize Kalshi's event contracts to hedge the risk of a government shutdown impacting its business.[8]

---

[2] *Id.* at 2–3.

[3] *Id.* at 3.

[4] *Id.*

[5] *Id.*

[6] Tradeweb and Kalshi Announce Strategic Partnership to Expand Institutional Access to Prediction Markets, Tradeweb (Feb. 19, 2026), https://www.tradeweb.com/newsroom/media-center/news-releases/tradeweb-and-kalshi-announce-strategic-partnership-to-expand-institutional-access-to-prediction-markets/.

[7] *See* Katherine Doherty and Sridhar Natarajan, *Wall Street Bond-Trading Hub Tradeweb Strikes Deal with Kalshi*, Bloomberg (Feb. 19, 2026), https://www.bloomberg.com/news/articles/2026-02-19/bond-trading-hub-tradeweb-strikes-prediction-markets-deal-with-kalshi.

[8] *See* Ryan Frazier, LinkedIn, https://www.linkedin.com/posts/activity-7386091007588749312-rhxN/ [https://perma.cc/CQN6-JK3M]; *see also* Michael J. de la Merced, *Kalshi, a Prediction Market, Raises $1 Billion in a New Round*, N.Y. Times (Dec.

37.     Sporting events can have significant economic consequences for a broad ecosystem of stakeholders.  *Orgel*, 2026 WL 474869, at *7–10; *Flaherty*, 2025 WL 1218313, at *6; CFTC Amicus Br. at 19-20.  Advertisers, sponsors, television networks, local communities, sportsbooks, and others all stand to gain or lose substantial sums depending on sports events.  Sports event contracts offer these entities opportunities to hedge their exposure.  And that is happening in the market right now.

38.     Take, for example, Game Point Capital, a sports-focused insurance firm that works with college athletic departments, pro teams, and sponsors to insure risk related to performance bonuses, coach salary buyouts, postseason and ticket revenue, and other areas of economic exposure.[9]  Game Point Capital uses Kalshi to hedge, and it intends to do so for $30 million in risk annually.[10]

39.     Likewise, Underdog Sports, a fantasy sports company, uses Kalshi as a tool to "hedge against volatility" on its own platform.[11]  Others can use sports event contracts to hedge as well:  Sponsors of a team or athlete can use event contracts to hedge against the risk that the team or athlete underperforms.  Hotel operators can hedge against the revenue earned from a local team making a playoff run, and TV networks can hedge against the risk that star players who draw viewers may not play in certain games.

---

2, 2025), https://www.nytimes.com/2025/12/02/business/dealbook/kalshi-prediction-market-billion.html [https://perma.cc/VUY8-HCDT].

[9] *Services*, Game Point Capital, https://www.gamepointcapital.com/services (last visited Mar. 12, 2026); *see also* Paul Steinbach, *UConn Insured Basketball Coach Bonuses and Saved Nearly $3M*, Athletic Bus. (Apr. 23, 2024), https://www.athleticbusiness.com/operations/budgeting/article/15669200/uconn-insured-basketball-coach-bonuses-and-saved-nearly-3m (Game Point Capital wrote insurance contract that saved university nearly $3 million in bonus payments to coaches related to NCAA tournament performance).

[10] Andrew Ross Sorkin, et al., *New Epstein Details Rattle Washington, Hollywood and Beyond*, N.Y. Times (Feb. 10, 2026), https://www.nytimes.com/2026/02/10/business/dealbook/epstein-lutnick-wasserman-starmer.html.

[11] *See* Brett Smiley, *Underdog Sports Preparing To Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 20, 2025), https://www.ingame.com/underdog-kalshi-pm-risk-management/.

- 13 -

40.     Event contracts are also a valuable means of communicating information to the public because contract prices reflect prevailing market opinions and conditions. Prediction markets thus serve as sensitive information-gathering tools that can provide insights for stakeholders—including businesses, individuals, governments, and educational institutions.    This is not theoretical.    Kalshi has recently announced partnerships with CNN and CNBC, which make use of its market data in their reporting.[12]

41.     Kalshi has recently launched a platform, Kalshi Research, to share market data with academics and promote research derived from the same.[13]    Data generated through prediction markets can also help to set rates and prices for assets whose value depends on the occurrence or non-occurrence of the underlying event. *See* 7 U.S.C. § 5(a) (derivatives contracts, including event contracts, "are affected with a national public interest by providing" both a means for hedging risk and "disseminating pricing information through trading in liquid, fair and financially secure trading facilities").

**B.     Congress Delegated the Power to Regulate Event Contracts That Are Offered by a Regulated Exchange to the CFTC.**

42.     Futures contracts have long been regulated by the federal government.    In 1936, Congress passed the CEA, which provides for federal regulation of all commodities and futures trading activities and requires that all futures and commodity options are traded on organized, regulated exchanges.

43.     In 1974, Congress established the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA.    Proponents of the 1974 Act were

---

[12] *See* James Faris, *Prediction giant Kalshi strikes a new media partnership with CNBC, days after its CNN deal*, Business Insider (Dec. 4, 2025), https://www.businessinsider.com/kalshi-cnbc-deal-cnn-data-integration-partnership-2025-12; R.T. Watson, *Kalshi inks exclusive CNBC deal as prediction markets surge into mainstream media*, The Block (Dec. 4, 2025), https://www.theblock.co/post/381415/kalshi-exclusive-cnbc-deal-prediction-markets-surge-mainstream-media.

[13] *See Kalshi launches new research arm*, Kalshi News (Dec. 22, 2025), https://news.kalshi.com/p/kalshi-launches-research-arm-prediction-markets.

4938-8185-1542

concerned that the "states . . . might step in to regulate the futures markets themselves," thus subjecting futures exchanges to "conflicting regulatory demands." *Am. Agric. Movement*, 977 F.2d at 1156. One Senator remarked that "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark). As a solution, the House Committee on Agriculture put "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 76, 82 (1974). The Senate reaffirmed the CFTC's exclusive power by deleting a provision of the CEA that would have preserved the states' authority over futures trading. *See* 120 Cong. Rec. 30464 (1974) (statements of Sens. Curtis and Talmadge).

44.    The CFTC regulates derivatives that reference physical commodities like "wheat, cotton, rice, corn, oats." 7 U.S.C. § 1a(9). The CFTC also regulates derivatives on intangible "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9).

45.    In 2010, Congress amended the CEA to add "swaps" to the CFTC's exclusive jurisdiction and to define event contracts as a type of swap. *See id.* §§ 1a(47)(A)(ii), (iv), (vi); *KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *2–3 (D.D.C. Sep. 12, 2024). "Event contracts" are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i).

46.    The CFTC has also recognized that "event contracts," including contracts on "the outcome of particular entertainment events," "can be designed to exhibit the attributes of either options or futures contracts." *Concept Release*, 73 Fed. Reg. 25,669, 25,669–70 (May 7, 2008). An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence—for example, the occurrence or severity of a hurricane. Where event contracts pay out based on financially significant

occurrences, they are "of the character of" futures and options, as understood by derivatives markets. *See* 7 U.S.C. § 1a(36) (defining "option").

47.    Also, in 2010, Congress amended the CEA to add a "Special Rule" governing event contracts. Congress provided that the CFTC "may"—but need not—conclude that event contracts are "contrary to the public interest" if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C).

## C.    Entities That Offer Event Contracts Must Comply with the Comprehensive Regulatory Framework Established by the CEA and CFTC.

48.    The public can only trade derivatives on a board of trade that the CFTC has designated as a contract market, or DCM. 7 U.S.C. §§ 2(e), 6(a)(1), 7(a); 17 C.F.R. § 38.3(a). An entity must first submit an application to the CFTC detailing how the entity complies with the Core Principles of the CEA. 17 C.F.R. § 38.3(a)(2). Among other things, the proposed contract market must show that it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor, and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300. Proposed exchanges must provide detailed information demonstrating their capacity to abide by the CEA. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the purported market's designation within 180 days of submission. 17 C.F.R. § 38.3(a)(1).

49.    Once the CFTC designates an entity as a contract market, the CEA gives the CFTC "exclusive jurisdiction" over the derivatives traded on the market. Those derivatives

- 16 -

include "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to "event" contracts. *See id.* §§ 1a(47)(A)(ii), (iv), (vi).

50.    The CFTC engages in significant oversight over DCMs. Part 38 of Title 17, Chapter 1 of the Code of Federal Regulations comprehensively regulates DCMs, ensuring that these markets continue to comply with the CEA. Exchanges must meet detailed requirements to maintain their DCM designation. 17 C.F.R. pt. 38. Among other things, DCMs must abide by recordkeeping requirements that specify the form, manner, and duration of retention. 17 C.F.R. §§ 38.950, 1.31. DCMs must meet reporting obligations like furnishing daily reports of market data on futures and swaps to the CFTC. 17 C.F.R. § 38.450 pt. 16. Part 38 also imposes specific liquidity standards, disciplinary procedures, dispute resolution mechanisms, board of directors requirements, auditing demands, and more.

51.    The CEA allows DCMs to list contracts on its exchange without pre-approval from the CFTC. To do so, a DCM self-certifies that a given contract complies with the CEA and CFTC regulations by filing a "written certification" with the CFTC at the time of listing. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The CFTC may initiate review of any contract under its purview. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c). The CFTC also may require a DCM to submit a "written demonstration" that it is "in compliance" with one or more Core Principles at any time. 17 C.F.R. § 38.5(b).

52.    Alternatively, exchanges have the option of submitting contracts to the CFTC for approval prior to listing. 7 U.S.C. § 7a-2(c)(4)(A); 17 C.F.R. §§ 40.3(a), 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA. 7 U.S.C. § 7a-2(c)(5)(B). Substantially all contracts listed by DCMs for trading are self-

- 17 -

certified by the listing DCMs; it is extremely rare for a DCM to seek CFTC approval of individual contracts.

53.    The CEA's enforcement process rounds out the comprehensive federal framework that regulates futures derivatives sold on DCMs.  The CEA gives the CFTC discretion as to how to police and enforce violations of the CEA for DCMs.  The CFTC includes an Enforcement Division, which may initiate investigations and, with the approval of a majority of the CFTC, pursue enforcement actions in federal court or administrative proceedings.  If the Enforcement Division concludes that there has been a violation of the CEA, it may recommend to the CFTC that it seek a wide range of enforcement measures, including (1) civil monetary penalties, (2) restitution, (3) disgorgement, (4) suspension, denial, revocation, or restriction of registration and trading privileges, and (5) injunctions or cease-and-desist orders.  *See* CFTC Division of Enforcement, Enforcement Manual (May 20, 2020), https://www.cftc.gov/media/1966, at § 3.3.  If the Enforcement Division suspects that an entity has engaged in criminal violations, the Enforcement Division may also refer the matter to the Department of Justice or the appropriate state authority for prosecution. *Id.*

**D.    After an Extensive Regulatory Process, the CFTC Registered Kalshi as a Contract Market That Operates Under Federal Law.**

54.    Kalshi is a CFTC-regulated exchange and prediction market where users can trade on the outcome of real-world events.  In 2020, the CFTC designated Kalshi as a contract market, affirming that its platform complied with the CEA.  Since then, Kalshi has been fully regulated as a financial exchange under federal law, alongside entities like the Chicago Mercantile Exchange and the Intercontinental Exchange.

55.    Kalshi specializes in event contracts, offering a secure and federally approved exchange where individual, retail, and institutional participants can hedge their risks on event-based outcomes.

- 18 -

4938-8185-1542

56.     Kalshi offers many kinds of event contracts related to an array of substantive areas like economics, finance, climate, technology, health, crypto, popular culture, and sports.  For example, Kalshi's platform currently allows users to trade on the level of US GDP growth in Q1 2026, the closing price of the S&P 500 at the end of 2026, whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030.  Kalshi also offers contracts on the outcomes of Supreme Court decisions, congressional votes, weather events, technological benchmarks, markers of cultural influence, and Federal Reserve interest rate decisions.

57.     Prior to making a contract available for trade on its platform, Kalshi self-certifies to the CFTC, pursuant to section 7a-2(c)(1) of the CEA, that the offering complies with the CEA and CFTC regulations.  Those certifications contain extensive information, including in confidential appendices not available to the public, for the CFTC's review.

58.     The CFTC also may require Kalshi to submit a "Demonstration of Compliance," which is "a written demonstration, containing supporting data, information and documents" that a DCM is required to file upon request from the CFTC to explain how the DCM "is in compliance with one or more core principles as specified in the request." 17 C.F.R. § 38.5(b).  The CFTC did just that with respect to Kalshi's first sports event contracts, and Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports event contracts traded on DCMs.

59.     The CFTC took no further action and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed, with no hint that the agency views these contracts as falling outside of its jurisdiction.  Had the CFTC deemed Kalshi's sports event contracts (or any other of its contracts) impermissible, it would have had the responsibility to "object[]" to the contracts.  7 U.S.C. § 7a-2(c)(3)(B)(ii).  But it did not. Unless and until the CFTC takes action on a self-certified Kalshi contract—and they all

- 19 -

have been self-certified—the contracts are authorized under federal law.  7 U.S.C. § 7a-2(c)(5).

**E.    ADG Threatened Kalshi with State Criminal Action with Regard to Its Event Contracts.**

60.    On May 21, 2025, the ADG sent Kalshi a cease-and-desist letter claiming that offering event contracts, including sports event contracts, based on future events without a license, violated Arizona law.  The letter directed Kalshi to "cease gambling operations in Arizona and desist from engaging those activities in the future."  Ex. 1, at 2.

61.    The ADG claimed that "there is no meaningful difference between buying one of [Kalshi's] offered contracts and placing a bet with any other sportsbook" and warned that, by offering event contracts without an ADG-issued license, Kalshi is participating in illegal "event wagering."  *Id.* at 1 (citing A.R.S. §§ 5-1301 *et seq.*).  The ADG went on to note that accepting wagers "with respect to the result or purported result of any race, sporting event, contest or other game of skill or chance or any other unknown or contingent future event or occurrence whatsoever" is presumed to constitute a crime in Arizona.  *Id.* (quoting A.R.S. § 13-3305(A)); *see also* A.R.S. § 13-3305(C) ("A person who violates this section is guilty of a class 1 misdemeanor.").

62.    The ADG further claimed that Kalshi was "avoiding regulatory requirements in Arizona to include [sic] licensing and background investigations, the prohibitions on wagers by persons under twenty-one (21) years of age, and requirements relating to integrity monitoring and problem gambling."  Ex. 1, at 1.  The ADG also declared that it would construe a decision by Kalshi to continue its operations in Arizona as "evidence of [Kalshi's] ongoing knowing and willful violation of the law."  *Id.* at 2.

63.    The ADG took the position that "Kalshi is subject to a potential restitution award for those who lost money, and an action forfeiting all monies it acquired, because of its illegal conduct" and that "[t]he statutes and criminal violations referred to in this letter are not exhaustive."  *Id.* at 2 (citing A.R.S. §§ 13-804 and 13-2314).  The ADG noted that

- 20 -

its letter was "intended only to place [Kalshi] on notice that [the ADG] is aware of Kalshi's conduct and to direct [Kalshi] to take immediate steps to comply with Arizona law." *Id*. The letter concluded by threatening possible "filing of criminal charges or a civil action against Kalshi and/or its principals or employees." *Id*.

### F.    The ADG Threatens All Event Wagering Operators with Revocation of Their Licenses for Partnering with DCMs Like Kalshi Inside or Outside Arizona.

64.    On September 15, 2025, the ADG sent a letter to "Event Wagering Operators" licensed in Arizona, warning them against doing business with DCMs, including Kalshi (the "Event Wagering Operator Letter"). *See* Ex. 2.

65.    The Event Wagering Operator Letter noted that entities with a sports-gaming license in Arizona have been considering entry into the "prediction marketplace by acquiring an existing DCM, becoming a DCM or a Futures Commission Merchant ('FCM'), or associating or partnering with a DCM or FCM directly or indirectly, to offer, enable, or sell event contracts outside the framework of state gambling laws." *Id.* at 1.  The ADG threatened that an Arizona operator's choice "to offer, enable, or sell event contracts to persons in this state through their own DCM or FCM," or "to associate, coordinate, or otherwise partner directly or indirectly with persons or entities offering or facilitating the offering, enabling, or sale of event contracts in Arizona without a license," would be considered as part of the ADG's evaluation of the "continued suitability for that person or entity to maintain a license." *Id.* at 2.

66.    The ADG also declared that the threat applies even if the licensee is not "associated directly with the offering or sale of event contracts to persons in Arizona." *Id.* at 2.  The ADG made clear that the threat extends to a licensee *or licensee affiliate* that partners with an entity offering, enabling, or selling event contracts *in other jurisdictions*. *See id.* ("So, for example, if the [ADG] believes that an entity related to a licensee is

- 21 -

partnered with a company that is selling event contracts in a jurisdiction outside Arizona in violation of the laws of that jurisdiction, that might . . . impact a licensing decision.").

67.    The upshot of this threat is that any Arizona licensee that partners with Kalshi not just in Arizona, but in any other state around the country, is at risk of losing their license.  This includes Arizona licensees who partner with Kalshi to offer sports contracts in New Jersey and Tennessee, where federal courts have enjoined state attempts to prohibit Kalshi's sports event contract offerings, as well as in the many states in which no such enforcement has even been attempted.

68.    The ADG's message to its gaming licensees has been clear: ***Kalshi's business is operating in violation of the law and if you do business with Kalshi anywhere in the country, your license is in jeopardy***.

**G.    Defendants Have Not Provided Assurances of Non-Enforcement.**

69.    Kalshi has made good-faith efforts to engage the ADG in dialogue.  While the parties engaged in productive conversations following receipt of the ADG's May 21, 2025 cease-and-desist letter, by March 2026, Kalshi became concerned that Defendants may imminently bring an enforcement action against Kalshi.

70.    On March 11, 2026, Kalshi's counsel attempted to contact representatives of Defendants to obtain written assurances of non-enforcement.  Defendants' representatives did not respond.

71.    Kalshi therefore has no option but to seek judicial relief.  The ADG's cease-and-desist letter, the Event Wagering Operator Letter, and the multiple amicus briefs submitted in courts across the country, and Defendants' refusal to engage with Kalshi's standstill proposal suggest that Defendants believe Kalshi's event contracts in Arizona violate Arizona law and that Kalshi may be immediately subjected to action by the State.  Absent any assurances of non-enforcement, Kalshi (and its users) face a threat of irreparable harm, leaving Kalshi with no choice but to protect its commercial interests and those of its users and bring this suit.

- 22 -

## REQUISITES FOR RELIEF

72.     As a result of Defendants' threatened conduct described above, there is a strong likelihood that Defendants will take action, including, but not limited to, the enforcement of preempted state law threatened by Defendants' statements, which will violate the Supremacy Clause of the U.S. Constitution, and will subject Kalshi and its customers to irreparable harm.

73.     An actual and substantial controversy exists between Kalshi and Defendants as to their respective legal rights and duties.  Defendants' conduct has already resulted in, and will continue to result in, irreparable injury to Kalshi, including but not limited to economic hardship, lost business opportunities, and impairment of existing contractual relationships.

74.     Kalshi has no plain, speedy, or adequate remedy at law to address the wrongs described herein.  Kalshi therefore seeks declaratory and injunctive relief restraining Defendants from enforcing Arizona law that interferes with the operation and function of Kalshi's futures market described herein.

## COUNT I

## (SUPREMACY CLAUSE—PREEMPTION BY COMMODITY EXCHANGE ACT)

75.     Plaintiff incorporates all prior paragraphs by reference.

76.     The Supremacy Clause, Article VI, Clause 2, of the U.S. Constitution, provides:

> THIS CONSTITUTION, AND THE LAWS OF THE UNITED STATES WHICH SHALL BE MADE IN PURSUANCE THEREOF; AND ALL TREATIES MADE, OR WHICH SHALL BE MADE, UNDER THE AUTHORITY OF THE UNITED STATES, SHALL BE THE SUPREME LAW OF THE LAND; AND THE JUDGES IN EVERY STATE SHALL

- 23 -

BE BOUND THEREBY, ANY THING IN THE CONSTITUTION OR LAWS OF ANY STATE TO THE CONTRARY NOTWITHSTANDING.

77.    The Supremacy Clause mandates that federal law preempt state law in any field over which Congress has expressly or impliedly reserved exclusive authority to the federal government, or where state law conflicts or interferes with federal law.

78.    Congress explicitly gave the CFTC "exclusive jurisdiction" to regulate futures trading on approved exchanges.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to futures regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos."  Senate Hearings at 685 (statement of Sen. Clark).  Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in futures trading on CFTC-regulated exchanges. *See, e.g.*, *Am. Agric. Movement*, 977 F.2d at 1156; *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (Friendly, J.); *Jones v. B.C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

79.    In threatening to enforce Arizona's anti-gambling laws against Kalshi, Defendants are impermissibly intruding on the CFTC's exclusive authority to regulate futures trading on CFTC-regulated exchanges.  Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same putative subject matter.  Because federal law occupies the entire field of regulating trading on designated contract markets, Defendants' threatened actions are both expressly and impliedly field-preempted under the Supremacy Clause.

80.    In addition, Defendants' threatened actions conflict with federal law and policy.  Defendants seek to ban event contracts that the CFTC has opted to authorize (and to subject the website on which such contracts are offered to abatement), which would plainly frustrate the CFTC's exclusive authority to regulate DCMs.  If Kalshi were forced

4938-8185-1542

1    into compliance with Arizona law, it could be forced to comply with 49 other states' laws,

2    producing the patchwork of state-by-state regulation Congress in the CEA sought to

3    prohibit.  And because federal law requires Kalshi to offer impartial access to its exchange,

4    compliance with Arizona law would jeopardize Kalshi's compliance with the federal

5    obligations to which it is subject.  For that reason, the threatened actions are conflict-

6    preempted under the Supremacy Clause.

7        81.    Defendants may not enforce Arizona's anti-gambling laws against Kalshi

8    because Kalshi is a federally regulated exchange that operates under the exclusive

9    oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 *et seq.*

10                          **PRAYER FOR RELIEF**

11        WHEREFORE, Plaintiff Kalshi requests that judgment be entered in its favor and

12    against Defendants as follows:

13        1.    Enter a judgment declaring that A.R.S. §§ 5-1301(4)(a), 5-1301(23)(a), 5-

14    1303(A), 13-3305(A), 13-804, 13-2314, any rules adopted thereunder, and any other

15    Arizona law that is used in a manner to effectively regulate Plaintiff's designated contract

16    market violates the Supremacy Clause of the U.S. Constitution as applied to Plaintiff, and

17    a declaratory judgment under 28 U.S.C. §§ 2201-2202 saying the same;

18        2.    Enter an injunction prohibiting Defendants, their officers, agents, servants,

19    employees, and all persons in active concert or participation with them who receive actual

20    notice of the injunction, from enforcing A.R.S. §§ 5-1301(4)(a), 5-1301(23)(a), 5-1303(A),

21    13-3305(A), 13-804, 13-2314, any rules adopted thereunder, or any other Arizona law that

22    attempts to effectively regulate Plaintiff's exchange, against Plaintiff; and

23        3.    Any other relief within this Court's discretion that it deems just and proper.

24

25

26

27

28

- 25 -

SNELL
& WILMER

Dated: March 12, 2026                 Respectfully submitted,

                                       SNELL & WILMER L.L.P.


By: *s/ Taryn J. Gallup*
      Adam E. Lang
      Matt Jarvey
      Derek C. Flint
      Taryn J. Gallup

      and

      Neal Katyal (*pro hac vice* forthcoming)
      Joshua B. Sterling (*pro hac vice* forthcoming)
      William E. Havemann (*pro hac vice*
      forthcoming)
      **MILBANK LLP**
      1101 New York Avenue NW
      Washington D.C. 20005

      Grant R. Mainland (*pro hac vice*
      forthcoming)
      Andrew L. Porter (*pro hac vice* forthcoming)
      **MILBANK LLP**
      55 Hudson Yards
      New York, NY 10001


      Attorneys for Plaintiff
      KalshiEX LLC

4938-8185-1542