Adam E. Lang (#022545)
Matt Jarvey (#031350)
Derek C. Flint (#034392)
Taryn J. Gallup (#035002)
**SNELL & WILMER LLP**
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone:    602.382.6000
Facsimile:     602.382.6070
Email: alang@swlaw.com
        mjarvey@swlaw.com
        dflint@swlaw.com
        tgallup@swlaw.com

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
Email: nkatyal@milbank.com
        jsterling@milbank.com
        whavemann@milbank.com

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
Email:  gmainland@milbank.com
        aporter@milbank.com

*Attorneys for Plaintiff*
*KalshiEX LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KalshiEX LLC,<br><br>               Plaintiff,<br><br>      v.<br><br>Jackie Johnson, in her official capacity as Director of the Arizona Department of Gaming; Douglas Jensen, in his official capacity as Chief Law Enforcement Officer of the Arizona Department of Gaming; Arizona Department of Gaming; and Kristin K. Mayes, in her official capacity as Attorney General for the State of Arizona,<br><br>               Defendants. | No. CV-26-01715-PHX-MTL<br><br>**PLAINTIFF'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF A PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER**<br><br>**ORAL ARGUMENT REQUESTED** |

KalshiEX LLC ("Plaintiff" or "Kalshi") moves the Court under Rule 65 of the Federal Rules of Civil Procedure for the entry of a temporary restraining order ("TRO") and preliminary injunction prohibiting Jackie Johnson, in her official capacity as Director of the Arizona Department of Gaming; Douglas Jensen, in his official capacity as Chief Law Enforcement Officer of the Arizona Department of Gaming; the Arizona Department of Gaming ("ADG"), as the state agency that regulates legal gambling in Arizona; Kris Mayes, in her official capacity as Attorney General of Arizona (together, "Defendants"); and Defendants' officers, agents, servants, employees, and all persons in active concert or participation with them who receive actual notice of the TRO and preliminary injunction, from enforcing A.R.S. §§ 5-1301(4)(a), 5-1301(23)(a), 5-1303(A), 13-3305(A), 13-804, 13-2314, or any other Arizona law that attempts to regulate Kalshi's exchange. This motion for a TRO and preliminary injunction (the "Motion") is made on the following grounds.

Defendants are unconstitutionally threatening to prohibit trading on Kalshi's federally designated contract market ("DCM"), even though Kalshi's contracts are federally authorized; Congress preempted state law by granting the CFTC "exclusive jurisdiction" to regulate trading on DCMs; and Arizona law exempts "bona fide business transactions that are valid under the law of contracts including contracts for the purchase or sale at a future date of securities or commodities" from its definitions of "gambling," "gamble," and "wager." Defendants have indicated their mistaken belief that Kalshi is operating unlawfully in Arizona, and Kalshi has reasonable belief that they are preparing to take imminent action to force Kalshi to cease offering event contracts in the state. These threats to enforce preempted state laws subject Kalshi to irreparable harm and require immediate preliminary relief.

Every marker of congressional intent confirms that Congress intended to preempt state regulation of trading on DCMs like Kalshi. The CEA's text grants the CFTC "exclusive jurisdiction" and thereby "supersede[s]" state law. 7 U.S.C. § 2(a)(1)(A). Congress sought to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974). Courts have

- 1 -

held for 50 years that "the CEA preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982).  The CFTC itself recognizes that "due to federal preemption, event contracts never violate state law when they are traded on a DCM."  Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583.  For that reason, two federal courts have granted Kalshi preliminary injunctions against the sort of state enforcement Defendants threaten here.  *See KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869, at *7 (M.D. Tenn. Feb. 19, 2026) ("Kalshi is likely to succeed on the merits because sports event contracts are 'swaps' and conflict preemption applies"); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025) (holding "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi).  These decisions adhere to a longstanding consensus that "the CEA preempts state bucket-shop laws and other anti-gambling legislation."  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 721 (1982).  And just last week, the CFTC issued an Advance Notice of Proposed Rulemaking Related to Prediction Markets in recognition of its authority in this area.  *See Prediction Markets*, 91 Fed. Reg. 6351 (Mar. 12, 2026) (*to be codified* at 17 C.F.R. ch. I).

Kalshi has no option but to seek immediate preliminary relief.  Kalshi faces myriad irreparable harms from Defendants' threats to enforce preempted state laws.  Kalshi attempted to contact representatives of Defendants to seek assurances of non-enforcement before filing this suit.  Defendants did not respond to Kalshi's outreach, though they had previously been willing to communicate with counsel.  Immediately after filing suit, Kalshi again asked Defendants on multiple occasions to confirm they would not seek enforcement while this action is pending; again Kalshi received no response.

Kalshi is likely to prevail on the merits, because federal law preempts the application of Arizona law against Kalshi.  The balance of harms and public interest

- 2 -

likewise favor Kalshi.  Kalshi therefore respectfully requests that this Court issue an immediate TRO, followed by a preliminary injunction.

**BACKGROUND**

**A.     The Exclusive Federal Scheme for Regulating Derivatives on DCMs.**

Derivative contracts are financial tools that traders use to mitigate risk.  *See KalshiEX LLC v. CFTC*, No. 23-3257, 2024 WL 4164694, at *1–2 (D.D.C. Sep. 12, 2024).  Event contracts are a type of derivative—they identify a future event with several possible outcomes, a payment schedule, and an expiration date.  *Id.* at *2.  The event contracts at issue here are traded on an exchange, so their prices are determined by market forces.  Kalshi does not set the price of any contract, and unlike a sportsbook there is no "house" that stacks the odds in its favor.  Declaration of Xavier Sottile ("Sottile Decl.") ¶¶ 33–34.[1]  This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a uniquely sensitive financial instrument that tracks real-world market perceptions.[2]  *Id.*  During the contract period, individuals can buy and sell the contract at changing prices; users may trade contracts in alignment with their desire to hedge risk.  Compl. ¶¶ 30-31, 33.  The ultimate value of a contract is determined at its expiration date—most commonly, the event's occurrence or a date upon which the contract terminates.  *See KalshiEX*, 2024 WL 4164694, at *2.  For example, a property owner on the Gulf Coast

---

[1] For this reason, federal law as enforced by the CFTC focuses on preventing market manipulation and disruption and ensuring market efficiency nationwide.  *See* 17 C.F.R. §§ 38.250, 38.152; *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156 (7th Cir. 1992), *abrogated on other grounds by Time Warner Cable v. Doyle*, 66 F.3d 867, 875 n.7 (7th Cir. 1995).

[2] Researchers at the Federal Reserve published a paper last month, indicating "that Kalshi markets provide a high-frequency, continuously updated, distributionally rich benchmark that is valuable to both researchers and policymakers," and finding that "in several episodes, they allocate probability mass in ways that may reflect the range of plausible macroeconomic outcomes better than traditional financial derivative or survey-based forecasts."  Diercks, Anthony M., Jared Dean Katz, and Jonathan H. Wright (Feb. 18, 2026), "Kalshi and the Rise of Macro Markets," Finance and Economics Discussion Series 2026-010, Washington: Board of Governors of the Federal Reserve System, https://doi.org/10.17016/FEDS.2026.010.

may place a position on whether a hurricane will strike the area around his property in 2026. *Id.* If a hurricane strikes, the property owner will receive payment on the contract, which mitigates financial losses associated with the hurricane. *Id.*

Congress passed the CEA in 1936 to regulate derivatives exchanges, but it initially chose not to preempt state regulation of those exchanges. In 1974, Congress amended the CEA to establish the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA and to grant the CFTC "exclusive jurisdiction" to regulate trading on the exchanges it oversees. These amendments were designed to "[b]ring[] all futures trading under federal regulation." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong., 2d Sess. 848 (1974) (hereinafter "Senate Hearings"). Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *Review of Commodity Exchange Act and Discussion of Possible Changes: Hearings Before the H. Comm. on Agric.*, 93d Cong., 1st Sess. 128 (1973). Subjecting exchanges to "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark).

Congress also deliberately reinforced the CFTC's exclusive jurisdiction. After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "where the jurisdiction of the [CFTC] is applicable, it supersedes State as well as Federal agencies." *Id.* at 23. The Senate also "struck" the existing CEA provision that preserved states' authority to regulate derivatives transactions. H.R. Conf. Rep. No. 93-1383, at 35 (1974). As the conference report explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.*

The CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The

- 4 -

exchange's application must detail its capacity to comply with all CFTC rules and regulations through a series of written submissions and exhibits. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the exchange's designation. *Id.* § 38.3(a)(1).

Once the CFTC designates an entity as a contract market—known as a "DCM"—the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements … and transactions involving swaps or contracts of sale of a commodity for future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to event contracts. *See id.* §§ 1a(47)(A)(ii), (iv), (vi). The CFTC also regulates derivatives on "excluded commodit[ies]" like interest rates, other financial instruments, economic indices, risk metrics, and—as particularly relevant here—events, which the CEA defines as any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. *Id.* § 1a(19)(iv); *see* 7 U.S.C. § 1a(9).

DCMs are subject to the CFTC's extensive regulatory framework as set out in the CEA and CFTC regulations. Together, these provisions establish a comprehensive scheme for regulating DCMs. *See Flaherty*, 2025 WL 1218313, at *1–2 (summarizing CFTC's regulatory scheme). The CEA prescribes a specific method by which the CFTC may approve new contracts on DCMs. A DCM that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The contracts are effective on the first day after the Commission receives the certification unless and until the CFTC initiates review of any contract. *See* 17 C.F.R. § 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B). If a DCM offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including but not limited to revocation of licensing, civil penalties, and criminal enforcement.

In 2010, Congress amended the CEA to add a "Special Rule" specifically addressing event contracts, which are "agreements, contracts, transactions, or swaps in excluded commodities." 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.*; *see also* 17 C.F.R. § 40.11(a) (implementing Special Rule). The decision to prohibit an event contract that falls within any of these categories is subject to the CFTC's evaluation of the "public interest." *See KalshiEX*, 2024 WL 4164694, at \*3 ("[T]he CFTC may determine that an agreement, contract, or transaction is contrary to the public interest only if it involves" one of the enumerated categories). The Special Rule further provides that no contract "determined by the Commission to be contrary to the public interest . . . may be listed or made available for clearing or trading on or through a registered entity." 7 U.S.C. § 7a-2(c)(5)(C)(ii).

**B.    Kalshi's Federal Registration as a CFTC-Regulated Designated Contract Market.**

In 2020, the CFTC certified Kalshi as a DCM, affirming that its platform complies with the CEA's regulatory requirements. *KalshiEX*, 2024 WL 4164694, at \*4. Because Kalshi is a DCM, its event contracts are subject to the CFTC's "exclusive jurisdiction." 7 U.S.C. § 2(a)(1)(A). Federal law requires Kalshi to comply with a host of federal requirements designed to ensure market integrity. An exchange's status as a DCM "imposes upon it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to "enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent price manipulation, cornering and other market disturbances." *Am. Agric. Movement*, 977 F.2d at 1150–51.

Kalshi offers event contracts related to economics, finance, health, cryptocurrencies, popular culture, and sports. Compl. ¶ 56. For example, Kalshi's platform currently allows users to trade on whether India will meet its 2030 climate goals, or whether the market share for electric vehicles will be above 50% in 2030. *Id.* Shortly after Kalshi self-certified its first sports event contract in January 2025, the CFTC requested that Kalshi submit a demonstration of compliance with the CEA for those contracts, pursuant to 17 C.F.R. § 38.5(b). Compl. ¶ 58. Kalshi responded with lengthy memoranda detailing its listings' compliance with applicable rules and regulations and the CFTC's jurisdiction over sports event contracts traded on DCMs. *Id.* The CFTC took no further action, and has since allowed thousands of Kalshi's sports event contracts to be listed, traded, and closed. *Id.* ¶ 59. These contracts, like all of Kalshi's contracts, are lawful under federal law, and they fall under the CFTC's exclusive jurisdiction. *Id.* ¶¶ 2, 13.

## C.    The Arizona Regulatory Scheme for "Event Wagering."

The ADG has stated its (mistaken) belief that Kalshi is participating in illegal "event wagering." Porter Decl., Ex. 1, at 1 (citing A.R.S. § 5-1301 *et seq.*). The definition of "[g]ambling[,]" "gamble[,]" or "wager" under Arizona law includes risking something of value for the opportunity to obtain a benefit from "a future contingent event." A.R.S. § 13-3301(6). "Event wagering" is broadly defined as "accepting wagers on sports events or other events . . . by any system or method of wagering, including in person or over the Internet through websites and on mobile devices." A.R.S. § 5-1301(4)(a). The ADG has represented that accepting wagers "with respect to the result or purported result of any race, sporting event, contest or other game of skill or chance or any other unknown or contingent future event or occurrence whatsoever" is presumed to constitute a crime in Arizona "absent some exception (none of which apply to Kalshi)", Ex. 1, at 1–2 (citing A.R.S. § 13-3305(A)), which can carry a term of incarceration up to six months. A.R.S. § 13-707.

Arizona's own anti-gambling laws exempt "bona fide business transactions that are valid under the law of contracts including contracts for the purchase or sale at a future date of securities or commodities" from the definitions of "gambling," "gamble," and "wager."

- 7 -

A.R.S. § 13-3301(6). Nonetheless, Defendants maintain that "[g]iven the lack of licensure and compliance with Arizona statutes and regulations related to event wagering," Kalshi's offering of event contracts "is illegal." Porter Decl., Ex. 1 at 1.

### D.    Defendants' Cease-and-Desist Letter and Subsequent Threats to Kalshi.

On May 21, 2025, the ADG sent Kalshi a cease-and-desist letter claiming that its offering of event contracts without a license violated Arizona law. The letter directed Kalshi to "cease gambling operations in Arizona," warned that Kalshi is participating in illegal "event wagering," and threatened the "filing of criminal charges or a civil action against Kalshi and/or its principals or employees." Porter Decl., Ex. 1, at 1-2 (citing A.R.S. § 5-1301 et seq., § 13-3305(A)). Kalshi's counsel discussed this letter with representatives of ADG and the Arizona Attorney General's Office, who suggested they were amenable to providing Kalshi with notice prior to initiating an enforcement action and agreed to provide a written confirmation of that offer. However, Defendants never provided that written assurance.

Then, on September 15, 2025, the ADG sent a letter to Arizona-licensed "Event Wagering Operators," warning them against doing business with DCMs, including Kalshi. The ADG threatened that an Arizona operator's choice to offer event contracts through a DCM, or to partner "directly or indirectly" with entities offering event contracts in Arizona without a license, would impact the ADG's evaluation of "continued suitability for that person or entity to maintain a license." Porter Decl., Ex. 2, at 1-2. The threat extends even to licensees whose affiliates partner with entities offering event contracts in other jurisdictions. *Id*.

During the ensuing months, Defendant Mayes, in her official capacity as Arizona's Attorney General and on behalf of the State of Arizona, signed and submitted amicus briefs that claim Kalshi is violating comparable state laws by offering sports event contracts. *See generally* Brief of Amici Curiae, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. June 17, 2025), Dkt. No. 29 ("June Amicus"); Brief of Amici Curiae, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Dec. 22, 2025), Dkt. No. 41-1 ("December Amicus"); Brief of Amici

Curiae, *KalshiEX LLC v. Hendrick*, No. 25-7516 (9th Cir. Jan. 30, 2026), Dkt. No. 48.1 ("January Amicus"); Brief of Amici Curiae, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Mar. 10, 2026), Dkt. No. 76.1 ("March Amicus").  Those amicus briefs argue that states, not the CFTC, have the sole power to regulate Kalshi's sports event contracts. *Id*.  And although those cases were focused particularly on Kalshi's sports event contracts, the positions advanced by the amicus briefs could apply to **all** of Kalshi's contracts.  Amicus Brief of CFTC at 2–3, 17–18, 28–29, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Amicus Br.") (explaining that arguments advanced by states in attempting to regulate sports event contracts apply beyond sports events, and this conduct improperly usurps the CFTC's exclusive authority while causing "market fragmentation [that] erode[s] the nationally uniform framework Congress established to reduce risk, promote transparency, and safeguard market integrity within the financial system.").

The most recent of these amicus briefs was filed March 10, 2026 in the Ninth Circuit, where the Court of Appeals is scheduled to hear oral arguments next month.  The following day, on March 11, Kalshi's counsel attempted to contact representatives of Defendants to request written assurances of non-enforcement of Arizona state laws against Kalshi pending the Ninth Circuit's decision.  Porter Decl., Ex. 3.  Despite previous engagement by these representatives, Kalshi's request was met with silence.

As detailed above, Kalshi has endeavored in good faith to reach a resolution with Arizona, but despite repeated requests, Defendants have not provided written assurances of non-enforcement.  The lack of assurances, combined with the clear threats in the ADG's cease-and-desist letter and the letter to event wagering operators, has led Kalshi to believe that enforcement action is imminent.  Sottile Decl. ¶¶ 18-63.  On March 12, Kalshi notified the Arizona Attorney General of this action after filing its complaint, but it again received no response.  Porter Decl., Ex. 4.  Kalshi is left with no choice but to respectfully request that this Court enter a TRO and preliminary injunction.

**ARGUMENT**

Federal Rule of Civil Procedure 65 governs preliminary injunctions and TROs. To obtain such relief, the moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). The legal standards for obtaining a TRO and a preliminary injunction are "substantially identical." *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017) (quoting *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001)). "A preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships . . . tips sharply towards' it, as long as the second and third *Winter* factors are satisfied." *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017). For the reasons district courts in Tennessee and New Jersey granted Kalshi a TRO and a preliminary injunction in similar cases, Kalshi satisfies each element of the inquiry.

**A.   Kalshi Is Likely to Succeed Because Arizona's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations.**

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law either expressly or impliedly. One manner of preemption is known as field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Alternatively, federal law can preempt state law where compliance with both is impossible or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2

SNELL
& WILMER

(1976) https://scholarship.law.vanderbilt.edu/vlr/vol29/iss1/1/.  Arizona's gambling laws are no exception.

  1.  <u>Kalshi's Event Contracts Are Swaps Subject to the CEA's Exclusive Jurisdiction.</u>

  As a threshold matter, Kalshi's event contracts are swaps under the plain language of the CEA.  Kalshi's contracts "provide[]" for payment based on the "occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii).  "Associated" commonly means "connect[ed]." *See Associated*, Oxford English Dictionary (3d ed. 2011).  A swap thus requires an event connected to a potential financial, economic, or commercial consequence.  Congress's choice of "potential" is "broad."  Oral Argument at 3:44–3:53, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir. Sept. 10, 2025), ECF No. 80 (Chagares, C.J.: "Well it's not only that, it's associated with a *potential* financial, economic or commercial consequence.  I mean that's – that's pretty broad." (emphasis in original locution)), https://perma.cc/8YTV-Q8TW; *Orgel*, 2026 WL 474869, at *8 (citing same).

  Election and sports contracts both fit comfortably within this definition.  The outcomes of political events such as elections are connected to obvious financial consequences.  The outcomes of sporting events likewise are connected with financial consequences—often significant ones—for a broad ecosystem of stakeholders, including team sponsors, advertisers, television networks, franchises, local communities, and more.  They also have direct economic consequences for state-regulated sportsbooks themselves, which face substantial financial risks associated with sports events (if their customers win, they lose, providing a natural hedging need).  Some sportsbooks have turned to Kalshi's contracts to hedge their financial risks accordingly.[3]

---

[3] Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, In Game (Oct. 22, 2025), https://perma.cc/BT4A-BK8T.

- 11 -

Kalshi's contracts are also futures or options in "excluded commodities." Excluded commodities include intangibles such as commercial benchmarks. *See* 7 U.S.C. § 1a(19). Congress also expressly defined "excluded commodity" to include "occurrence[s]" that are "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). An "occurrence"-based futures contract or option results in a payment based on a specified occurrence or extent of an occurrence—for example, the occurrence or severity of a hurricane.[4] Kalshi's event contracts likewise pay out based on financially significant occurrences and thus are "of the character of" futures and options, as understood by derivatives markets. *See id.* § 1a(36) (defining "option").

The Special Rule confirms that Congress considered "event contracts" to be subject to CFTC jurisdiction, regardless of whether they are understood as swaps or futures. *Id.* § 7a-2(c)(5)(C)(i). That provision gives the CFTC jurisdiction to review specified types of "agreements, contracts, transactions, or swaps in excluded commodities." *Id.* The CFTC itself has repeatedly confirmed that it understands Kalshi's contracts to fall within that provision. In 2008, before the CFTC's jurisdiction encompassed swaps, it recognized that event contracts, which may be based on "varied" eventualities such as "the results of political elections, or the outcome of particular entertainment events," could be structured as "futures" or "options." *Concept Release*, 73 Fed. Reg. 25,669, 25,669-71 (May 7, 2008).

2.    Arizona's Gambling Laws Are Expressly and Impliedly Field Preempted as Applied to Kalshi's Event Contracts.

Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption "categories" "are not 'rigidly distinct,'" and "'field' preemption may fall into any of the categories of express, implied, or conflict preemption"). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203–13 (1983). Courts can also infer field preemption from a scheme of "federal statutory

---

[4] *See CME to Launch Hurricane Futures and Options on Futures Contracts*, CME Group (Feb. 14, 2007), https://perma.cc/5MKV-WCTH.

directives" that "provide a full set of standards" designed to function "as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines*, 312 U.S. at 72). "Where Congress occupies an entire field," "even *complementary* state regulation is impermissible." *Id.* (emphasis added). Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation. Every marker of congressional intent confirms that Congress has preempted the field.

*Statutory Text*: The text of the 1974 amendments to the CEA could hardly be clearer. Congress established the CFTC and granted it "*exclusive jurisdiction*" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.

The "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to other entities. *Mississippi v. Louisiana,* 506 U.S. 73, 77–78 (1992). The Supreme Court has repeatedly instructed that state law is preempted where a federal agency's jurisdiction is "exclusive." *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). And courts have easily found that statutes containing similar language preempt parallel state law regulation. *See Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (federal statute completely preempts state action when "the scope of a statute indicates that Congress intended federal law to occupy a field exclusively"); *BNSF Ry. Co. v. Hiett*, 22 F.4th 1190, 1194 (10th Cir. 2022) (statutory grant of "exclusive jurisdiction" preempted state law "by its plain language").

Other features of Section 2(a)'s text confirm its preemptive effect. The statute contains a savings clause providing it does not "supersede" state regulatory authority, but crucially, the clause applies *"[e]xcept as hereinabove provided"* by the exclusive jurisdiction grant. 7 U.S.C. § 2(a)(1)(A). That proviso enables a "logical inference" of

- 13 -

preemption as to matters within the CFTC's exclusive jurisdiction. *Omnipoint Commc'ns, Inc. v. City of Huntington Beach,* 738 F.3d 192, 194-196 (9th Cir. 2013). Because the savings clause clarifies that state law is not "supersede[d]" as *to off-DCM* transactions, it confirms that state law is superseded as *to on-DCM* transactions. Indeed, Congress added the proviso specifically to ensure that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies." S. Rep. No. 93-1131, at 6.[5]

*Statutory Purpose*: Congress in the 1974 Act sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ from one jurisdiction to the next. One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation." *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001). As one sponsor of the 1974 Act explained, "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark).

Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 82 (1974). The Conference Report confirmed Congress's intent to preempt the field: "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned*." H.R. Conf. Rep. No. 93-1383 at 35 (emphasis added).

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC. Writing for the Second Circuit, for example, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges. *Leist*, 638 F.2d at 322; *see also Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive jurisdiction

---

[5] While some courts have found that the CEA does not prevent states from barring Kalshi's event contracts, those decisions are mistaken and have been appealed. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. 2025); *KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575, 2025 WL 3286282 (D. Nev. Nov. 24, 2025); *KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, slip op. (S.D. Ohio Mar. 9, 2026).

clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act"). Defendants' effort to regulate Kalshi's event contracts cannot be reconciled with that clear congressional purpose.

*Drafting History*:  The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi.  To "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading.  120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis); *see also Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947).  And after House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC.  S. Rep. No. 93-1131, at 31 (1974).  The language ensured that "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies."  *Id.* at 6. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had previously relied on "to hold that the CEA did not preempt state regulation."  Van Wart, *supra*, at 692–93.  "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language."  *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442–43 (1987).  The Senate's decision to omit provisions allowing concurrent state jurisdiction over trading on DCMs is yet further proof of Congress's intent to preempt parallel state regulation.

*The CFTC's Position*:  The CFTC clearly views prediction markets as subject to its exclusive jurisdiction.  In 2024, the CFTC informed the D.C. Circuit that "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM."  Brief for Appellant at *27, *KalshiEX LLC v. CFTC*, 119 F.4th 58 (D.C. Cir. 2024) (No. 24-5205), 2024 WL 4512583 (emphases added).  Just last month, the CFTC stated that "commodity derivatives markets require nationally uniform rules . . . to prevent the type of fragmented oversight" that would result from state enforcement.  CFTC Amicus Br. at 1.  In the

- 15 -

CFTC's view, event contracts, including sports-event contracts, fall "comfortably within" the CEA and under its regulatory authority. *Id*. at 19.

The CFTC's March 12, 2026 Advance Notice of Proposed Rulemaking Related to Prediction Markets supports the agency's position that prediction markets are subject to its exclusive jurisdiction. *See Prediction Markets*, 91 Fed. Reg. 6351, 6354 n.5 (noting that Section 2(a)(1)(A) "expressly extends the CFTC's 'exclusive jurisdiction' to encompass 'transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market designated pursuant to [CEA section 5, 7 U.S.C. 7] ….'"); *see also Prediction Markets Advisory*, CFTC Letter No. 26-08, at 1 (Mar. 12, 2026) (providing DCMs with guidance regarding their responsibilities as to the listing of event contracts that may carry risk of manipulation).

*Comprehensive Regulatory Scheme*:  The comprehensive nature of the regulatory scheme Congress created for DCMs is further evidence that Congress intended to foreclose concurrent state jurisdiction. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368–69 (1986).  As the Supreme Court has found, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch*, 456 U.S. at 356 (quoting H.R. Rep. No. 93-975, at 1 (1974)).  An exchange may only offer derivatives after undergoing an extensive review process and receiving the CFTC's designation as a DCM.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100.  Once an exchange is designated as a DCM, the CFTC enjoys "exclusive jurisdiction" over the derivatives traded on the market.  7 U.S.C. § 2(a)(1)(A).  DCMs are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* § 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties, *id.* pt. 38.  Congress elected to allow DCMs to list contracts by self-certifying that they comply with the CEA's requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(2).  Congress then gave the CFTC the back-end authority to conduct a review of a contract if it believes the contract may run afoul of any statute or regulation.

SNELL & WILMER

*See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).  Violations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the Special Rule specifically authorizes the CFTC to bar certain event contracts deemed to be "contrary to the public interest" and "involv[ing]" certain categories of activities.  7 U.S.C. § 7a-2(c)(5)(C)(i); *see generally* 17 C.F.R. § 40.11.  The Special Rule is not mandatory—the CFTC "may" prohibit a contract involving a listed activity or it may determine that such a contract would not be contrary to the public interest. *Id.* Congress thus left the decision to one federal authority—not 50 separate states and the District of Columbia.  *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025) (because the CFTC has "exclusive jurisdiction," "the only enforcement mechanism belongs to the [CFTC]"); CFTC Amicus Br. at 21 (the CEA's "exclusive jurisdiction" provision "preempts application of state gambling laws to event contracts trading on DCMs.").

Congress granted an enforcement role to states—but that role expressly *excludes* the right to enforce state laws against DCMs.  The CEA authorizes state officials to bring suit regarding CEA violations, but a proviso limits that authorization to only actions against parties "*other than a [designated] contract market.*"  7 U.S.C. § 13a-2(1) (emphasis added).  The CEA also allows states to enforce "antifraud" laws, but not antigambling laws. *Id.* § 13a-2(7); *see Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 207 (N.D. Ala. 1981) ("this specific allowance of antifraud proceedings must be deemed to preclude antigambling proceedings.").  Congress further made clear that the CEA does not "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so.  7 U.S.C. § 16(e)(1)(C).  In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees but permitted federal and state agencies to police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (emphasis added).  Thus, the CEA does not call into question the

- 17 -

state's authority to regulate casinos or entities that are not DCMs. But the CEA's comprehensive scheme for regulating DCMs evinces Congress's intent to preempt the field.

Other federal laws reinforce this intent. The Unlawful Internet Gaming Enforcement Act of 2006 ("UIGEA") generally prohibits use of the internet to transmit wagers between states "where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), but provides that the term "bet or wager" "*does not include*" transactions conducted on "a registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E) (emphasis added). UIGEA underscores Congress's understanding that, under the CEA, state gambling laws do not reach trading on DCMs. *See Blue Lake Rancheria*, 2025 WL 3141202, at *6 (Kalshi's "internet contracts are not bets or wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling' even if the contracts are received, placed or transmitted from persons" where gambling is unlawful under local law).

Arizona's own laws implicitly recognize the CEA's preemptive effect, exempting "bona fide business transactions that are valid under the law of contracts including contracts for the purchase or sale at a future date of securities or commodities" from the definitions of "gambling," "gamble," and "wager." A.R.S. § 13-3301(6). That means, properly applied, Arizona law does not reach businesses like Kalshi, which operate under the federal scheme.

3.    Arizona Laws Are Conflict-Preempted as Applied to Kalshi.

As another court recently held regarding similar state laws, *see Orgel*, 2026 WL 474869, at *9-10, Arizona gambling laws are conflict-preempted as applied to Kalshi. It would be "impossible" for Kalshi "to comply with both state and federal law," and Arizona's laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby*, 530 U.S. at 372-73. In at least three respects, subjecting Kalshi's event contracts to Arizona law would conflict with the CEA.

*First*, Congress passed the 1974 Amendments to bring futures markets "under a uniform set of regulations." *Am. Agric. Movement,* 977 F.2d at 1156. "[A] contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Id.* The Seventh Circuit held that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156–57 (internal citations omitted).

Courts commonly find conflict preemption where a statute provides for a uniform federal scheme. The Supreme Court has found state law to conflict with federal law where permitting state regulation was "at odds with the goal of uniformity that Congress sought to implement." *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990); *see Botsford v. Blue Cross & Blue Shield of Mont., Inc.*, 314 F.3d 390, 393-95 (9th Cir. 2002) (finding conflict preemption where "[t]he application of different state standards would disrupt the nationally uniform administration" provided by federal statute).

Subjecting Kalshi to Arizona's gambling laws would conflict with Congress's goal of a uniform federal scheme. Piecemeal state-by-state regulation is precisely what Congress sought to avoid, and the conflict is made even clearer when considering the possibility that 49 other states might also attempt to subject Kalshi to their own state laws (as several have). That state-by-state regulation would erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67. As a Tennessee federal court recently held in granting Kalshi a preliminary injunction, "state law likely stands as an obstacle to . . . the CEA's primary objective: uniform regulation of the derivatives market," because it "would directly affect trading on Kalshi by limiting who can trade with whom." *Orgel*, 2026 WL 474869, at *10.

*Second*, compliance with Arizona law would be impossible. As Defendants noted in their cease-and-desist letter, "The operation of event wagering in Arizona is allowed only if conducted pursuant to A.R.S. §§ 5-1301 *et seq.*, which requires, among other things,

- 19 -

licensure.  *See e.g.,* A.R.S. § 5-1303(A)."  In order to comply with Arizona's licensing requirements, Kalshi would need to limit access to the exchange solely to persons making trades in Arizona.  *See* Ariz. Admin. Code § R19-4-102 ("Event wagers . . . shall only be accepted from persons within the State pursuant to the Act and this Article.").  The requirement to accept trades only within one state would be impossible for a nationwide exchange like Kalshi, required by federal law to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services."  17 C.F.R. § 38.151(b) (emphasis added); CFTC Amicus Br. at 25-26 (noting that "a DCM is required by federal law to provide 'impartial access' to all eligible participants nationwide," and that a DCM "cannot fulfill its federal mandate" if it imposes geographical restrictions).[6]  If Arizona could subject Kalshi to state laws, 49 other states could do the same, resulting in the patchwork that Congress recognized would make operating a DCM impossible.  Again, a Tennessee district court recently agreed that compliance with state law would "violate" Kalshi's impartial-access obligation, making it "impossib[le]" to comply with both state and federal law.  *Orgel*, 2026 WL 474869, at *9– 10.

*Third*, a state law stands as an "obstacle" where it hampers "the careful balance struck by Congress."  *Arizona*, 567 U.S. at 406.  Where Congress "entrust[s]" the federal government with "discretion" over violations of federal law, a state regime that allows for state prosecutions of the same actions is "preempted by federal law."  *Id.* at 407-10.  Otherwise, a state could bring charges "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies."  *Id.* at 402.  Congress authorized the CFTC to review contracts involving "gaming" and bar them if "contrary to the public interest."  7 U.S.C. § 7a-2(c)(5)(C)(i).

---

[6] Even if Kalshi could somehow exclude Arizona residents from participating in its exchange, CFTC's Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of *price distortions and market disruptions*."  17 C.F.R. § 38.255 (emphasis added).  Abruptly closing Kalshi's event contracts to anyone located in Arizona as a result of the Defendants' threats of criminal liability would constitute exactly that sort of market disruption.

The CFTC declined to initiate such review of Kalshi's contracts. Compl. ¶ 59. Allowing states to impose their own judgments would nullify the CFTC's exclusive right to engage in public-interest review. *See Crosby*, 530 U.S. at 380.

**B.    Kalshi Will Suffer Irreparable Harm Without a TRO and Preliminary Injunction.**

The Ninth Circuit "*presume[s]* that a constitutional violation causes a preliminary injunction movant irreparable harm and that preventing a constitutional violation is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1046 (9th Cir. 2023). In addition, the loss of market share or business opportunities constitutes irreparable harm. *See Innovative Health Techs. v. Urmeev*, 2020 WL 4346751, at *5 (D. Ariz. July 29, 2020); *CH2O, Inc. v. Meras Eng'g, Inc.*, 2017 WL 1700844, at *2 (C.D. Cal. May 2, 2017) (loss of "market position and share" shows irreparable harm.). The analysis "focuses on irreparability, 'irrespective of the magnitude of the injury.'" *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (quoting *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999)).

Defendants' actions threaten Kalshi with a "Hobson's choice" giving rise to irreparable harm—either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). As the district courts in Tennessee and New Jersey recognized in similar cases, Kalshi suffers irreparable harm in several respects. *Orgel*, 2026 WL 474869, at *10–11; *Flaherty*, 2025 WL 1218313, at *6.

*First*, if Kalshi chooses not to comply with Defendants' threats, Kalshi and its officers face the harms associated with criminal prosecution. A party facing imminent enforcement under a preempted state statute suffers "irreparable injury." *Morales*, 504 U.S. at 381; *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("credible threat of prosecution" under a preempted state statute amounts to irreparable harm). Defendants' statements that Kalshi is operating illegally and their threats to revoke licenses of entities that partner with Kalshi amount to just such a threat. Three other states recently

commenced enforcement proceedings against Kalshi, confirming a real threat of enforcement. *See Commonwealth of Mass. v. KalshiEX LLC*, No. 2584-cv-02525 (Mass. Sup. Ct.); *State of Nevada ex rel. Nevada Gaming Control Bd. v. KalshiEX LLC*, No. 260000050-1B (Nev. Dist. Ct.); *People ex rel. Nessel v. KalshiEX LLC*, No. 26-001087-CZ (Mich. Cir. Ct. Ingham Cnty.). Defendants' threats not only subject Kalshi's officers to the prospect of criminal liability but also generate uncertainty that will harm Kalshi. One of Kalshi's partners, for example, declined to roll out a partnership with Kalshi in some states as a direct response to the threat of enforcement actions by Nevada authorities. Sottile Decl. ¶ 61. If Defendants act on their threats and harm Kalshi's business relationships, that alone amounts to irreparable harm.

*Second*, compliance with Defendants' threats would subject Kalshi to extensive unrecoverable harms. Kalshi has nearly 100,000 users in Arizona with millions of dollars in open contracts. Sottile Decl. ¶ 31. Compliance would require Kalshi to forgo this business, with no prospect of recouping losses. If Kalshi complied with Defendants' unconstitutional threats during the pendency of this litigation, it would forgo business in this market, with no prospect of recouping its losses even if it ultimately prevails. Moreover, any attempt to force Kalshi to cease operating in Arizona would subject Kalshi to extraordinary technological challenges and costs. Kalshi has no current obligation to geolocate its users on a real-time, state-by-state basis. *Id.* ¶ 25. Attempting to implement geolocation capabilities would take months and cost tens of millions of dollars annually. *Id.* ¶¶ 28–29. And because the Eleventh Amendment bars damages against state officials, Kalshi would have no way of recovering its losses. *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (concluding that monetary harm "is irreparable here because [plaintiffs] will not be able to recover monetary damages" due to damages immunity).

*Third*, a TRO and preliminary injunction are needed to protect not only Kalshi but also its users. Immediately shuttering access to contracts for Arizona users could require Kalshi unilaterally to terminate contracts and liquidate users' positions, or to pause trading on these contracts pending the outcome of litigation months or more in the future. Sottile

- 22 -

Decl. ¶¶ 42, 49. Under either scenario, this would be an extraordinary and disruptive act, harming users not just in Arizona but nationwide, because cutting off access to users in one state would substantially distort the markets and contract prices for users in other states. As described above, Kalshi is not a party to any event contract traded on its exchange. Compl. ¶ 30; Sottile Decl. ¶¶ 34, 47. Therefore, people "located in Arizona" are inevitably transacting with persons located in other states, which means that the harms flowing from Defendants' threats would be suffered not only in Arizona, but in all other states— including New Jersey and Tennessee, where federal courts have preliminarily enjoined enforcement of state laws against Kalshi. Sottile Decl. ¶¶ 43, 47. This constitutes irreparable harm. *See Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) ("[L]ikely interference with customer relationships" resulting from breach of contract constitutes irreparable harm).

*Fourth*, Kalshi will face irreparable reputational harm if no injunction is granted. If an Arizona state enforcement action against Kalshi is not preempted, the threat of prosecution undermines its reputation as a lawfully licensed DCM. But bowing to Defendants' threats would undermine users' confidence and make them fear their positions are at risk. Sottile Decl. ¶¶ 59-62. This loss of goodwill could not easily be regained and constitutes irreparable harm. *See Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013); *see Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 866 (9th Cir. 2017) (loss of goodwill cannot readily be remedied with damages). Moreover, abruptly terminating Kalshi's event-based contracts in Arizona would risk violating the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255. *See* CFTC Amicus Br. at 25–26 (noting a DCM "cannot fulfill its federal mandate" if it complies with state-by-state regulation). A TRO and preliminary injunction are needed to prevent Kalshi from suffering irreparable harm during the pendency of this litigation.

SNELL & WILMER

- 23 -

**C.      The Balance of the Equities and Public Interest Favor a TRO and Preliminary Injunction.**

When the government is a party to a lawsuit, the Ninth Circuit "consider[s] the balance of equities and the public interest together." *Azar*, 911 F.3d at 581.  When deciding whether to issue a preliminary injunction, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24.  And the Ninth Circuit has held that "plaintiffs who are able to 'establish[ ] a likelihood that [a] policy violates the U.S. Constitution . . . have also established that both the public interest and the balance of the equities favor a preliminary injunction.'"  *Baird*, 81 F.4th at 1042 (quoting *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014)).

"[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol*, 732 F.3d at 1029 (citation and internal quotation marks omitted).  "In such circumstances, the interest of preserving the Supremacy Clause is paramount." *Cal. Pharmacists Ass'n v. Maxwell–Jolly*, 563 F.3d 847, 852–53 (9th Cir. 2009).  The Tennessee and New Jersey courts found as much. *Orgel*, 2026 WL 474869, at *11; *Flaherty*, 2025 WL 1218313, at *7.  Arizona, by contrast, lacks any interest in enforcing a state law that is preempted—especially a law that, by its terms, excludes lawful contracts like Kalshi's event contracts. *See Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010); *Arizona*, 567 U.S. at 401.

Beyond that, the failure to issue an injunction would "reach[] beyond the parties, carrying with it a potential for public consequences." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).  Ceasing operations in Arizona would harm Kalshi's users and impose intractable technological difficulties.  Sottile Decl. ¶¶ 18–63.  Abrupt cessation would make it difficult to inform users in Arizona of their rights and obligations regarding ongoing event contracts and cut off users' access to their positions on Kalshi's exchange. *Id*. ¶ 46.  And the harms would be suffered by counterparties nationwide, including in

- 24 -

Tennessee and New Jersey where similar enforcement actions have been enjoined. *Id*. ¶ 47. Because Arizona's laws are preempted as applied to Kalshi, the balance of the equities and public interest firmly favor preliminary relief.[7]

## **CONCLUSION**

For the foregoing reasons, the Court should issue a temporary restraining order and preliminary injunction.

---

[7] Fed. R. Civ. P. 65(c) requires a party seeking a TRO or preliminary injunction to "give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Rule 65(c) invests this Court "with discretion as to the amount of security required, if any." *Barahona-Gomez v. Reno*, 167 F.3d 1228, 1237 (9th Cir. 1999); *see also Connecticut Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) ("The court has wide discretion in setting the amount of the bond."). Defendants will suffer no nonspeculative damage by halting enforcement against Kalshi during the pendency of this litigation. Accordingly, no security is needed. *See Doctor's Associates, Inc. v. Stuart,* 85 F.3d 975, 985 (2d Cir. 1996) (affirming decision not to require bond). Alternatively, should the Court require a security, only a de minimis security is warranted. Kalshi is prepared to obtain a security forthwith should the court deem one appropriate.

DATED: March 16, 2026

Respectfully submitted,

**SNELL & WILMER L.L.P.**


*/s/ Matt Jarvey*
Adam E. Lang (#022545)
Matt Jarvey (#031350)
Derek C. Flint (#034392)
Taryn J. Gallup (#035002)

and

Neal Katyal (*pro hac vice* forthcoming)
Joshua B. Sterling (*pro hac vice* forthcoming)
William E. Havemann (*pro hac vice* forthcoming)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice* forthcoming)
Andrew L. Porter (*pro hac vice* forthcoming)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
*Attorneys for Plaintiff KalshiEX LLC*

SNELL & WILMER