**KRISTIN K. MAYES**
**Attorney General**
(Firm State Bar No. 14000)

Joshua D. Bendor (Bar No. 031908)
Alexander W. Samuels (Bar No. 028926)
Joshua A. Katz (Bar No. 039449)
William Y. Durbin (Bar No. 036941)
(*application pending*)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Joshua.Bendor@azag.gov
Alexander.Samuels@azag.gov
Joshua.Katz@azag.gov
William.Durbin@azag.gov
ACL@azag.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| KalshiEX LLC, | No. CV-26-1715-PHX-MTL |
| Plaintiff, | |
| v. | **DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| Jackie Johnson, et al., | |
| Defendants. | |

Kalshi would have this Court believe that, in a bill regulating financial markets (the Dodd-Frank Wall Street Reform and Consumer Protection Act) in 2010, Congress silently gave the Commodity Futures Trading Commission ("CFTC") exclusive and preemptive authority to regulate sports gambling—and no one realized it until 2025. Even more outlandish, Kalshi must contend that when the Supreme Court invalidated a prior federal statute that expressly prohibited almost all sports gambling in 2018, the Supreme Court totally failed to realize that Congress had already given the CFTC exclusive authority over sports gambling through Dodd-Frank. But Congress does not hide elephants in mouseholes, and the Supreme Court is not composed of fools. Nor does the text of the Dodd-Frank amendments hold that sports bets are swaps that states may not regulate. Thus, this Court should not enjoin the State from regulating sports gambling in the manner established by the elected branches, the people of Arizona, and agreed to with the 22 Tribes whose sovereign nations lie within Arizona.

But the Court need not reach the merits of this issue. As Defendants will show in their response on the Order to Show Cause, *Younger* abstention squarely applies and prevents a federal court from enjoining the pending state criminal matter against Kalshi.

## BACKGROUND

Plaintiff KalshiEX LLC ("Kalshi") operates an online platform, registered with the CFTC as a designated contract market ("DCM"), where users can trade "event contracts." These "contracts" let users wager on sporting events, elections, and other areas, via "yes" or "no" positions. *See* "What Is Kalshi? A Beginner's Guide," https://news.kalshi.com/p/what-is-kalshi-f573. Kalshi offers bets on the outcomes of professional football and basketball games, college basketball games, and elections (e.g., whether Andy Biggs will win the 2026 Republican Party primary election for Governor). *See* Information at 2–4, 6–7, 13, *State v. KalshiEX LLC*, Nos. CR 2026-000173-001, -002 (Maricopa Cnty. Super. Ct.) ("Information") (ECF No. 17-1 Ex. 3); *see also* Kalshi, All sports Odds & Predictions 2026, https://kalshi.com/category/sports/all-sports; Kalshi, Election Prediction Markets & Odds, https://kalshi.com/category/elections. Kalshi also allows users to bet whether a

particular player will score at least a certain number of points in a game, whether a particular famous person will attend a prominent event (e.g., Will Elon Musk attend the Super Bowl?), and whether proposed legislation will become law (e.g., the SAVE Act). *See* Information at 5, 6, 14; *see also* Kalshi, Politics Prediction Markets & Odds, https://kalshi.com/category/politics.

Kalshi users can also place "parlay" bets, stringing together multiple wagers for an increased payout if all the wagers are successful (e.g., whether a team will win a game by at least a certain number of points, whether a particular player will score at least a certain number of points in that game, and whether a particular player may make at least a certain number of three-point shots in that game). *See* Information at 11. Users can even wager on whether the announcers on a professional basketball broadcast will say words like "airball" or "alley-oop." *See* Kalshi, Announcers at Denver vs Phoenix Professional Basketball Game, https://kalshi.com/markets/kxnbamention/nba-mention/kxnbamention-26mar25denphx.

**I.    Arizona constructed a framework for limited legalized sports "event wagering" but continues to make election wagering illegal.**

The regulation of gambling is "concededly within the police powers of a state." *Ah Sin v. Wittman*, 198 U.S. 500, 505–06 (1905). But only within the last 10 years have states begun to legalize sports wagering within their boundaries, following the U.S. Supreme Court's decision in *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 486 (2018), which found the Professional and Amateur Sports Protection Act violated the anticommandeering doctrine by restricting states' ability to regulate sports gambling, thus recognizing the authority of states to make their own gambling policy choices.

While Arizona has permitted event wagering only since 2021, the Tribal nations in the State have operated casinos since the early 1990s and are well-versed in gambling regulation in partnership with the Department. After deliberation and consultation with the public and experts, including the Department and Tribal nations, the Arizona Legislature passed the 2020 Gaming Act, A.R.S. §§ 5-1301 *et seq.* (the "Act"), allowing

event wagering in the State.  The Act was included as part of the 2021 amended and restated Tribal-State Gaming Compacts,[1] and Rules implementing the Act were put through an extensive public comment process, resulting in a framework that reflects the policies of the State and the values of Arizonans.

### A. Licensing for Event Wagering Operators

"Event wagering" is "accepting wagers on sports events or other events, portions of sports events or other events, the individual performance statistics of athletes in a sports event or combination of sports events or the individual performance of individuals in other events or a combination of other events by any system or method of wagering, including in person or over the Internet through websites and on mobile devices." A.R.S. § 5-1301(4)(a).  "Wager" means the same thing as "gamble."[2]  The operation of event wagering in Arizona is allowed only if conducted pursuant to the Act, which requires, among other things, licensure.  *See, e.g.*, A.R.S. § 5-1303(A).

Event wagering of any type may only be operated in the State by a limited number of licensed event wagering operators ("EWOs"), who must meet a wide range of regulatory standards intended to protect the public's interests.  The Department is responsible for investigating applicants and licensing EWOs, and it has authority to revoke, suspend, or deny a license.  *See* A.R.S. § 5-1302.  The Act also prohibits those with insider knowledge or who could have an influence on the outcome of events from being licensed.  *See* A.R.S. §§ 5-1301(16), 5-1311(A).

EWOs are required to pay percentages of adjusted gross event wagering receipts

---

[1] Interpreting the Act as a violation of federal law such that Kalshi can operate unlicensed event wagering in Arizona may lead to arguments about the impact on the Tribal-State Gaming Compacts, in particular the triggering of Compact Section 3(h)(1), termed the "poison pill."

[2] These terms are defined as "risking . . . something of value for the opportunity to obtain a benefit from a game or contest of chance or skill or a future contingent event . . . ." A.R.S. § 13-3301(6).  That provision includes an exception for "bona fide business transactions that are valid under the law of contracts including contracts for the purchase or sale at a future date of securities or commodities . . . ."  All gambling is illegal in Arizona unless a statute excludes it as legal.  A.R.S. § 13-3302.

as privilege fees to the State. A.R.S. § 5-1318(A); Ariz. Admin. Code R19-4-112(A). These fees go to the State's general fund as well as for gambling regulation. A.R.S. § 5-1318; Ariz. Admin. Code R19-4-111. EWOs paid almost $43 million in privilege fees to the State in calendar year 2024. *See* American Gaming Ass'n, https://www.americangaming.org/wp-content/uploads/2025/02/Arizona_Overview.pdf.[3]

## B.    Criminal and other provisions

A.R.S. § 13-3305(A) makes it a crime to accept wagers on the result of "any race, sporting event, contest or other game of skill or chance or any other unknown or contingent future event or occurrence whatsoever," unless it is excepted as "[r]egulated gambling" under A.R.S. § 13-3302(A)(3). Offering or selling event contracts to persons located within Arizona without a license violates Arizona law. A.R.S. § 5-1303(A).

Even EWOs are not permitted to facilitate election wagering under Arizona law. Such wagers on "any contingency whatever arising out of [an] election" are illegal without exception. A.R.S. § 16-1015.

## II.    Congress enacted and amended the Commodity Exchange Act to regulate the markets for futures and other derivatives; it created the CFTC to enforce it.

The Commodity Exchange Act ("CEA") regulates trading in futures—contracts to buy or sell a specific quantity of a commodity at a specific price on a specific date. 7 U.S.C. §§ 1, *et seq.* In 1936, Congress enacted the CEA to regulate grains and other commodities, as well as futures contracts based on those commodities. Pub. L. No. 74-675, § 3, 49 Stat. 1491, 1491 (1936). "A futures contract enables an investor to hedge the risk that the price of the commodity will change between the date the contract is entered and the date delivery is due—without having to take physical delivery of the commodity." *CFTC v. Noble Metals Int'l, Inc.*, 67 F.3d 766, 772 (9th Cir. 1995).

In 1974, Congress established the CFTC and amended the CEA to strengthen federal regulation of futures markets and to extend the CEA's coverage to derivatives

---

[3] This Court can consider hearsay "in deciding whether to issue a preliminary injunction." *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).

contracts (like options) and non-agricultural commodities. *See* Pub. L. No. 93-463, 88 Stat. 1389 (1974). Derivatives are financial contracts that derive their value from an underlying asset, such as stocks, bonds, commodities, or interest rates. Primarily used to hedge risk or speculate, they allow investors to take a position on (and benefit from) price movements without owning the asset itself. *See* Congressional Research Service, Introduction to Derivatives and the Commodity Futures Trading Commission (Mar. 13, 2025), https://www.congress.gov/crs-product/R48451. Congress gave the CFTC "exclusive jurisdiction" over futures and other derivatives (including transactions involving contracts of sale of a commodity for future delivery) that are traded or executed on exchanges registered with the agency, including "designated contract markets" ("DCMs"). 7 U.S.C. § 2(a)(1).

Trading in "swaps," a newer sort of derivative, fueled the 2008 financial crisis. In the wake, Congress amended the CEA through the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank"). *See* Pub. L. No. 111-203, pt. II, 124 Stat. 1376, 1658–754 (2010). Swaps are contracts between parties to exchange (and thus hedge risk on) their financial obligations, such as interest payments.[4] *See id.* Dodd-Frank amended Section 2(a) to add swaps to the list of derivatives under the CFTC's exclusive jurisdiction. *See id.* § 722(a); 7 U.S.C. § 2(a)(1). It further authorized the CFTC to regulate swaps and required they be traded on exchanges rather than directly between parties. *See* 7 U.S.C. §§ 1a(47)(A), 2(e). Because swaps shift real financial risk affecting interstate commerce and national public interest, Congress wanted them to be transparently priced as well as efficiently and securely traded. *See* 7 U.S.C. § 5. Centralized exchanges promote these goals.

---

[4] If Company A has a floating interest rate loan but believes interest rates may rise, it may hedge against the cost of rising rates by engaging in a swap. Company A would "swap" its floating rate obligation with Counterparty B who has a fixed-rate obligation. Company A will make fixed rate payments to Counterparty B, who will make floating rate payments to Company A. The parties use a "notional" principal amount and net the difference in payments; when rates rise, the net difference will amount to profit for Company A.

Finally, Dodd-Frank added a "Special Rule" that addresses event contracts, which are defined to be "agreements, contracts, transactions, or swaps in excluded commodities that are based upon the occurrence, extent of an occurrence, or contingency," with certain exceptions. 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA defines "excluded commodity" to include various financial or economic rates or indices (e.g., an interest rate) or an "occurrence, extent of an occurrence, or contingency (other than a change in the price, rate, value, or level of a commodity . . .) that is (I) beyond the control of the parties to the relevant contract, agreement, or transaction; and (II) associated with a financial, commercial, or economic consequence." 7 U.S.C. § 1a(19). The CFTC may prohibit companies from listing on a DCM certain event contracts as against the public interest, *see* 7 U.S.C. § 7a-2(c)(5)(C)(i), but the CFTC does not have exclusive jurisdiction over event contracts or excluded commodities, *see* 7 U.S.C. § 2(a)(1) (CFTC's exclusive jurisdiction provision, omitting these transactions).

As part of the CFTC's authority to prohibit transactions in contracts on a DCM that "are contrary to the public interest," it can prohibit transactions involving "gaming" or "activity that is unlawful under any Federal or State law." 7 U.S.C. § 7a-2(c)(5)(C)(i), (v). In 2011, the CFTC exercised that authority in promulgating Rule 40.11, which prohibits DCMs from listing event contracts that involve "gaming, or an activity that is unlawful under any State or Federal law," or any similar activity that the CFTC determines is contrary to the public interest. 17 C.F.R. § 40.11(a).

**III.    Kalshi offers event wagers that it asserts are swaps under the CEA.**

In June 2023, Kalshi "self-certified" its Congressional Control Contracts, which allowed users to bet on which political party would control each chamber of Congress after the 2024 election. KalshiEX LLC, Commission Regulation 40.2(a) Notification Regarding the Initial Listing of the "Will <chamber of Congress> be controlled by <party> for <term>?" Contract (June 12, 2023), https://www.cftc.gov/sites/default/files/filings/ptc/23/06/ptc0612232834.pdf. Through this "self-certification" process, the CEA allows DCMs like Kalshi to offer event contracts to its users without pre-approval from

6

the CFTC; the DCM need only provide a "written certification" one business day prior to the intended listing date.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).  The CFTC may review any contract under its purview.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.2(c).

The CFTC rejected Kalshi's Congressional Control Contracts submission, finding these election-related contracts constituted illegal "gaming" under the Special Rule, 7 U.S.C. § 7a-2(c)(5)(C), and 17 C.F.R. § 40.11.  *See* CFTC, In re KalshiEX LLC, No. 23-14 (Sept. 22, 2023); *see also* "CFTC Disapproves KalshiEX LLC's Congressional Control Contracts," P.R. No. 8780-23, 2023 WL 6173513 (Sept. 22, 2023).  Kalshi sued the CFTC under the Administrative Procedure Act in D.C. federal court.  The trial court granted summary judgment for Kalshi, finding that the contracts "involved" elections and not illegal activities or gaming; the court did not consider whether the contracts were contrary to the public interest.  *KalshiEX LLC v. CFTC*, No. 23-cv-3257 (JMC), 2024 WL 4164694, at *7 (D.D.C. Sept. 12, 2024).  Finding the CFTC had failed to show likelihood of harm to the public, the D.C. Circuit denied the CFTC's emergency motion for stay pending appeal, allowing Kalshi to list its contracts.  *KalshiEX LLC v. CFTC*, 119 F.4th 58, 64 (D.C. Cir. 2024).  After the change in administrations and ensuing leadership changes at the CFTC, it voluntarily dismissed its appeal on the merits last May.

At issue in that litigation was whether the election-related contract was "gaming" under the CEA.  The courts were not considering whether states could enforce their laws with respect to election wagering.  And at the time, Kalshi did not offer sports bets.  Kalshi therefore tried to contrast its election wager (which it contended was not gaming) with "a contract on the outcome of a sporting event," which Kalshi said is a "classic example" of "gaming" that should not be "conducted on derivatives markets" in the first place.  Brief of Appellee KalshiEx LLC at *41, *KalshiEX LLC v. CFTC*, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) (No. 24-5205).[5]  Two months later, Kalshi began offering sports event contracts, ahead of the 2025 Super Bowl.

---

[5] *See also* Brief of Appellee KalshiEx LLC at *17 ("An event contract . . . involves 'gaming' if it is contingent on a game or a game-related event—like the Kentucky Derby,

**IV.    Kalshi has marketed itself as a sports- and election-betting platform.**

Kalshi operates what it calls a "prediction market," offering event contracts relating to areas like finance, climate, popular culture, and sports. Compl. ¶¶ 23, 56. But the company recognizes the contracts on sporting events for what they are: sports betting. Kalshi has called itself the "first app for legal sports betting in all 50 states." *See KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575, --- F. Supp. 3d ---, 2025 WL 3286282, at *8 (D. Nev. Nov. 24, 2025) ("*Hendrick II*"). It relies heavily on sports betting; one report attributes about 90% of Kalshi's annualized revenue to sports, nearly $1.3 billion. *See* Grant Mitchell, *Kalshi, Prediction Markets Stealing Market Space from Top Sportsbooks*, Yahoo! Finance (Feb. 16, 2026), https://finance.yahoo.com/news/kalshi-prediction-markets-stealing-market-160600765.html.

**V.    Related litigation**

Arizona is the tenth state Kalshi has sued in an attempt to enjoin state laws. As of this filing, six federal cases have properly denied those attempts by Kalshi and its peers.[6] At least two state courts have also rejected Kalshi's preemption argument.[7] The two

---

Super Bowl, or Masters golf tournament, all of which were mentioned in the provision's only legislative history.")

[6] *See KalshiEX, LLC v. Schuler*, No. 2:25-cv-01165-SDM-CMV, 2026 WL 657004 (S.D. Ohio Mar. 9, 2026); *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-01541-APG-DJA, 2025 WL 3283308, at *1 (D. Nev. Nov. 25, 2025) ("*Robinhood*"), *appeal docketed*, No. 25-7831 (9th Cir. Dec. 12, 2025); *Hendrick II*, 2025 WL 3286282, at *14; *N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nev. Gaming Control Bd.*, No. 2:25-cv-00978-APG-BNW, 2025 WL 2916151, at *1 (D. Nev. Oct. 14, 2025) ("*Crypto*"), *appeal docketed*, No. 25-7187 (9th Cir. Nov. 14, 2025); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667 (D. Md. Aug. 1, 2025) ("*Martin*"), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025). On removal of a state enforcement action, another federal court found no preemption, remanding the case back to state court. *See State of Nevada ex rel. Nevada Gaming Control Board v. Kalshiex, LLC*, No. 2:26-CV-00406-MMD-MDC, 2026 WL 579364, at *5 (D. Nev. Mar. 2, 2026).

[7] *State of Nevada ex. rel. Nevada Gaming Control Board v. KalshiEX, LLC*, No. 26 0C 00050 1B, slip op. at 3–4 (1st Dist. Ct. Nev. Mar. 20, 2026) ("*NGCB*"); *Massachusetts v. KalshiEX, LLC*, No. 2584CV02525, 2026 WL 188019, *3–8 (Mass. Sup. Ct. Jan. 20, 2026) ("*Mass.*").

federal cases decided in Kalshi's favor are on appeal.[8]  Kalshi has appealed its own losses, too.  Pending before the Ninth Circuit is its appeal from *Hendrick II*, where the court dissolved a preliminary injunction against the Nevada Gaming Control Board blocking it from enforcing Nevada law against Kalshi.  *See Kalshiex, LLC v. Dreitzer*, No. 25-7516 (9th Cir.).[9]  The Ninth Circuit consolidated that case for oral argument (to be held April 16, 2026) with two others out of the Nevada District Court involving similar preemption issues and prediction market operators, Crypto.com and Robinhood.  *See Dreitzer*, No. 25-7516, ECF Nos. 75, 93 (9th Cir. Feb. 26, 2026).  A bipartisan group of 40 Attorneys General has submitted an amicus brief in support of Nevada.  *Id.* at ECF No. 48.1.

## VI.   Procedural posture of this case

Kalshi is not licensed as an EWO in Arizona.  On May 21, 2025, the Department sent Kalshi a cease-and-desist letter advising that its unlicensed event wagering operation was illegal, and that it could be in violation of criminal statutes.  Compl. ¶¶ 60-63.  The letter noted that Kalshi could be in violation of provisions beyond those cited, and that "[f]uture actions may include the filing of criminal charges."  *Id.* ¶ 63.

Kalshi filed this suit on March 12, 2026, and its Motion for Preliminary Injunction and Temporary Restraining Order ("Motion") on March 16.  Also on March 16, the Arizona Attorney General's Office filed a 20-count misdemeanor criminal information against Plaintiff and a related entity, Kalshi Trading LLC, charging illegal wagering in violation of A.R.S. § 13-3305(A)(1) and election wagering in violation of A.R.S. § 16-1015.  The parties are briefing the *Younger* abstention issue in parallel with this Motion.

**LEGAL STANDARD**

"A preliminary injunction is 'an extraordinary and drastic remedy, one that should

---

[8] *See KalshiEX LLC v. Orgel*, No. 3:26-cv-00034, 2026 WL 474869 (M.D. Tenn. Feb. 19, 2026), *appeal noticed*, ECF No. 55 (Mar. 20, 2026); *KalshiEX LLC v. Flaherty*, No. 25-cv-02152, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025), *appeal docketed*, No. 25-1922 (3d Cir. May 15, 2025).
[9] Chairman Dreitzer succeeded Chairman Hendrick on the Nevada Gaming Control Board, and the Ninth Circuit updated the caption accordingly.

not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)) (emphasis in original).  It is "never awarded as of right."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).  Moreover, when the preliminary injunction would alter, rather than preserve, the status quo (here, compelling State officials to refrain from enforcing duly enacted statutes), it is disfavored, and the movant's burden is heightened.  *See Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1319–20 (9th Cir. 1994).

To qualify for a preliminary injunction, a plaintiff must demonstrate: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in the plaintiff's favor, and (4) an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  "The third and fourth factors . . . merge into one inquiry when the government opposes" preliminary relief.  *Porretti v. Dzurenda*, 11 F.4th 1037, 1050 (9th Cir. 2021); *see also Nken v. Holder*, 556 U.S. 418, 435 (2009).

Alternatively, under the Ninth Circuit's sliding scale approach, a plaintiff must demonstrate (1) "serious questions going to the merits," (2) a likelihood of irreparable harm, (3) "the balance of hardships tips sharply in the plaintiff's favor," and (4) an injunction is in the public interest.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) (citations omitted).

## ARGUMENT

Under either framing of the legal standard, Kalshi fails.

### I.    Kalshi is unlikely to succeed on the merits.

Kalshi cannot demonstrate a likelihood of success on the merits, let alone make a "clear showing."  *Lopez*, 680 F.3d at 1072.  Nor can Kalshi demonstrate "serious questions going to the merits."  *Cottrell*, 632 F.3d at 1135.

There are two initial procedural points on which Kalshi cannot prevail.  First, Kalshi cannot obtain an injunction blocking the Department from enforcing the

10

challenged laws against it because the Department is a nonjural entity.  Second, Kalshi has not requested relief with respect to the State's election wagering law, A.R.S. § 16-1015.  This Court should not afford Kalshi relief it has not sought.

On the substance, Kalshi's event contracts do not fall under the CFTC's exclusive jurisdiction.  Even if the CEA did cover those event contracts, it does not preempt the State from enforcing gambling law as to those bets.

Kalshi's request for an injunction is also inequitable.  Kalshi told the CFTC and federal courts in D.C. that the CFTC did ***not*** have the power to stop it from listing the Congressional Control Contracts because those contracts were not within the scope of "gaming" under the CEA.  To persuade the courts, Kalshi distinguished those contracts from a contract on a sporting event, calling it a "classic example" of "gaming" that should not be "conducted on derivatives markets" in the first place.  Now that it offers sports event contracts, Kalshi would have this Court and a dozen others believe that the CFTC is the ***only*** authority it must answer to.  But, as the CFTC said itself, it "is not a gaming regulator," and it lacks the regulatory tools to "protect[] against gambling-specific risks and concerns, including customer protection concerns inherent to gambling."  Event Contracts, 89 Fed. Reg. 48968, 48982 (proposed June 10, 2024).[10]  Thus, "[p]ermitting event contracts involving gaming . . . to trade on CFTC-regulated markets would in effect permit instruments commonly understood as bets or wagers on contests or games to avoid these legal regimes and protections."  *Id.*

This Court should recognize that the CFTC does not have exclusive authority over Kalshi's sports- and election-event contracts, and that the State is empowered to hold Kalshi accountable for any violations of Arizona law.

**A.      Kalshi cannot obtain relief from the Department or Defendant Jensen.**

State law determines a party's capacity to be sued.  *See* Fed. R. Civ. P. 17(b)(3).  Kalshi cannot obtain an injunction against the Department because it is a nonjural entity,

---

[10] The CFTC recently withdrew this rule proposal.  *See* Event Contracts; Withdrawal of Proposed Regulatory Action, FR Doc. 2026-02454 (Feb. 6, 2026).

meaning it cannot sue or be sued. Under Arizona law, "[g]overnmental entities have no inherent power and possess only those powers and duties delegated to them by their enabling statutes." *McKee v. State*, 241 Ariz. 377, 384, ¶ 28 (App. 2016). "A governmental entity may be sued only if the legislature has so provided." *Id.* The legislature has not provided the Department the authority to sue or be sued. *See* A.R.S. §§ 5-604, 5-1302 (enabling statutes).

In addition, Kalshi makes no specific allegations against Defendant Jensen. His position is not identified in State law, and he does not have his own statutory authority (separate from that held by the Department and Director) relevant to this matter. Thus, as to Defendant Jensen, there is nothing for the Court to enjoin. There is no relief the Court can order against the Department or Defendant Jensen that will address Kalshi's alleged harm. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559–60 (1992).

**B.     Kalshi cannot obtain relief it has not requested.**

Kalshi has not moved to enjoin enforcement of Arizona's statue prohibiting election wagers, A.R.S. § 16-1015. Nor does its Complaint even mention that law. Kalshi therefore cannot have met its burden to show that the court should enjoin Defendants from enforcing that law. *See United States v. Sineneng-Smith*, 590 U.S. 371, 375 (2020) (emphasizing the importance of the party-presentation principle); Fed. R. Civ. P. 65(a)(1) ("The court may issue a preliminary injunction only on notice to the adverse party.").

**C.     Kalshi's sports- and election-event contracts are not under the exclusive jurisdiction of the CFTC.**

Turning to the merits, Kalshi argues that its sports- and election-event contracts are options, futures, or swaps. No matter what Kalshi calls them, the text of the CEA makes clear that these event contracts fall outside any exclusive federal jurisdiction.

**1.     Kalshi's sports- and election-event contracts are not swaps.**

The CEA provides several definitions of "swap." *See* 7 U.S.C. § 1a(47)(A). Kalshi contends that its event contracts on sporting events and elections meet the test of subpart (ii) because they "'provide[]' for  payment based on the 'occurrence,

12

nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence.'" Mot. at 11 (quoting 7 U.S.C. § 1a(47)(A)(ii)). Kalshi equates "occurrence, nonoccurrence, or the extent of the occurrence of an event" with an "outcome" of a sporting event or election. *See id.* It asserts such outcomes are connected to "obvious" or "significant" financial consequences. *Id.* On that basis, Kalshi says, the CEA "supersede[s]" state law and gives the CFTC "exclusive jurisdiction." *See id.* at 1 (citing 7 U.S.C. § 2(a)(1)(A)).

But Kalshi's proposed reading is strained and overly broad. The two federal district courts to have most recently decided this issue have found likewise, determining Kalshi's sports event contracts not to be swaps. *See Hendrick II*, 2025 WL 3286282, at *6–9; *Schuler*, 2026 WL 657004, at *4–7.[11] This Court should do the same.

"When interpreting a statute, [courts] are guided by the fundamental canons of statutory construction and begin with the statutory text." *United States v. Neal*, 776 F.3d 645, 652 (9th Cir. 2015). "[Courts] interpret statutory terms in accordance with their ordinary meaning, unless the statute clearly expresses an intention to the contrary." *Id.*

***First***, as the Nevada District Court found in *Crypto* and *Hendrick II*, the word "event" does not mean "outcome." The court interpreted the word "occurrence" to mean something happened,[12] and "event" to mean "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Hendrick II*, 2025 WL 3286282, at *3 (citing *Crypto*, 2025 WL 2916151, at *8).

In the specific context of sports, the court ruled that the "event" would be "the

---

[11] The *Martin* and *Massachusetts* courts assumed without deciding that Kalshi's contracts were swaps; they nevertheless found the CEA did not preempt state gambling law. *See Martin*, 793 F. Supp. 3d at 675, 679 n.4, 680; *Mass.*, 2026 WL 188019, *5, *9. As discussed in Argument § I.D, this is another basis on which this Court should deny relief.

[12] The court posited a boxing match could take place (occurrence), not take place (nonoccurrence), or go only three rounds (extent of the occurrence). *Crypto*, 2025 WL 2916151, at *8.

13

sporting event itself, not who wins it." *Id.* ("An ordinary American interpreting the word 'event' would conclude that the Kentucky Derby is an event. But who wins the Kentucky Derby is an outcome of that event, not a separate event in and of itself."). The same analysis would apply to an election—it is "a happening of some significance" that could occur or not occur. But a swap could not properly "depend" on its occurrence. If someone were interested in an "agreement, contract, or transaction . . . that is dependent" on its *outcome*, it would simply be a wager. The *Schuler* court reached a similar conclusion. 2026 WL 657004, at *6 (concluding that if all contracts for payment based on the *outcome* of a sporting event, meaning all sports bets, were treated as swaps, then all betting would be forced onto DCMs and every sportsbook in the country would be put out of business).

        ***Second***, the Nevada District Court found in *Hendrick II* that the requirement that an event or contingency be "associated with a potential, financial, economic, or commercial consequence" means it is "inherently joined or connected with a potential, financial, economic, or commercial consequence." *Hendrick II*, 2025 WL 3286282, at *6. An event contract on the Fed raising interest rates would be inherently joined with a financial consequence. The court rejected Kalshi's alternative reading, which would take into account "externalities like potential downstream financial consequences [of the event] such as parties extrinsic to the event betting on it." *Id.* An event contract on who will be the next Fed chairman would only have potential downstream financial consequences. As the court explained, "Congress did not define a swap as a contract on anything that happens or could happen." *Id.* If any conceivable happening is an event or contingency, and if any downstream economic consequence associates that event or contingency with a potential financial, commercial, or economic consequence, the words lose all meaning because they no longer limit the definition. *See United States v. Lopez*, 514 U.S. 549, 565 (1995) (rejecting a "rationale [that] lacks any real limits because, depending on the level of generality, any activity can be looked upon as commercial").

        The rest of the statutory definition of "swap" supports this conclusion. *See Fischer v. United States*, 603 U.S. 480, 487 (2024) ("[T]he canon of *noscitur a sociis* teaches that

14

a word is given more precise content by the neighboring words with which it is associated. That avoids ascribing to one word a meaning so broad that it is inconsistent with the company it keeps.") (brackets, citations, and quotations omitted).  The other subparts of the "swap" definition in section 1a(47)(A) refer almost exclusively to financial measures, indices, or instruments.  Subparts (i) and (iii) define swaps as agreements that directly relate to "1 or more interest or other rates, currencies, commodities, securities, instruments of indebtedness, indices, quantitative measures, or other financial or economic interests or property."  7 U.S.C. § 1a(47)(A)(i), (iii).  Subpart (iii) goes on to list specific examples of swaps, including an interest rate swap; a foreign exchange swap; an equity index swap; a debt swap; a credit spread; a weather swap; an energy swap; a metal swap; an agricultural swap; an emissions swap; and a commodity swap.

It follows that the "event or contingency associated with a potential financial, economic, or commercial consequence" used in subpart (ii) refers to events and contingencies that have a similarly direct and inherent association with matters of financial, economic, or commercial consequence—instruments meant to hedge real financial, economic, or commercial risk.[13]  *See Hendrick II*, 2025 WL 3286282, at *7 (similarly "[r]eading subpart (ii) in context of the surrounding subparts").  That does not include the outcome of the Suns game or the number of points Devin Booker scores.

Swaps are hedging tools.  There is no genuine basis to hedge against happenings that have no inherent financial, economic, or commercial significance, such as the number of three-point shots made or what announcers say during a basketball game.  Indeed, Kalshi bans the very people who could arguably use a sports-related event contract to hedge against risk: athletes and other "individuals involved in college and professional

---

[13] Under subpart (iv) of the "swap" definition, an "agreement, contract, or transaction" is a swap if it "is, or in the future becomes, commonly known to the trade as a swap." 7 U.S.C. § 1a(47)(A)(iv).  This seemingly open-ended provision must also be bound by these same limiting principles discussed here.  Indeed, if Kalshi's contracts are "commonly known" to be anything, it would be "bets" or "wagers."  In any event, Kalshi does not explain how it might rely on this provision.

sports." *See* Amy Calistri, *Kalshi Now Blocking Athletes, Politicians from Trading on Certain Markets*, Yahoo! Finance (Mar. 24, 2026), https://finance.yahoo.com/markets/options/articles/kalshi-now-blocking-athletes-politicians-162400034.html. It does so for good reason—those individuals are in a position to manipulate the outcome. But this underscores how absurd it would be to treat these event contracts as swaps or any other legitimate hedging instrument within the exclusive purview of the CFTC.

**2.      Kalshi's sports- and election-event contracts are not futures or options.**

Kalshi asserts that, even if its sports- and election-event contracts are not swaps, they are options or futures in "excluded commodities" under the CEA. Mot. at 12. They are not, for some of the same reasons they are not swaps. But even if Kalshi's sports- and election-event contracts were "excluded commodities," the CFTC does not have exclusive jurisdiction over excluded commodities. This Court should reject Kalshi's alternative argument, just as *Hendrick II* did. 2025 WL 3286282, at *10–12.

In addition to the general definition of "commodity," *see* 7 U.S.C. § 1a(9), the CEA includes a category of "excluded commodity," *id.* § 1a(19), over which the CFTC does not have exclusive jurisdiction, *see id.* § 2(a)(1)(A). An excluded commodity can be a financial rate (such as an interest rate) or index. *See id.* § 1a(19)(i)-(iii). Relevant here, it may also be "an occurrence, extent of an occurrence, or contingency" that is "associated with a financial, commercial, or economic consequence." *Id.* § 1a(19)(iv). This is almost identical to the relevant definition of what underlies a "swap." *See id.* § 1a(47)(A)(ii), discussed in Argument § I.C.1, above. And Kalshi's sports and election bets are not "excluded commodities" for the same reasons they are not swaps: they are contracts on the *outcome* of an event, not the "occurrence" of an event, and the outcome is not "associated with a financial, commercial, or economic consequence." *See* Argument § I.C.1, above.

In any event, the CFTC does not have exclusive jurisdiction over "excluded commodities." *See* 7 U.S.C. § 2(a)(1) (exclusive jurisdiction statute, which applies to

transactions involving commodities and swaps, but not "excluded commodities").[14] Thus, even if Kalshi's sports or election bets were transactions in "excluded commodities," that would not prevent Arizona from regulating them.

Moreover, even if Kalshi's sports- and election-event contracts were excluded commodities, they would not qualify for listing on a DCM, which further undermines the argument that Arizona is preempted from regulating them. The Special Rule authorizes the CFTC to prohibit the listing of contracts that are contrary to the public interest because they involve gaming or a similar activity. 7 U.S.C. § 7a-2(c)(5)(C). Rule 40.11 prohibits DCMs from listing event contracts that involve "gaming, or an activity that is unlawful under any State or Federal law." 17 C.F.R. § 40.11. First, as discussed above, Kalshi has already conceded before the D.C. courts that sports betting contracts amount to gaming. Second, unlicensed sports gambling is unlawful under Arizona law. *See* A.R.S. § 13-3305. Third, election wagering is unlawful under Arizona law, e.g., A.R.S. § 16-1015. Accordingly, Kalshi's contracts do not qualify for listing on exchanges.

Because Kalshi is unlikely to succeed in showing that its sports- and election-event contracts are swaps, options, or futures contracts under the exclusive purview of the CFTC, its Motion should be denied.

### D. The CEA does not preempt state law on sports-gaming or betting on elections.

Kalshi would have this Court find Congress intended to create a new "Wild West" of gambling, grabbing states' traditional police powers without expressly saying so. But

---

[14] Kalshi's contracts are also not "contracts of sale of a commodity for future delivery" within the CFTC's exclusive jurisdiction. *See* 7 U.S.C. § 2(a). Excluded commodities are primarily financial rates or indices "not sold 'for future delivery.'" *Hendrick II*, 2025 WL 3286282, at *11. To say Kalshi is offering contracts of sale of a sports event for future delivery is nonsensical. *See id.* By the same token, Kalshi is mistaken that its contracts are "for the purchase or sale at a future date of securities or commodities" and so exempt from Arizona gambling law as "bona fide business transactions." *See* A.R.S. § 13-3301(6). Kalshi's sports and election bets are not securities or commodities. And, in any event, that state law question is for the state court overseeing the pending criminal case, not a federal district court hearing an argument based on federal preemption.

17

even if Kalshi's contracts are covered by the CEA, that "power grab" did not happen. Accordingly, this Court should reject Kalshi's argument.

The presumption against preemption is strong. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996). Faced with "a field which the States have traditionally occupied, [courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* (cleaned up). It is "rare" for the Supreme Court to find "that Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (cleaned up).

**1.    The CEA does not field-preempt state law on sports-gaming or betting on elections.**

Field preemption applies where federal law "so thoroughly occupies a legislative field" that it leaves "no room" for state regulation. *Nat'l Fed'n of the Blind v. United Airlines Inc.*, 813 F.3d 718, 733 (9th Cir. 2016). Even if a statute suggests some preemptive intent, courts should "avoid 'interpreting the scope of the preempted field too broadly.'" *Martin*, 793 F. Supp. 3d at 680 (quoting *Sikkelee v. Precision Airmotive Corp.*, 822 F.3d 680, 689 (3d Cir. 2016)); *see Medtronic*, 518 U.S. at 484.

Kalshi's burden is to establish that Congress clearly and manifestly intended to strip states of their authority to regulate gambling simply because it is facilitating those wagers on a DCM. It cannot carry that heavy burden. Gambling regulation is among the most historically entrenched exercises of state police power in American law.

Kalshi makes much of Section 2(a)'s text, giving the CFTC "exclusive jurisdiction . . . with respect to accounts, agreements . . . , and transactions" involving "contracts of sale of a commodity for future delivery" and "swaps," so long as such transactions are conducted on DCM like Kalshi. 7 U.S.C. § 2(a)(1)(A). The provision also contains a savings clause: "[e]xcept as hereinabove provided, nothing contained in this section shall . . . supersede or limit the jurisdiction . . . conferred on . . . other regulatory authorities under the laws of the United States or of any State." *Id.*

18

Kalshi argues that this text must mean that Congress intended to preempt state sports gaming laws that would otherwise require DCMs to be licensed by the state. Kalshi reads the text to mean that, apart from any antifraud enforcement, states have no say over a DCM and what is traded on it. Here, again, Kalshi's view is overly broad. Congress may have intended to occupy the field of *commodity futures* when it enacted the CEA. *See Martin*, 793 F. Supp. 3d at 677–78. But concluding the "field" Congress intended to "occupy" included gambling goes too far.

The CEA also includes two express preemption clauses. 7 U.S.C. § 16(e)(2), (h). One of those clauses preempts state laws about select forms of "gaming." 7 U.S.C. § 16(e)(2). But the "gaming" the clause covers does not extend to sports betting or election wagering laws. *See KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 680–81 (D. Md. 2025) (7 U.S.C. § 16(e) ultimately references agreements, contracts, transactions in foreign currency, government securities, certain other commodities, and other things that are not sports or election contracts). Congress's inclusion of a specific preemption provision tailored to certain forms of gaming indicates that Congress did not intend to preempt other forms of gaming. *See Schuler*, 2026 WL 657004, at *8–9; *Mass.*, 2026 WL 188019, at *5–6; *Martin*, 793 F. Supp. 3d at 681; *see also Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992) ("Congress' enactment of a provision defining the pre-emptive reach of a statute implies that matters beyond that reach are not pre-empted."). Put differently, Congress considered which state laws to displace, and the presumption against preemption means state laws were otherwise preserved. More specifically, the CEA does not provide that it preempts state gaming laws of general application, or state sports wagering laws.

What's more, the CEA does not contain a comprehensive regulatory scheme for gaming. The regulatory scheme it does construct is meant for financially sophisticated parties, and it involves reporting obligations and liquidity standards. *See* Mot. at 16 (citing 17 C.F.R. §§ 38.450, pt. 16, 38.1101(a)(2)). But, unlike Arizona's and other states' regulatory schemes, it lacks measures applicable to gaming. Arizona's regulatory

framework includes licensing or background checks for participants.  *See* A.R.S. §§ 5-1304, 5-1305 & 5-1311.  It also includes provisions to promote responsible gaming, allow for dispute resolution, prevent fraud, and verify users are not under the age of 21, self-excluded, or otherwise prohibited.  *See* A.R.S. §§ 5-1311, 1316 & 1320.

Kalshi contends that, because it lists its contracts on a DCM, those contracts are beyond the reach of the 50 separate states and D.C.  Mot. at 17.  But Kalshi's logic is circular.  What matters is not just *where* the contracts are listed but *what they are* (or are not).  *See* 7 U.S.C. § 2(a)(1)(A) (requiring that contracts be of a certain nature—e.g., swaps or other derivatives—*and* listed on a DCM).  As explained above, this Court should find Kalshi's contracts fail this test—they are not swaps or other derivatives.  Moreover, Kalshi's self-certification and the CFTC's silence cannot shield the contracts from state law.  By recognizing contracts may involve activity unlawful under state law, the Special Rule expresses an "affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful."  *Martin*, 793 F. Supp 3d at 680 (emphasis in original).

States have long occupied the field of gambling regulation.  In enacting Dodd-Frank to address the causes of the 2008 financial crisis, Congress did not intend to legalize sports betting nationwide and oust states from regulating it.  Dodd-Frank's swap provisions address interest rate swaps, credit default swaps, currency swaps, and commodity derivatives for commercial hedgers.  There is no indication that Congress in 2010 understood it was preempting state sports betting regulation that did not yet exist in any commercially significant form.  This reading is consistent with the federalism canon of construction.  Federal law historically has "defer[red] to, and even promote[d], differing gambling policies in different States."  *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 187 (1999).  Congress did not make a "clear statement" signaling that it intended "a significant change in the sensitive relation between" the federal and state governments as to gambling.  *See Bond v. United States*, 572 U.S. 844, 858–59 (2014) (quotation omitted).

Before *Murphy*, Congress would not have even thought about overriding state laws that regulate sports betting, because at those times it was already largely illegal federally to engage in sports gambling (under either the Wire Act in 1974 or the Professional and Amateur Sports Protection in 2010). *See Martin*, 793 F. Supp. 3d at 683. And in 2018, the Supreme Court reiterated that "Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Murphy*, 584 U.S. at 486. That statement would have made little sense if Congress had already given the CFTC exclusive and preemptive authority over sports gambling when it enacted Dodd-Frank.

### 2. The CEA does not conflict-preempt state law on sports-gaming or betting on elections.

Kalshi's conflict-preemption argument fares no better. Conflict preemption occurs only where "compliance with both federal and state regulations is a physical impossibility" or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (cleaned up). Neither form of conflict preemption (impossibility or obstacle) applies here.

***First***, Kalshi points to a supposed uniform federal scheme that conflicts with state law. There is such a scheme—as to the derivatives markets. But there is not one as to sports and election wagering. In the cases Kalshi cites, the uniform federal schemes covered matters "to which there is a uniquely federal interest," *Martin*, 793 F. Supp. 3d at 685, namely, immigration and foreign affairs. *See Arizona*, 567 U.S. at 399; *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 375–77 (2000). Neither case involved state statutes with a long pedigree under the states' police powers.

***Second***, impossibility preemption applies when it would be "impossible to comply with both federal and state law." *Am. Apparel & Footwear Ass'n, Inc. v. Baden*, 107 F.4th 934, 943 (9th Cir. 2024). It applies only "to the extent" of an actual conflict. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983). Kalshi could comply with both Arizona law and the CEA. It has simply

21

chosen not to—despite having opportunity and options. Kalshi could apply for licensure in partnership with a qualifying Tribal Nation or Arizona sports team, or it could apply as a management services provider to an existing licensee under A.R.S. § 5-1309.

Kalshi seems to worry that by continuing to operate nationwide it would run afoul of Arizona regulation requiring that "[e]vent wagers . . . only be accepted from persons within the State." Ariz. Admin. Code R19-4-102. But that regulation is aimed only at conduct within Arizona. If Kalshi chooses to accept wagers in other states, compliance with those other states' laws is up to Kalshi. Whatever Kalshi does, its concern about violating the CFTC's "impartial access" requirement seems misplaced. There is no indication "that the CFTC would take adverse action against Kalshi for complying with court orders and state law while the various lawsuits play out." *Hendrick II*, 2025 WL 3286282, at *12. Indeed, in its amicus brief submitted to the Ninth Circuit, the CFTC mentioned the impartial access requirement but gave no inkling that a DCM would face consequences for a perceived violation. *See* Amicus Brief of CFTC at 26-27, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187, ECF No. 37-2 (9th Cir.).

Even if there were a conflict with Arizona law, that would only excuse compliance with the conflicting provision of Arizona law—not all of Arizona gaming law. Although Arizona law has some differences from the CEA—for example, Arizona bans gaming under age 21, and Kalshi allows 18-year-olds to gamble, *see* Kalshi, Verification and Prohibitions, Minimum Age to Register & Participate, https://kalshi.com/faq—state law can be more protective than federal law; that does not show a conflict. *See Wyeth v. Levine*, 555 U.S. 555, 573 (2009).

***Third***, Arizona gaming law does not pose any obstacle to fulfilling the CEA's purposes: Congress enacted the CEA to regulate commodity futures and other derivatives, not to federalize sports betting. The CEA's consideration for the public interest is shown through the Special Rule, 7 U.S.C. § 7a-2(c)(5)(C)(i), and Rule 40.11, 17 § C.F.R. 40.11. Those provisions' references to "State law" presuppose that state law retains operative authority to define what is unlawful. A statute cannot simultaneously preempt states from

making gaming illegality determinations and reference state illegality as a basis for CFTC action. Indeed, if Kalshi's preemption argument were correct, the Special Rule would be meaningless.

## II.    Kalshi has not shown irreparable harm is likely to occur.

Even if the Court finds Kalshi likely to prevail on the merits, Kalshi is still not entitled to a preliminary injunction. It cannot show that irreparable harm is likely.

"Plaintiffs seeking preliminary relief cannot rely on the mere possibility that irreparable harm will occur but must instead show such harm is 'likely in the absence of an injunction.'" *Ariz. Recovery Housing Ass'n v. Ariz. Dep't of Health Servs.*, 462 F. Supp. 3d 990, 997 (D. Ariz. 2020) (quoting *Winter*, 555 U.S. at 22).

Kalshi primarily worries about harm to its business as a result of criminal prosecution. But such harm to its business relationship is not both certain and imminent. *See Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). As Kalshi admits, its alleged harm rests on "if" it chooses not to comply with Arizona law. Whether any harm comes to Kalshi depends on its own conduct and the decisions of its business partners. Moreover, a state enforcement proceeding "typically does not constitute irreparable harm," because Kalshi could raise any potential defense, including its preemption argument. *John Doe Co. v. CFPB*, 235 F. Supp. 3d 194, 203 (D.D.C. 2017). Kalshi also worries about lost revenue if it exits Arizona. Again, Kalshi must bear the consequences of its own decisions.

Kalshi complains about the cost or feasibility of geofencing Arizona users or certain contracts. But this is just the cost of doing business for state-regulated sportsbooks. As of March 21, Kalshi stopped selling its sports-related contracts in Nevada, pursuant to the TRO ordered in *NGCB*. *See* Geoff Zochodne, *Kalshi Shuts Down Sports Trading in Nevada After Legal Loss*, Yahoo! Finance (Mar. 22, 2026), https://finance.yahoo.com/markets/options/articles/kalshi-faces-nevada-ban-sports-195900074.html. Several other companies that offer sports-based event contracts have done so only in certain states (or not in a certain state, as the case may be). *See* Dan

23

Bernstein, Eben Novy-Williams, *Fanatics Launches a Prediction Market - Without the G Word*, SPORTICO (Dec. 3, 2025), https://www.sportico.com/business/sports-betting/2025/fanatics-prediction-markets-crypto-launch-gambling-1234878084 (Fanatics, FanDuel, and DraftKings offer sports-based event contracts in only certain states).  Kalshi could do the same here.

Whether third parties might be harmed if Kalshi unwinds contracts goes not to this factor but to the public interest.  In any event, Kalshi can manage or restructure user positions through ordinary market mechanisms.  If contracts with Arizona users have to be canceled, Kalshi can issue refunds.  Any resulting reputational harm is self-inflicted.  Kalshi took a risk when it chose to ignore Arizona law, and it should have known that state enforcement activities were a possible outcome.

Kalshi's choice to do business in Arizona without a license is the cause of any possible harm it may suffer absent an injunction.  "[S]elf-inflicted" harms are not irreparable as a matter of law.  *Al Otro Lado v. Wolf*, 952 F.3d 999, 1008 (9th Cir. 2020).  As the Nevada District Court observed, "Kalshi is, in some sense, proceeding at its own risk and creating its own harms."  *KalshiEX, LLC v. Hendrick*, No. 2:25-CV-00575-APG-BNW, 2025 WL 1073495, at *8 (D. Nev. Apr. 9, 2025) ("*Hendrick I*").  Almost a year ago, the Department warned Kalshi of potential consequences.  The Court should help Kalshi avoid the consequences of its continued unlawful operation in Arizona.

## III.   The balance of equities and public interest favor enforcement of State law.

A State "suffers a form of irreparable injury" "[a]ny time" it is "enjoined by a court from effectuating statutes enacted by representatives of its people." *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 148 F.4th 648, 656 (9th Cir. 2025) (quoting *Trump v. CASA, Inc.*, 606 U.S. 831, 860–61 (2025)).  The Legislature charged the Department with supervising compliance with the State's event wagering laws, A.R.S. § 5-1302, and the Attorney General with enforcing criminal violations of gaming laws, A.R.S. § 15-261.  Preventing Defendants from carrying out those duties would infringe on Arizona's sovereignty and intrude on the democratic will of the people.

24

Arizona has a sovereign interest in maintaining the framework set up by the Act and Tribal-State Gaming Compacts, which follow over 30 years of cooperation between Arizona and the Tribes to balance their respective interests and carefully regulate and share in the benefits of legal gambling. Kalshi's operation in Arizona, while ignoring state gaming laws, causes irreparable injury to the State's gaming industry. It gives Kalshi an unfair advantage over licensed operators, who pay licensing fees, taxes, and compliance costs. Kalshi's unlicensed gaming incentivizes others to shift sports betting to DCMs rather than becoming (or remaining) licensed by the State. Lastly, Kalshi's actions undermine the protections and policy decisions of the State. For example, EWOs are prohibited from accepting wagers on the outcome of high school sporting events (A.R.S. § 5-1311(B)(4)), and on the individual performances of collegiate athletes during an event (a type of wager sometimes called a "proposition" or "prop" bet) (A.R.S. § 5-1315). Kalshi exposes vulnerable Arizonans to harm, including those who are underage as well as individuals addicted to gambling in Arizona's Self-Exclusion program.[15]

For at least the last 120 years, from *Ah Sin* to *Murphy*, the Supreme Court has recognized that states have strong interests in regulating gambling. For all these reasons, the balance of equities and public interest tilt strongly in Defendants' favor.

## CONCLUSION

States are best positioned to protect the public and promote confidence in the gaming industry. Nothing in federal law suggests, much less clearly shows, that Congress stripped the States of their traditional power over sports betting. This Court should not do so.

The Court should deny Plaintiff's Motion.

---

[15] These injuries, as well as lost privilege fees and other monetary harm, will persist as long as Kalshi operates as is. If the Court grants Kalshi's Motion, it should require Kalshi to post a Fed. R. Civ. P. 65(c) bond of 10% of its annual adjusted gross event wagering receipts in Arizona, consistent with A.R.S. § 5-1318(A). A court may only "dispense with the filing of a bond when it concludes there is no realistic likelihood of harm to the defendant from enjoining [its] conduct." *Couturier*, 572 F.3d at 1086 (citation omitted).

RESPECTFULLY SUBMITTED this 25th day of March, 2026.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**


By  /s/ *Joshua D. Bendor*
      Joshua D. Bendor
      Alexander W. Samuels
      Joshua A. Katz
      William Y. Durbin (*application pending*)
      Office of the Arizona Attorney General
      2005 N. Central Ave.
      Phoenix, AZ 85004

*Attorneys for Defendants*

26