**KRISTIN K. MAYES**
**Attorney General**
(Firm State Bar No. 14000)

Joshua D. Bendor (Bar No. 031908)
Alexander W. Samuels (Bar No. 028926)
Joshua A. Katz (Bar No. 039449)
William Y. Durbin (Bar No. 036941)
(*application pending*)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Joshua.Bendor@azag.gov
Alexander.Samuels@azag.gov
Joshua.Katz@azag.gov
William.Durbin@azag.gov
ACL@azag.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| KalshiEX LLC, | No. CV-26-1715-PHX-MTL |
| Plaintiff, | |
| v. | **DEFENDANTS' RESPONSE TO ORDER TO SHOW CAUSE REGARDING *YOUNGER* ABSTENTION** |
| Jackie Johnson, et al., | |
| Defendants. | |

Federal courts do not sit in judgment over state courts. Consequently, federal courts do not enjoin pending state court criminal prosecutions, *see Younger v. Harris*, 401 U.S. 37, 53 (1971), unless "'extraordinary circumstances' render the state court incapable of fairly and fully adjudicating the federal issues before it," *Kugler v. Helfant*, 421 U.S. 117, 124 (1975). No such extraordinary circumstances exist here. Arizona's state courts are fair and neutral arbiters, and they are fully capable of adjudicating Kalshi's preemption arguments and any other defenses it may raise. Accordingly, this Court should abstain from enjoining the pending state court proceeding, which was filed before any proceedings of substance on the merits occurred in this Court.

Faced with a clear case of *Younger* abstention, Kalshi tries to argue that Arizona acted in bad faith by violating a purported reciprocal advance notice agreement, which Kalshi incorrectly claims the parties agreed to orally but never documented in writing. But as the declarations submitted with this brief show, the parties never reached such an agreement. And even if they had, Kalshi sued Arizona without providing the requisite notice, which would have breached the imaginary agreement and excused Arizona from performing. Kalshi's red herring about the purported oral agreement does not show bad faith and certainly cannot justify an injunction against the pending state criminal case.

## BACKGROUND

About one year ago, the Arizona Attorney General and Gaming Department learned that an unlicensed gaming operator was accepting bets from Arizona residents. That operator was Kalshi, and the subjects of the bets included both sports and politics. The State investigated. In May 2025, Gaming issued Kalshi a cease and desist letter. *See* Ex. 1 to Porter Decl. ISO Mot. for PI/TRO (Doc. 11-2).[1] Gaming also sent a letter to the CFTC, urging it to "enforce[e] its own rules" related to Kalshi and other companies whose

---

[1] Unless noted otherwise, citations to briefs and the record use internal pagination, not the ECF pagination.

products similarly violated Arizona gambling law.  *See* Letter from Director Jackie Johnson to Acting Director Pham (6/2/2025), Ex. 2 to Porter Decl. (Doc. 11-2).[2]

The cease and desist letter prompted a video conference between counsel for Kalshi and Gaming on June 10, 2025.  *See* Declaration of Valerie Marciano, attached hereto as Exhibit A ("Marciano Decl.") ¶ 3; Declaration of Danielle Schelble, attached hereto as Exhibit B ("Schelble Decl.") ¶ 4; Declaration of James Stipe, attached hereto as Exhibit C ("Stipe Decl.") ¶ 4.  On that call, counsel for Kalshi sought an agreement for advance notice before litigation was filed against it.  Marciano Decl. ¶ 4.  Counsel for the Department responded that any such agreement would have to be reciprocal and would require a written request to the Department and approval by the Attorney General's Office.  Marciano Decl. ¶ 5; Schelble Decl. ¶¶ 7–8.  The parties discussed the length of any potential notice period, but no agreement for an advance notice period was reached during the videoconference.  Marciano Decl. ¶ 6; Stipe Decl. ¶¶ 7–8.  Indeed, when an attorney for Kalshi mistakenly stated on the call that the parties had reached an agreement, Assistant Attorney General Marciano corrected him.  Marciano Decl. ¶ 7; Schelble Decl. ¶ 9.  Ultimately, Kalshi never submitted a written request for an advance notice period.  Marciano Decl. ¶ 8; Schelble Decl. ¶ 10; Stipe Decl. ¶ 10; *see also* Havemann Decl. ¶¶ 10–11 (not disputing this point); Letter from Kalshi to Attorney General Mayes (3/19/2026), Ex. 4 to Havemann Decl. (Doc. 17-1) at 2 (same).

Meanwhile, the State continued to monitor related litigation around the country and investigate.  As part of that investigation, Gaming investigators placed bets for Kalshi to facilitate.  The first bet was placed on December 12, 2025, on the outcome of a football

---

[2] Kalshi (at 4–5) mischaracterizes the letter as somehow a concession that the CFTC has exclusive jurisdiction over Kalshi's contracts.  In fact, the letter repeatedly makes clear that these contracts "amount[] to illegal gambling in Arizona."  *Id.* at 1; *see also id.* at 4 ("The State does not accept the idea that for years states have blindly passed legislation and regulated event wagering without knowing that Congress secretly upended its historical approach to gambling in the Commodities Exchange Act, a fact only just now revealed by the DCMs.").

game. *See* Information, Ex. 3 to Havemann Decl. (Doc. 17-1), Count 1. Most of the bets underlying the Information were placed in February 2026. *See* Information, Counts 2 to 17. The sports bets included bets on basketball and football games, including who would win (Counts 1–4, 7, 14), the total points scored or points margin (Counts 9, 13), an individual player's performance (Counts 5, 15), and who would attend (Count 6). They also included parlays (referred to as "combos" on Kalshi's website), which combine multiple bets (Count 16–17, 20).

Investigators also bet on questions relating to elections and politics. For example, on February 12, 2026, an investigator bet on whether a certain bill would be enacted into law. *See* Information, Count 8. Other bets covered which parties would control which offices (Counts 11–12, 19), who they would nominate (Count 18), and who would win certain elections (Count 10).

Several months into the investigation, on March 11, 2026, at 3:20pm, counsel for Kalshi sent an email to counsel for Gaming. Email (3/11/2026), Ex. 3 to Porter Decl. (Doc. 11-2). In that email, counsel for Kalshi threatened suit unless Arizona agreed, by noon the next day, "not to initiate an enforcement proceeding against Kalshi until after the Ninth Circuit issues a final decision in the pending appeals." *Id.* at 16. That was a reference to an appeal from Nevada proceedings. Arizona officials did not agree or respond to that email. Kalshi filed this suit the next day, seeking to enjoin Arizona from enforcing its gambling laws against Kalshi.

Four days later, Kalshi moved for a preliminary injunction. Mot. for TRO/PI (Doc. 11). That afternoon, the Attorney General filed a 20-count criminal Information in Maricopa County Superior Court, based on its months-long investigation.

## ARGUMENT

**I.      Supreme Court precedent squarely requires abstention.**

It is "basic" to "equity jurisprudence" that "courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law." *Younger*, 401 U.S. at 43. This alone is sufficient reason for

3

federal courts not to enjoin state criminal prosecutions, at least where defendants are permitted to put on federal defenses at trial.

But there is a second even more powerful reason. The "Framers rejected" a system of "centralization of control over every important issue in our National Government and its courts." *Id.* They chose instead "a system in which there is sensitivity to the legitimate interests" of state governments, leading the federal government to "not unduly interfere" with their "legitimate activities." *Id.*

Thus, federal courts do not interfere with pending state criminal proceedings absent "extraordinary circumstances." *Kugler*, 421 U.S. at 124; *accord Ex parte Young*, 209 U.S. 123, 162 (1908) ("[T]he Federal court cannot, of course, interfere in a case where the proceedings were already pending in a state court."). Accordingly, federal courts abstain when there is: (1) an "ongoing" "state proceeding" "of a judicial nature"; (2) "implicating important state interests"; (3) and "the federal plaintiff is not barred from litigating his federal constitutional issues in that proceeding." *Washington v. Los Angeles Cnty. Sheriff's Dep't*, 833 F.3d 1048, 1058 (9th Cir. 2016). After those "threshold element[s]" are met, (4) "[t]he requested relief must seek to enjoin—or have the practical effect of enjoining—ongoing state proceedings." *ReadyLink Healthcare, Inc. v. State Compensation Ins. Fund*, 754 F.3d 754, 758 (9th Cir. 2014). Here, the Court must abstain.

**A.      Kalshi seeks to enjoin an "ongoing" state proceeding.**

A state proceeding need not "be pending on the day the federal case is filed" to be ongoing. *Hicks v. Miranda*, 422 U.S. 332, 349 (1975). Rather, the state prosecution must begin only "before any proceedings of substance on the merits have taken place in the federal court." *Id.* The *Hicks* timing rule fulfills the purpose of *Younger*, which "is designed to 'permit state courts to try state cases free from interference by federal courts,' particularly where the party to the federal case may fully litigate his claim before the state court." *Id.* (quoting *Younger*, 401 U.S. at 43 (internal citation omitted)).

In the Ninth Circuit, the question whether substantial proceedings on the merits have taken place is subject to certain "bright line" rules, and a factual inquiry when these

4

do not apply. *Nationwide Biweekly Admin., Inc. v. Owen*, 873 F.3d 716, 728 (9th Cir. 2017). The grant of a preliminary injunction is a substantial proceeding on the merits. *Id.* But the denial of a temporary restraining order is not. *Id.* Here, these bright-line rules are dispositive, as even less than the denial of a TRO had happened when the State filed its criminal Information. "[T]he commencement of state proceedings only ceases to require federal abstention after the federal court proceedings have moved beyond an embryonic stage." *Credit One Bank, N.A. v. Hestrin*, 60 F.4th 1220, 1225 (9th Cir. 2023).

That Information was filed the same day Kalshi filed a TRO/PI motion. It was filed before the Court held a status conference (also the same day) and before the Court denied the TRO from the bench (not on merits grounds) at the same status conference. *See* Order (3/17/2026) (Doc. 15). It was filed before any responsive briefing on the motion for preliminary relief. Indeed, the Court had held no proceedings at all. This case is thus squarely controlled by *Hicks*.

Kalshi (at 11–12) tries to wriggle out from *Hicks* by relying on an older case, *Steffel v. Thompson*, 415 U.S. 452 (1974). But Kalshi fails to tell the Court that *Hicks* expressly clarified *Steffel*, as shown in the block quote below. Kalshi also suggests that *Hicks* turned on the relationship between the employees of an adult theatre (convicted in the first state court case, before the federal lawsuit) and the theatre itself (which was charged in state court one day after it filed the federal lawsuit). But in fact, *Hicks* stated an emphatic rule that did not depend on the relationship between the theatre and its employees:

> Neither *Steffel v. Thompson*, 415 U.S. 452 [ ] (1974), nor any other case in this Court has held that for *Younger v. Harris* to apply, the state criminal proceedings must be pending on the day the federal case is filed. Indeed, the issue has been left open; and **we now hold that where state criminal proceedings are begun** against the federal plaintiffs after the federal complaint is filed but **before any proceedings of substance on the merits have taken place in the federal court, the principles of *Younger v. Harris* should apply in full force**.

*Hicks*, 422 U.S. at 349 (emphasis added). That rule governs this case.

*Doran v. Salem Inn, Inc.*, 422 U.S. 922 (1975), issued a few days after *Hicks*, illustrates the rule. A town enacted an ordinance prohibiting topless bars. *Id.* at 924.

5

Three companies complied with the ordinance and sued in federal court. *Id.* The court denied the request for a temporary restraining order and set a preliminary injunction hearing. *Id.* at 925. Before the hearing, one of the companies, M&L Restaurant, Inc., resumed topless dancing and was served with criminal summonses. *Id.* The other two companies complied with the ordinance until after the district court issued its preliminary junction, which enjoined the town from prosecuting all three plaintiffs. *Id.* The Supreme Court held that the district court should not have enjoined the prosecution of M&L, but did not abuse its discretion in enjoining any prosecution of the other two companies. *Id.* at 929–31.

The Court explained that M&L could have complied with the law until it obtained federal judicial relief, as did the other two companies. *Id.* at 929. "Had it done so, it would not have subjected itself to prosecution for violation of the ordinance in the state court." *Id.* And because the criminal summonses against M&L were issued when "the federal litigation was in an embryonic stage and no contested matter had been decided," "M & L's prayer for injunction is squarely governed by *Younger*." *Id.*

By contrast, the other companies "were not subject to state criminal prosecution at any time prior to the issuance of a preliminary injunction by the District Court." *Id.* at 930. Accordingly, *Younger* did not bar the injunction as to them.

Kalshi is like M&L. It could have chosen to comply with Arizona gambling law until it obtained federal judicial relief. Instead, it flouted the law. And because Arizona charged Kalshi when "the federal litigation was in an embryonic stage and no contested matter had been decided," Kalshi's "prayer for injunction is squarely governed by *Younger*." *Id.* at 929.

Kalshi has no good response. Instead, in the face of this Supreme Court precedent, the best it can do is point (at 12) to a case in which the district court issued a TRO "shortly before the filing of the state court action." *Wal-Mart Stores, Inc. v. Rodriguez*, 236 F. Supp. 2d 200, 207 (D. P.R. 2002). The court concluded that the grant of a TRO was a proceeding of substance on the merits. *Id.* at 208–09. That could be right. But it does

not matter here, because this Court did not issue a TRO before the State filed the Information. It is telling that this is the best Kalshi can do. *See* Pltf's Resp. at 12 (describing *Wal-Mart* as the "most analogous case Kalshi has identified").

Kalshi also cites (at 10 n.2) four circuit court cases that seem to contradict *Hicks* and *Doran* by stating that abstention turns on whether the federal case was filed first. But the first case, *Village of Belle Terre v. Boraas*, 416 U.S. 1, 3 n.1 (1974), predates *Hicks* and *Doran*; the statement in the second case, *ReadyLink*, 754 F.3d at 759, is dicta because the court held that the state court civil action was not the kind of proceeding to which *Younger* applies, and did not rule on timing; and in the third and fourth cases, the court merely noted that the state court proceedings were *already* ongoing when the federal complaint was filed, requiring abstention even after the state case ended, *see Beltran v. State of Cal.*, 871 F.2d 777, 781–82 (9th Cir. 1988); *Kitchens v. Bowen*, 825 F.2d 1337, 1341 (9th Cir. 1987). None of these cases purport to undermine the rule of *Hicks* and *Doran*—that if the federal case is filed shortly before the state case, *Younger* applies if no "proceedings of substance on the merits have taken place in the federal court" at the time the state case is filed. *Hicks*, 422 U.S. at 349. *Beltran* and *Kitchens* simply add another, also state-protective, layer.

**B.      Important state interests call for abstention.**

The State obviously has an important interest in enforcing its criminal laws. *See California v. Mesa*, 813 F.2d 960, 966 (9th Cir. 1987) (the state's "ability to protect its citizens from violence and other breaches of the peace through enforcement of criminal laws is the centermost pillar of sovereignty"). Indeed, *Younger* did not require the State to show such an interest. "*Younger* exemplifies one class of cases in which federal-court abstention is required: When there is a parallel, pending state criminal proceeding, federal courts must refrain from enjoining the state prosecution." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 72 (2013). It was when the Court expanded *Younger* to include certain "noncriminal judicial proceedings" that it required "important state interests" before courts abstain in those cases. *See Middlesex Cnty. Ethics Comm. v. Garden State*

*Bar Ass'n*, 457 U.S. 423, 432 (1982) ("The policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved.").

Regardless, the state interests implicated here are weighty and make abstention appropriate. Contrary to Kalshi's claims, those state interests are not diminished simply because Kalshi alleges that state law is preempted. Nor are the state interests diminished by any role the United States has played in other litigation.

### 1. This case independently presents important state interests aside from enforcing criminal law.

Even aside from the state interest in enforcing its criminal laws, this case independently raises other important state interests. Important state interests are present when, for instance, a proceeding "vindicate[s] important state policies." *World Famous Drinking Emporium, Inc. v. City of Tempe*, 820 F.2d 1079, 1082 (9th Cir. 1987). Here, Arizona's choices about sports gambling are an "important policy choice." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 486 (2018). Kalshi does not seek an injunction against enforcement of A.R.S. § 16-1015 (prohibiting election wagers) but to the extent it wishes to contest Arizona's prohibition on such bets, that implicates an equally important state interest in "maintaining the integrity of public elections." *See Bird v. State*, 184 Ariz. 198, 206 (App. 1995).[3]

### 2. No preemption exception to state interests applies.

Kalshi does not challenge these state interests. Instead, Kalshi attempts a broadside attack, arguing that "[n]o significant state interest is served where the state law is preempted by federal law and that preemption is 'readily apparent.'" Pltf's Resp. at 13 (quoting *Gartrell Const. Inc. v. Aubry*, 940 F.2d 437, 441 (9th Cir. 1991)) (alteration in original). That argument fails because preemption is not "readily apparent."

---

[3] In Kalshi's view, if states cannot regulate election betting, no one can. *See* Pltf's Resp. at 8–9 (election "contracts are lawful under the CEA and cannot be prohibited even by the CFTC.").

If the plaintiff alleges that state law is preempted, *Younger* applies unless preemption is "readily apparent" on the face of the statute. *Gartrell*, 940 F.2d at 441. A mere allegation of preemption is not enough. *Fresh Int'l Corp. v. Agric. Lab. Relations Bd.*, 805 F.2d 1353, 1361 (9th Cir. 1986). Nor does the "determination of whether to abstain … turn on whether a state law is preempted" in the final analysis. *Id.* Either of those approaches "would render *Younger* a nullity." *Woodfeathers, Inc. v. Washington Cnty., Or.*, 180 F.3d 1017, 1021 (9th Cir. 1999) (citation omitted).

The case does not resemble cases that have found preemption "readily apparent." And while Kalshi relies heavily on the CFTC's recently stated litigating positions on preemption, the CFTC does not receive deference on the question of whether its jurisdiction is exclusive.

### a. No identified preemption exception holds here.

Courts have found preemption readily apparent "where the Supreme Court had previously decided the issue." *Woodfeathers*, 180 F.3d at 1021. Other cases where preemption is readily apparent include: "where the state law fell under the express preemption clause of [ERISA]," and "where the federal regulatory jurisdiction of the employees in a bargaining unit had previously been determined."[4] *Id.*

This case is nothing like the instances described in *Woodfeathers*. More importantly, the logic of those cases has no purchase here.

Kalshi has no Supreme Court ruling in hand. Indeed, the most relevant Supreme Court decision suggests that CFTC does not have exclusive jurisdiction. In *Murphy*, the Supreme Court held that states, not the federal government, regulate sports gambling. 584 U.S. at 486. Nowhere in that case did the Supreme Court mention a prediction-market exception lodging exclusive jurisdiction with CFTC.

ERISA is famously preemptive. *See Champion Int'l Corp. v. Brown*, 731 F.2d 1406, 1408 (9th Cir. 1984) (discussing ERISA's readily apparent preemption provisions).

---

[4] An additional instance dealt with discipline of a marine pilot. *Id.* at 1021–22.

By contrast, Kalshi has tested its preemption theory against many states in court and it has a losing record. *See* Defs' Resp. to Mot. for TRO/PI at 8–9. As Kalshi points out (at 5, 9, 10–11, 12, 17), one of those losses is on appeal in the Ninth Circuit, after the district court dissolved Kalshi's preliminary injunction. *See Kalshiex, LLC v. Dreitzer*, No. 25-7516 (9th Cir.). It is unclear, though, why Kalshi thinks this is helpful to its argument. Losing in district court and appealing may not mean Kalshi is wrong. But it certainly does not mean Kalshi is right. In any event, this record shows that preemption claims under the CEA are far more involved than the clear preemption under ERISA.

Finally, this case is not like the jurisdiction of the NLRB over a labor dispute. Kalshi's claim is, of course, more general. But as shown below, the differences between the CFTC and NLRB are material and decisive here.

### b.      CFTC's claims of exclusive jurisdiction receive no deference.

Both in addressing the third exception noted in *Woodfeathers*, and more broadly, Kalshi relies heavily (at 2, 13–16) on CFTC's claims that it has exclusive jurisdiction over contracts like Kalshi's. But CFTC alleging preemption does not make preemption readily apparent. Agencies like CFTC do not, as a general matter, receive deference on jurisdictional questions, and did not even before *Loper Bright*. And even if they did, Kalshi has not cited any CFTC position of the sort to which courts would defer.

### i.      Agency claims about their own jurisdiction do not, in general, receive deference.

An "agency's position on jurisdiction is not entitled to deference." *Our Children's Earth Found. v. U.S. EPA*, 527 F.3d 842, 846 n. 3 (9th Cir. 2008) (citing *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1038–39 (D.C. Cir. 2002)). That was true before the Supreme Court's *Loper Bright* decision sharply cut back agency deference. *See id.* Obviously, it remains true after.

Kalshi suggests otherwise, relying on *Bud Antle, Inc. v. Barbosa*, which held the NLRB's claims of exclusive jurisdiction decisive. 45 F.3d 1261, 1273 (9th Cir. 1994). Kalshi suggests that CFTC's claim of exclusive jurisdiction is therefore relevant, if not

decisive. But *Bud Antle* dealt with a special case of agency deference, not a general rule applicable here.

*Bud Antle* applied *Garmon* deference. *See San Diego Bldg. Trades Council, Millmen's Union, Local 2020, Building Material & Dump Drivers, Local 36, v. Garmon*, 359 U.S. 236 (1959). *Garmon* held that "the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board" because of unique qualities of the National Labor Relations Act. 359 U.S. at 245.

In *Bud Antle*, the question was whether to abstain in light of a state labor board proceeding. 45 F.3d at 1273. NLRB had "clearly expressed its view" that the question before the court "f[ell] under the jurisdiction of the [NLRB]." *Id.* The Ninth Circuit deferred to the NLRB under *Garmon* and, as a result, found preemption "readily apparent" and the state board without jurisdiction. *Id.* In short, the case applied a special doctrine requiring deference to NLRB's jurisdictional claims.[5] But no such special doctrine exists for CFTC.

### ii. In any event, Kalshi cites only a weak litigation position.

CFTC's claims about its jurisdiction do not receive deference. But to the degree they might in some cases, this is not one of them. Kalshi cites only a CFTC litigating position, and a weak one, at that.

"[A]gency litigating positions that are wholly unsupported by regulations, rulings, or administrative practice" receive no deference. *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212 (1988). Courts "may not accept appellate counsel's post hoc rationalizations for agency orders." *Id.* (cleaned up). And this is particularly true where the litigating position contradicts the agency's past representations. *See id.* (differences between past and present positions make deference particularly inappropriate).

---

[5] The Supreme Court has recently noted that the related doctrine of *Garmon* preemption is "unusual" because it "maintains that the NLRA preempts state law even when the two only *arguably* conflict." *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 776 (2023); *see also id.* at 785 (Thomas, J., concurring in the judgment) ("I write separately to emphasize the oddity of *Garmon's* broad pre-emption regime.").

CFTC has not arrived at the views Kalshi cites (at, *e.g.*, 15) via formal rulemaking. It has not arrived at them during a formal adjudication. It has not even stated them while litigating in its own cases. In fact, it represented the opposite in the most recent litigation CFTC conducted. *See, e.g.*, Appellant's Br., KalshiEX LLC v. U.S. CFTC, No. 24-5205 (D.C. Cir. Oct. 16, 2024), 2024 WL 4512583. Instead, Kalshi relies on an *amicus brief* the CFTC submitted in a *different case*. Pltf's Resp. at 1 (citing CFTC Amicus Br. at 1, 21, N. Am. Derivatives Exch., Inc. v. Nevada, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2).

The rejection of reliance on agency litigating positions makes even more sense in the context of an amicus brief. The determination of what position to take in an amicus brief, like any litigating position, is not made "through any 'relatively formal administrative procedure,' but through internal decisionmaking not open to public comment or determination." *Price v. Stevedoring Servs. of Am., Inc.*, 697 F.3d 820, 827 (9th Cir. 2012) (quoting *United States v. Mead Corp.*, 533 U.S. 218, 233 (2001)).

CFTC's amicus briefs on its jurisdiction are entitled to no deference, and certainly do not make preemption readily apparent.[6]

**C.     Kalshi has conceded it will have an adequate opportunity to present its defenses in the state court litigation.**

Even after this Court abstains, Kalshi will still have its day in court—state court. And it is entitled to argue its preemption defense there.

---

[6] If anything, the actions of the Executive Branch of the United States argue *against* a finding that Arizona's event wagering laws are preempted. That is because the event wagering laws are incorporated into Arizona's Tribal-State Gaming Compacts, *see* Compact §§ 2(d), 2(kkk), 3(h)(2), available at https://gaming.az.gov/tribal-gaming/gaming-compact-statutes, which in turn have been approved by the Department of the Interior, *see* Indian Gaming; Approval of Tribal-State Class III Gaming Compacts in the State of Arizona, 86 Fed. Reg. 27,889 (May 24, 2021), pursuant to 25 C.F.R. § 293.4. Presumably, the Department of the Interior would not have approved the Compact if it incorporated laws that invaded a field occupied by federal law.

Federal courts do not abstain if the federal court plaintiff demonstrates that they will have no means of asserting their federal claims. *Pennzoil Co. v. Texaco, Inc.*, 481 U.S. 1, 14 (1987) (putting burden on federal court plaintiff). "[T]he only pertinent inquiry is whether the state proceedings afford an adequate opportunity to raise the [federal] claims." *Moore v. Sims*, 442 U.S. 415, 430 (1979). This "adequate opportunity" requirement is not a high bar; courts require only that there must be no "procedural bars to raising a federal claim in the state proceedings." *Commc'ns Telesystems Int'l v. Cal. Pub. Util. Comm'n*, 196 F.3d 1011, 1020 (1999) (cleaned up).

Arizona's criminal courts are courts of general jurisdiction fully competent to consider constitutional and federal statutory defenses, including Supreme Clause preemption. Kalshi's preemption theory—that the CEA preempts Arizona's gaming statutes as applied to its contracts—is a defense to criminal liability that Kalshi can, and indeed must, raise in the state criminal proceedings.

Kalshi does not address this *Younger* requirement. As it bears the burden, that concedes the point, and Kalshi's reply will be too late to contest it. *See United States v. Gianelli*, 543 F.3d 1178, 1184 n.6 (9th Cir. 2008) ("[A]rguments raised for the first time in a reply brief are generally considered waived.").

**D.    The requested injunction would enjoin a pending state case.**

The final prong of the test requires that "[t]he requested relief … seek to enjoin—or have the practical effect of enjoining—ongoing state proceedings." *ReadyLink*, 754 F.3d at 758. That is exactly what Kalshi seeks to do here. Indeed, there is no other imminent enforcement action that Kalshi could seek to enjoin.

Kalshi argues (at 3, 16) that the CFTC's amicus brief in Kalshi's pending Ninth Circuit appeal out of Nevada negates *Younger*'s policies here. It relies on the Ninth Circuit's statement (not involving a criminal case) that "it is impossible to avoid federal-state conflict when the United States is a party" and so *Younger* "lacks force." *United*

*States v. Morros*, 268 F.3d 695, 708 (9th Cir. 2001). But *Morros* is about parties, and the United States is not a party.[7]

## II.     No *Younger* exception applies.

All requirements for *Younger* abstention are met. So, *Younger* abstention is "warranted" unless Kalshi shows this is the rare case where the federal court plaintiff shows "bad faith, harassment, or any other unusual circumstance that would call for equitable relief." *Yelp, Inc. v. Paxton*, 137 F.4th 944, 951 (9th Cir. 2025). "These exceptions to *Younger* are 'narrow.'" *Id.* (quoting *Huffman v. Pursue, Ltd.*, 420 U.S. 592, 602 (1975)).

Kalshi alleges bad faith. "[B]ad faith generally means that a prosecution has been brought without a reasonable expectation of obtaining a valid conviction." *Yelp*, 137 F.4th at 951 (citation and quotation marks omitted). The "lack of merit must … be so palpable and overwhelming as to fairly demonstrate bad faith." *Id.* at 952. In particular, bad faith should only be found where "the state proceeding is brought with no legitimate purpose." *Id.* (cleaned up). Put another way, bad faith is shown when "the state court action is based on a clearly inapplicable law, for which there was never any remote chance that it could be enforced against the state court defendant." *Id.* (cleaned up). Even allegations of retaliation are not enough to "establish[] bad faith sufficient for a federal court to enjoin a state court action." *Id.* at 954.

This case presents none of these concerns, and Kalshi makes little serious effort to show otherwise. Arizona law prohibits the facilitation of gambling with exceptions not applicable to Kalshi. Kalshi facilitates gambling. The state prosecution is meant to enforce that law, a legitimate purpose. *See* Defs' Resp. to Mot. for TRO/PI (Doc. 18) at 24–25. Kalshi can assert defenses, including preemption and its claims (at 15–16) about

---

[7] *Morros* did not involve an underlying state criminal prosecution. It involved a conflict lasting more than a decade between Nevada and the United States, making comity concerns "disingenuous." *Id.* at 708. It is unclear how it applies to a criminal case without that history.

the structure of state law, *see id.* at 17 n.14 (rebutting Kalshi's arguments about Arizona gambling law). But no defense Kalshi will assert is sufficient to show Arizona lacks a "reasonable expectation" of victory. *Yelp*, 137 F.4th at 951. The existence of a contested defense, including a far-fetched one like the claim that sports bets are "transactions involving commodities contracts" is not evidence that the prosecution is in bad faith. *See* Pltf's Resp. at 17.

Kalshi suggests (at 2) bad faith because "Defendants rushed to file charges against Kalshi for the purpose of depriving this Court of jurisdiction." But as explained above, at 1–3, Kalshi brought suit towards the end of a lengthy investigation by Gaming. That it arrived first (by four days) does not show that Defendants acted in bad faith.

Finally, Kalshi suggests, throughout its brief, that Arizona showed bad faith by agreeing to give Kalshi notice before bringing any enforcement action, then not doing so. Not so. Neither the Attorney General nor Gaming ever agreed to such a notice requirement. Kalshi's claims on the matter are far-fetched and difficult to believe. And even taking Kalshi's facts as true (which they are not), Kalshi's own allegations show that Kalshi, not Arizona, first breached any such an agreement.

First, there was no notice agreement. Kalshi's counsel asked counsel for the Department for such an agreement. Marciano Decl. ¶ 4. The Department's counsel informed Kalshi that such a request had to be in writing, and had to be approved by the Attorney General's Office. Marciano Decl. ¶ 5; Schelble Decl. ¶¶ 7–8. Kalshi never delivered a written request or followed up. Marciano Decl. ¶ 8; Schelble Decl. ¶ 10; Stipe Decl. ¶ 10; *see also* Havemann Decl. ¶¶ 10–11 (not disputing this point); Letter from Kalshi to Attorney General Mayes (3/19/2026), Ex. 4 to Havemann Decl. (Doc. 17-1), at 2 (same).

Kalshi offers a different understanding of the events. In Kalshi's telling, lawyers for the Gaming orally promised that the Attorney General would not enforce the State's criminal prohibitions on gambling without notice, the supposed length of which they cannot even attest to. What is more, those lawyers, per Kalshi, offered to provide written

15

confirmation of such an arrangement, but Kalshi's lawyers were satisfied with verbal assurances and never followed up for that written agreement. Havemann Decl. ¶ 9; *see* Stipe Decl. ¶ 10. In other words, sophisticated counsel at one of the nation's leading law firms, representing a multi-billion-dollar client, supposedly obtained a verbal agreement to protect their client from what it considers "extensive unrecoverable harms" (Mot. for TRO/PI (Doc. 11) at 22), were offered written assurances, and declined. That doesn't pass the smell test. In any case, Kalshi makes clear that it holds no written confirmation of such an agreement.

Second, if there were a notice requirement as described in Kalshi's filings, Arizona's actions would not have violated it, but Kalshi's would have.

Begin with William Havemann's declaration. It alleges only that "Arizona's representatives … represented that they could give advanced notice of any imminent threat of legal action against Kalshi so long as Kalshi's legal team did the same." ¶ 8. Whether they "could" is disputed, as they did not represent the Attorney General's Office; but the issue is whether they promised to. And it is clear any agreement would have been mutual. *Id.*; *see* Letter from Kalshi to Attorney General Mayes (3/19/2026), Ex. 4 to Havemann Decl. (Doc. 17-1), at 2 ("the parties agreed to provide reasonable notice before instituting any action against the other"; "Kalshi stuck to that agreement, but the AG did not"); *see also* Stipe Decl. ¶ 5 ("[C]ounsel informally discussed a potential reciprocal notice period prior to filing litigation."); Marciano Decl. ¶ 5 ("Counsel for the Department informed them that any agreement ... would have to be reciprocal."). Mr. Havemann's declaration does not say which agency supposedly entered the agreement. *Cf.* Stipe Decl. ¶ 9 (Gaming Counsel made clear they did not represent the AG or AGO).

Kalshi's post-litigation letter to Arizona tells a different story. Letter from Kalshi to Attorney General Mayes (3/19/2026), Ex. 4 to Havemann Decl. (Doc. 17-1), at 2. According to Kalshi's letter, Gaming, not the Attorney General or her Office, agreed to a five-day notice period. All the letter says about the Attorney General is that "[t]he attorney representing the AG did not object to that agreement." *Id.* Presumably, this

refers to Assistant Attorney General Marciano, who was representing Gaming. Marciano Decl. ¶ 4; Stipe Decl. ¶ 9. Marciano was not "representing the AG," whose criminal authority is distinct from her role in representing state agencies, nor had she purported to. Marciano Decl. ¶ 4; Stipe Decl. ¶ 9.

So, per the letter, someone not representing the Attorney General agreed to a mutual five-day notice period, and someone else not representing the Attorney General was silent. According to Kalshi, this somehow created an agreement binding the Attorney General. Even if that were so, Kalshi then violated it. Kalshi says that it "became concerned" because Attorney General Mayes signed amicus briefs in other cases. Letter from Kalshi to Attorney General Mayes (3/19/2026), Ex. 4 to Havemann Decl. (Doc. 17-1), at 2. So, on March 11, at 3:20pm, counsel for Kalshi wrote to Arizona demanding assurances. *Id.* In that email, counsel demanded a response by noon the next day, or they "would pursue a federal action." *Id.*

On March 12, at 3:07pm, counsel for Kalshi emailed counsel for Gaming and the Attorney General, transmitting the complaint they had filed that afternoon. *See* Exhibit D hereto. That was less than a single day's notice, and far less than the five days in the imaginary agreement. This breach would have excused any obligations Arizona owed under any agreement, so Arizona could not have breached four days later when it filed criminal charges. Kalshi's breach is not bad faith on Arizona's part.

**CONCLUSION**

This is a simple *Younger* abstention case. Each requirement is satisfied and no exception applies. Therefore, the Court should abstain from enjoining the state court criminal proceeding and dismiss the case. *See Gilbertson v. Albright*, 381 F.3d 965, 981 (9th Cir. 2004) ("When an injunction is sought and *Younger* applies, it makes sense to abstain, that is, to refrain from exercising jurisdiction, *permanently* by dismissing the federal action because the federal court is only being asked to stop the state proceeding.").

**RESPECTFULLY SUBMITTED** this 27th day of March, 2026.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**

By  /s/ *Joshua A. Katz*
    Joshua D. Bendor
    Alexander W. Samuels
    Joshua A. Katz
    William Y. Durbin (*application pending*)
    Office of the Arizona Attorney General
    2005 N. Central Ave.
    Phoenix, AZ 85004

*Attorneys for Defendants*