Adam E. Lang (#022545)
Matt Jarvey (#031350)
Derek C. Flint (#034392)
Taryn J. Gallup (#035002)
SNELL & WILMER LLP
One East Washington Street
Suite 2700
Phoenix, Arizona 85004-2556
Telephone:   602.382.6000
Facsimile:   602.382.6070
Email: alang@swlaw.com
        mjarvey@swlaw.com
        dflint@swlaw.com
        tgallup@swlaw.com

Neal Katyal (*pro hac vice*)
Joshua B. Sterling (*pro hac vice*)
William E. Havemann (*pro hac vice*)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
Email: nkatyal@milbank.com
        jsterling@milbank.com
        whavemann@milbank.com

Grant R. Mainland (*pro hac vice*)
Andrew L. Porter (*pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
Email:  gmainland@milbank.com
        aporter@milbank.com

*Attorneys for Plaintiff*
*KalshiEX LLC*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KalshiEX LLC, | No. CV-26-01715-PHX-MTL |
| Plaintiff, | **PLAINTIFF'S REPLY IN SUPPORT OF A PRELIMINARY INJUNCTION** |
| v. | |
| Jackie Johnson, in her official capacity as Director of the Arizona Department of Gaming; Douglas Jensen, in his official capacity as Chief Law Enforcement Officer of the Arizona Department of Gaming; Arizona Department of Gaming; and Kristin K. Mayes, in her official capacity as Attorney General for the State of Arizona, | **ORAL ARGUMENT SCHEDULED APRIL 3, 2026 (1:00 PM)** |
| Defendants. | |

4931-4614-2108

To prevent this Court from granting Kalshi relief, Defendants have taken the extraordinary step of filing criminal charges against Kalshi in Arizona state court. These charges turn on the theory that all of Kalshi's event contracts are criminal gambling, even though these contracts are traded on a Designated Contract Market ("DCM") and even though the Commodity Futures Trading Commission ("CFTC"), Kalshi's federal regulator, has emphatically defended its exclusive jurisdiction over Kalshi.

Defendants' theory has no limit and is obviously incorrect. The plain text of the Commodity Exchange Act ("CEA") grants the CFTC "exclusive jurisdiction" to regulate trading on DCMs like Kalshi. The purpose of this express preemption provision was to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). It has been settled for five decades that states are preempted from regulating trading on DCMs. The CFTC has announced a rulemaking to address event contracts like Kalshi's, underscoring its exclusive jurisdiction. *See Prediction Markets*, 91 Fed. Reg. 12,516, 12,516 (Mar. 16, 2026). States may make their voices heard in the rulemaking, but they may not regulate Kalshi directly, and they certainly may not take the unprecedented step of filing criminal charges against Kalshi for offering contracts the CFTC has blessed.

Defendants' brief focuses mainly on Kalshi's sports-event contracts, but the necessary implication of their theory is that they may ban *all* event contracts as illegal gambling. That theory is contrary to all precedent. A century ago, many states tried to ban futures trading as mere gambling. Congress put an end to that practice when it gave the CFTC exclusive jurisdiction, but Defendants seek to restore it. As the CFTC itself recently informed the Ninth Circuit, "[s]tates cannot invade the CFTC's exclusive jurisdiction … by re-characterizing swaps trading on DCMs as illegal gambling," and the states' theory presents "a fundamental threat to Congress's statutory design" that would create "a seismic shift in the longstanding status quo between CFTC and state authority." *See* Amicus Brief of CFTC at 2, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 38.2 ("CFTC Br."). Defendants have no answer to the CFTC or to the radical implications of their position. Nor do they justify their rash decision to subject

- 1 -

4931-4614-2108

Kalshi to criminal liability even though the preemption question has divided federal courts and even though the Ninth Circuit will, in 16 days, hear argument in a case that will govern this federal question. The Court should grant a preliminary injunction.

## I.    KALSHI IS LIKELY TO SUCCEED ON THE MERITS.

### A.    Kalshi's Contracts Are Swaps.

*First*, Defendants are wrong (at 13-14) that an "outcome" is not an "event" or "contingency" that may underlie a swap. Dictionaries define "event" to include "outcome." *Event*, Random House Webster's Unabridged Dictionary (2d ed. 2001). President Trump winning the 2024 presidential election was an outcome but also undeniably an event. And "contingency" includes "something liable to happen as an adjunct to or result of something else." *Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). That definition easily encompasses outcomes. Defendants' contrary position would upend the CFTC's view that event contracts may be based on "outcome[s]." *Concept Release*, 73 Fed. Reg. 25,669, 25,669-70 (May 7, 2008); *see KalshiEX LLC v. CFTC*, No. 23-cv-3257, 2024 WL 4164694, at *1 (D.D.C. Sept. 12, 2024) ("event contracts" are "a type of derivative contract whose payoff is based on the outcome of a contingent event"). And Defendants' position would cause the CFTC's jurisdiction to rise and fall based on semantics, because almost any event can be reframed as an outcome of some different event.

*Second*, Defendants are wrong (at 14-16) that sports events are not "associated with" potential financial consequences. Sports events have *actual* and *significant* financial consequences—for sponsors, advertisers, broadcasters, franchises, local businesses, and more. *See* Compl. ¶ 37. As the CFTC noted, "sporting events are economic enterprises that generate billions of dollars in economic activity and materially affect both regional and national markets" and create "precisely the type of economic exposure that derivatives markets are designed to mitigate." CFTC Br. at 19-20. Defendants' main response is (at 15) that events lack "inherent" financial consequences. But the CEA does not require "inherent" consequences; it requires "potential" consequences, which is effectively the

4931-4614-2108

opposite of inherent.  And Defendants' assertion (at 15) that there "is no genuine basis to hedge against" sports events is wrong twice over.  For one thing, insurers and other companies are *in fact* using Kalshi to hedge millions of dollars against sports-related risk.[1]  For another, Congress did not define "swap" by reference to hedging, and speculation is also essential for derivatives markets.  *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 358 (1982) ("The liquidity of a futures contract, upon which hedging depends, is directly related to the amount of speculation that takes place.").  Defendants' position is especially untenable because it requires them to prove that *no* sports events or elections are associated with potential financial consequences, which is clearly incorrect.

*Third*, Defendants cite (at 11) a 2024 CFTC proposed rulemaking to suggest that the CFTC agrees with Defendants.  But this proposal was never finalized, and Defendants concede in Footnote 10 it has been withdrawn.  Defendants, however, never address the CFTC's Ninth Circuit brief, which explains that "[s]tates cannot invade the CFTC's exclusive jurisdiction . . . by re-characterizing swaps trading on DCMs as illegal gambling"; that allowing states to regulate these products "is inconsistent with the text, structure, and history of the CEA"; that state regulation would "reintroduce precisely the regulatory fragmentation Congress deliberately displaced" in creating the CFTC; and that the states' theory presents "a fundamental threat" to the CEA.  CFTC Br. at 2.

*Fourth*, the Special Rule confirms that Kalshi's contracts are swaps.  It expressly describes "event contracts," including those involving "gaming," as "agreements, contracts, transactions, *or swaps*."  7 U.S.C. § 7a-2(c)(5)(C)(i) (emphasis added).  The Special Rule thus provides irrefutable textual proof that gaming contracts are not categorically excluded from the "swap" definition, as Defendants claim.  Defendants concede (at 17) that Special Rule "authorizes the CFTC" to bar contracts involving "gaming" as contrary to the public interest.  Even if Defendants are correct that Kalshi's

---

[1] One insurance company "expects to hedge about $30 million annually" through Kalshi to help athletics departments, teams and sponsors "manage the financial risks of performance incentives in athletes' and coaches' contracts."  Andrew Ross Sorkin, et al., *Hedging, not betting, on sports via prediction markets*, N.Y. Times: DealBook (Feb. 10, 2026), https://perma.cc/J5FM-YHYH.

4931-4614-2108

contracts involve gaming, Congress's solution was to give the CFTC—not 50 states— discretion to evaluate whether they should be barred.  And Defendants err in claiming (at 17) that a CFTC regulation is a blanket prohibition on sports contracts.  17 C.F.R. § 40.11. Subsection (a) prohibits contracts involving enumerated categories, but subsection (c) permits the CFTC to review such contracts on a case-by-case basis.  *See Provisions Common to Registered Entities*, 76 Fed. Reg. 44,776, 44,785-86 (July 27, 2011) (DCMs "may always" self-certify contracts, and that Section 40.11 operates to allow review "on a case-by-case basis").  But even if it were a blanket prohibition, it would have no bearing on whether Kalshi's contracts are swaps.  Indeed, Defendants' argument is an inadvertent concession, because if Kalshi's contracts violate a CFTC regulation, the remedy is a CFTC enforcement action, not state prosecution.  Where "the CFTC has jurisdiction, its power is exclusive."  *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989).[2]

*Fifth*, Defendants are wrong (at 20-21) that treating sports-event contracts as swaps would "overrid[e] state laws that regulate sports betting."  Instead, it would reaffirm the CFTC's exclusive jurisdiction over trading on DCMs, while leaving states free to regulate off-DCM sports betting.  *See* 7 U.S.C. § 2(a)(1)(A) ("[e]xcept as . . . provided" by the CFTC's exclusive jurisdiction over on-DCM trading, "nothing" in the remainder of Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws"); *see also id.* § 16(e)(1)(B)(i); *Further Definition of "Swap,"* 77 Fed. Reg. 48,208, 48,247 (Aug. 13, 2012) (describing further distinctions between swaps and "consumer and commercial transactions" that may be regulated by states).

---

[2] Defendants mischaracterize (at 7-8, 11) Kalshi's statements in litigation over its election contracts.  Kalshi's argument throughout that litigation was that its election contracts did not involve "gaming" and therefore could not be subject to public-interest review under the Special Rule.  Kalshi maintained that "gaming" required an actual game such as a sporting event and noted that Congress had particular concerns about gaming contracts.  The upshot was *not* that Congress prohibited gaming contracts; instead, Kalshi explained, Congress addressed its concerns by "empower[ing] the CFTC to *at least review the category of game-based contracts*" under the Special Rule.  Appellee Br. at *45, *KalshiEX LLC v. CFTC*, No. 24-5205, 2024 WL 4802698 (D.C. Cir. Nov. 15, 2024) (emphasis added). Kalshi also made clear that "the CFTC's 'exclusive jurisdiction' over the derivatives markets preempts any state law that purports to prohibit the trading of a contract on a regulated exchange."  *Id.* at *31.  That is likewise Kalshi's position here.

- 4 -

Defendants claim support from *Murphy v. National Collegiate Athletic Ass'n*, 584 U.S. 453 (2018), but nothing about *Murphy* addressed whether the CEA preempts state laws. Instead, *Murphy* recognized that "Congress can regulate sports gambling directly. . . ." *Id.* at 486. And while Defendants cite (at 1) the elephants-in-mouseholes canon, Kalshi's position is not a proverbial elephant, because it leaves states free to regulate off-DCM transactions, nor is anything hidden in a mousehole, because CFTC's exclusive jurisdiction over on-DCM trading was the cornerstone of the 1974 CEA amendments.

*Sixth*, Kalshi's contracts are swaps, but even if they were not, they would be futures or options on "excluded commodities." *See* 73 Fed. Reg. at 25,670 (event contracts can be designed as "either options or futures contracts"). Defendants' argument (at 16-17) to the contrary rests on a clear legal error. Defendants claim (at 16-17) the CFTC's exclusive jurisdiction covers "transactions involving commodities and swaps, but not 'excluded commodities.'" But excluded commodities are *a type* of commodity. "Excluded commodity" is a CEA term-of-art for intangible commodities, which were originally excluded from the on-DCM-trading requirement. 7 U.S.C. § 1a(19); *KalshiEX*, 2024 WL 4164694, at *2 ("Event contracts are subject to regulation under the CEA as 'excluded commodities[.]'"). And while Defendants note (at 17 n.14) that sports events are not physically delivered, cash settlement qualifies as a form of future delivery. *See CFTC v. Erskine*, 512 F.3d 309, 320 (6th Cir. 2008) ("[f]inancial futures" are proper futures even though they "are cash settled" and are not physically delivered); *accord CFTC v. Zelener*, 373 F.3d 861, 864 (7th Cir. 2004). Defendants' argument would upend derivatives law, because many common futures are based on undeliverable excluded commodities such as interest-rate benchmarks and stock indexes, 7 U.S.C. § 1a(19)(i)-(ii), and these instruments have always been cash-settled.

**B.    The CEA Preempts Arizona's Gaming Laws As Applied To Kalshi.**

Express Preemption: The CEA expressly gives the CFTC "exclusive jurisdiction" over the instruments it regulates on DCMs. 7 U.S.C. § 2(a)(1)(A). "Exclusive" means "[n]ot divided or shared with others." *Exclusive*, American Heritage Dictionary (2d ed.

- 5 -

1980). The Supreme Court has instructed that state law is preempted where a federal agency's jurisdiction is "exclusive." *See Hughes v. Talen Energy Mktg., LLC*, 578 U.S. 150, 163 (2016). It has further held that a "description of . . . jurisdiction as 'exclusive' necessarily denies jurisdiction" to others. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992). "The explicit statutory conferral of exclusive jurisdiction" is "a form of express preemption." *Transcon. Gas Pipe Line Co. v. Pa. Envtl. Hr'g Bd.*, 108 F.4th 144, 152-53 (3d Cir. 2024). Section 2(a) thus expressly preempts the field of regulating trading on DCMs. *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 n.6 (2000) (noting that "'*field*' preemption" may be "express").

Defendants invoke a presumption against preemption, but where a statute "contains an express pre-emption clause, [courts] do not invoke any presumption." *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (citation modified); *see also Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1101 (9th Cir. 2024). Defendants argue for a presumption (at 18) because states regulate gambling, but the Sixth Circuit recently rejected this argument, explaining that since "regulation of *interstate* gambling isn't a traditional area of state regulation," a "presumption against preemption doesn't apply." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025). Defendants fail to address express preemption at all. *See* Mot. for Prelim. Inj. and TRO 10-13 (arguing express preemption).

Field Preemption: Mountains of evidence confirm that Congress preempted the field of regulating DCMs. Congress gave the CFTC "exclusive jurisdiction" over trading on DCMs, thus "supersed[ing]" the "regulatory authorities" of "any State." 7 U.S.C. § 2(a)(1)(A). Congress intended to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974) (Conf. Rep.). Congress defined the "jurisdiction of states" to *exclude* the right to regulate DCMs, *see* 7 U.S.C. § 13a-2(1), because Congress "wanted the power to enforce the *CEA with respect to organized exchanges to* remain solely in the CFTC." Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 708 (1982). And for 50 years, courts have easily concluded that "the CEA preempts the

- 6 -

4931-4614-2108

application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) (CFTC occupies "the entire field of commodities futures regulation"); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992) (state laws that "would directly affect trading on or the operation of a futures market" are "preempted"); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 590-91 (D.C. Cir. 2001) (CFTC jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*" (citation omitted)).

Defendants do not dispute that the CEA preempts some state laws. They contend instead (at 19) that to hold "the 'field' Congress intended to 'occupy' included gambling" would "go[] too far." Defendants effectively ask this Court to rewrite the CEA to make the CFTC's jurisdiction exclusive *except for state gambling laws*. But courts "apply faithfully the law Congress has written" and "cannot replace the actual text with speculation as to Congress' intent." *Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023) (quotation omitted). The CEA's text preempts *all* state regulation of trading on DCMs, irrespective of the form that regulation takes. Defendants cannot carve out certain types of state laws from the preempted field based on textual speculation about what Congress intended. *See PPL EnergyPlus, LLC v. Nazarian*, 753 F.3d 467, 475 (4th Cir. 2014) (field preemption does not permit a "case-by-case analysis" of which state laws Congress may have silently wished to preserve).

History, moreover, refutes Defendants' speculation about Congress's intent. Before the CEA, many states regulated *all futures trading* as unlawful "gambling in grain." *Dickson v. Uhlmann Grain Co.,* 288 U.S. 188, 198 (1933). These states made arguments much like those Defendants press here: that "dealing in 'futures'" "according to the fluctuations of the market, is void" because it is "a crime"—a "species of gambling." *Cothran v. Ellis*, 16 N.E. 646, 648 (Ill. 1888). State efforts to treat futures trading as gambling repeatedly reached the U.S. Supreme Court. *See Dickson*, 288 U.S. at 198 (Missouri law prohibiting "gambling in grain"); *Irwin v. Williar*, 110 U.S. 449, 508-09 (1884) (Indiana law providing that if the "real intent" of a futures contract is "merely to

- 7 -

SNELL & WILMER

speculate in the rise or fall of prices" it is "nothing more than a wager"); *Pearce v. Rice*, 142 U.S. 28, 34-35 (1891) (Illinois law providing that futures contracts are "gambling contracts"). It therefore would have been exceedingly clear to Congress that granting the CFTC exclusive jurisdiction preempted state gambling law specifically.

Statutes enacted by both the Arizona Legislature and U.S. Congress rest critically on the premise that the CEA preempts state gambling laws. Arizona exempts from its definition of "gambling" all "bona fide business transactions," which are defined to include "contracts for the purchase or sale at a future date of . . . commodities." A.R.S. § 13-3301(6). This exemption acknowledges that commodities trading might otherwise fall within Arizona gambling laws—otherwise no exemption would be needed—and that Arizona lacks authority to regulate commodities trading given federal preemption. Defendants' only response (at 17 n.14) is to repeat their assertion that Kalshi's contracts do not involve "commodities," but that argument fails for the reasons explained above. The Unlawful Internet Gambling Enforcement Act of 2006 similarly regulates internet wagering, while making clear that the term "bet or wager" "*does not include*" transactions conducted on "a registered entity . . . under the Commodity Exchange Act." 31 U.S.C. § 5362(1)(E) (emphasis added). Defendants have no response.

Defendants invoke (at 19) 7 U.S.C. § 16, but it supports Kalshi. Section 16(e)(1) provides that the CEA shall *not* "supersede or preempt" state law as to transactions "*not conducted on*" a DCM. 7 U.S.C. § 16(e)(1) (emphasis added). The only coherent inference of specifying no preemption as to *off-DCM* transactions is that Congress did intend preemption as to *on-DCM* transactions. Defendants point to Section 16(e)(2), which preempts states from applying their gaming laws to transactions exempted from the CEA's on-DCM requirement. *See* 7 U.S.C. § 16(e)(2). But Congress enacted Section 16(e)(2) to prevent states from applying their gaming laws to exempted transactions that occur *off DCMs*, just as states were already prevented from applying their gaming laws to transactions that occur on DCMs. As Congress noted in enacting the provision, "*the current*" CEA already "supersedes and preempts" state laws "in the case of transactions

- 8 -

conducted *on a registered entity*," and the new provision clarified that "the CEA supersedes and preempts State gaming and bucket shop laws" as to exempt transactions. H.R. Rep. No. 106-711, pt. 2, at 71 (2000) (emphases added).

Defendants invoke the Special Rule, but it is fatal to their position. While Defendants contend (at 17) that "gaming" contracts fall outside the CFTC's jurisdiction, the Special Rule provides that "event contracts" involving "gaming" are "agreements, contracts, transactions, or swaps in excluded commodities" subject to CFTC jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). Defendants claim (at 20) that "the Special Rule expresses an 'affirmative intent to preserve state laws governing whether particular conduct is lawful or unlawful.'" But that misreads the Special Rule in two ways. *First*, the statute's text allows "*the Commission*"—not 50 states—to prohibit contracts involving activity that violates state or federal law. 7 U.S.C. § 7a-2(c)(5)(C)(i). And *second*, as the D.C. District Court has held, the CFTC may prohibit a contract under this provision only if the *underlier* of the contract—the activity referenced such as a sporting event or election—is unlawful. *KalshiEX*, 2024 WL 4164694, at *12. The court noted that any other interpretation would allow the CFTC to ban "*any* event contract," because such contracts could fall within state laws "defin[ing] such conduct as 'gambling.'" *Id*. But "no one would contend that reading represents a plausible construction of the statute" given that "the CEA specifically preempts the application of state law over derivative markets. . . ." *Id*.

Defendants argue (at 19) that "the CEA does not contain a comprehensive regulatory scheme for gaming." But that is not the question. The CEA provides a "comprehensive regulatory structure" *for trading on DCMs*. *Curran*, 456 U.S. at 356 (citation and quotation marks omitted). Given that comprehensive structure, Congress did not "contemplate that there will be a need for *any* supplementary regulation by the States." H.R. Rep. No. 93-1383, at 36 (1974) (Conf. Rep.) (emphasis added). Defendants' only response (at 20) is that Kalshi's contracts are not swaps or other derivatives. This is effectively a concession that if Kalshi's contracts are swaps, state law is preempted, and thus that the latter half of Defendants' merits argument is wrong. And while Defendants

- 9 -

4931-4614-2108

argue (at 20) Kalshi's contracts *should* be regulated as gaming, that is not their decision to make. Defendants may submit comments to the CFTC when it conducts its event-contracts rulemaking, but they may not substitute their judgment for Congress's.

Defendants brush past the radical implications of their position. While their brief focuses on sports and election contracts, their legal theory would mean that they may criminalize *all* of Kalshi's event contracts as illegal gambling. Event contracts are quintessential derivatives spelled out in the CEA's text as subject to CFTC jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). Defendants' efforts to prohibit all event contracts illustrate their theory's limitlessness.

Conflict Preemption: Applying Arizona law to criminalize trading on Kalshi would conflict with the CEA in at least three respects.

*First*, compliance with Arizona law is impossible for Kalshi. Defendants' suggestion (at 21-22) that Kalshi could comply by obtaining a license ignores Arizona law, which would require Kalshi to limit access solely to persons making trades in Arizona. *See* Ariz. Admin. Code § R19-4-102 ("Event wagers . . . shall only be accepted from persons within the State."). Defendants claim (at 22) that if "Kalshi chooses to accept wagers in other states, compliance with those other states' laws is up to Kalshi." But that is not true: *Arizona law itself* prohibits Kalshi from accepting trades outside of Arizona. Many other states impose similar geographical limitations, and compliance with such limitations would result in 50 different siloed markets rather than the uniform national market the CEA mandates. Federal law requires a DCM to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services." 17 C.F.R. § 38.151(b) (emphasis added). As the CFTC has noted, compliance with state geographical limitations is an "impossibility," because a DCM "cannot fulfill its federal mandate" if it imposes geographical restrictions. CFTC Br. at 26-27; *see Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012) (state law preempted where federal law "forbids what the state law requires"). Defendants' only response (at 22) is that "[t]here is no indication 'that the CFTC would take adverse action against Kalshi for complying'"

- 10 -

with state law.  But Defendants offer no support for this theory of preemption, which would require entities to follow state law in violation of their federal obligations in the hope that federal regulators might choose to excuse the violation.

For this reason, this Court should accord little weight to the adverse district court decisions Defendants cite (at 8 n.6).  These courts held, without the benefit of the CFTC's position, that Kalshi can comply with both state and federal law.  *See KalshiEX, LLC v. Schuler*, 2026 WL 657004, at *9 (S.D. Ohio Mar. 9, 2026) (finding no evidence "that the CFTC would view geographic restrictions predicated on compliance with state law as 'partial'"); *KalshiEX LLC v. Martin*, 793 F. Supp. 3d 667, 686 (D. Md. 2025) (finding no conflict because the "CFTC's Core Principles and Maryland's gaming laws work in tandem"); *KalshiEX, LLC v. Hendrick*, 2025 WL 3286282, at *9 n.7 (D. Nev. Nov. 24, 2025) (crediting CFTC statements about sports-event contracts in the now-withdrawn proposed rulemaking).  The CFTC's position calls those holdings into grave doubt.  While the CFTC is not entitled to *Chevron* deference, courts may account for its "body of experience and informed judgment" in interpreting a statute.  *Loper Bright Enters. v. Raimondo,* 603 U.S. 369, 402 (2024) (citation and quotation marks omitted).

*Second*, Arizona law is also preempted because it "would directly affect trading on or the operation of a futures market," *Am. Agric.*, 977 F.2d at 1156-57, which Defendants do not dispute.  The CEA sought to bring derivatives markets "under a uniform set of regulations."  *Id.* at 1156.  Courts easily find conflict preemption where state-by-state regulation is "at odds with the goal of uniformity that Congress" intended.  *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990).  Defendants note (at 22) that Kalshi imposes some limits on who may trade on its markets, but the key point is that Kalshi applies these restrictions *nationwide*, not state-by-state.  Defendants also argue (at 22) that "state law can be more protective than federal law" without creating a conflict.  But the CEA does not merely set a floor—it establishes exclusive federal jurisdiction.  Subjecting Kalshi to Arizona's gambling laws would conflict with Congress's goal of a uniform federal scheme.

*Third*, Defendants' efforts to regulate Kalshi conflict with Congress's "method of

- 11 -

enforcement" in the Special Rule. *Arizona v. United States*, 567 U.S. 387, 406 (2012). Congress authorized the CFTC to review contracts involving "gaming" and bar them if they are "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). Congress thus intended to address gaming contracts via public-interest review by the CFTC—not via criminal actions by 50 different states. As to Kalshi's sports-event contracts, the CFTC has declined to initiate public-interest review of these contracts. Thus, these contracts "evidence—by their very existence—the CFTC's exercise of its discretion and implicit decision to permit them." *KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *6 (D.N.J. Apr. 28, 2025). If 50 states could prosecute DCMs for offering contracts the CFTC has opted to permit, the CFTC's exclusive jurisdiction to make a public-interest judgment would be meaningless. As to Kalshi's election contracts, the CFTC attempted to subject those contracts to public-interest review, but that attempt was overturned by a federal court on the ground that the CEA *required* those contracts to be permitted. It is difficult to conceive of a clearer conflict than a state attempting to criminalize contracts that *must* be permitted under the exclusive federal regime to which the contract is subject.

For that reason, Defendants' citation (at 21) to *Arizona* supports Kalshi. There, the Supreme Court held that state regulation was preempted where it conflicted with Congress's "careful balance." *Arizona*, 567 U.S. at 406. Here, Congress entrusted the CFTC with discretionary authority to prohibit contracts it determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). If Arizona and 49 other states could impose their own public-interest judgments, the CFTC's exclusive authority would be undermined. *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *11 (M.D. Tenn. Feb. 19, 2026). States would be free to bring charges "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Arizona*, 567 U.S. at 402.

**C.    Kalshi Is Entitled To Relief From Arizona's Election Wagering Law.**

Defendants are wrong (at 12) that Kalshi cannot obtain relief as to Arizona's election wagering statute. *See* A.R.S. § 16-1015. Defendants note that Kalshi's complaint

- 12 -

does not mention this statute.  But that is because Defendants' cease-and-desist letter does not mention it, either.  To protect against the risk that Defendants would prosecute Kalshi under unmentioned state laws, Kalshi's Complaint seeks injunctive relief not just as to Arizona's gaming laws, but also "any other Arizona law that attempts to effectively regulate Plaintiff's exchange."  Compl. at 25.  Kalshi's preliminary injunction motion likewise seeks to enjoin Defendants from enforcing "any other Arizona law that attempts to regulate Kalshi's exchange."  Mot. for Prelim. Inj. and TRO at 1.  Kalshi thus preserved its entitlement to relief.

## II. KALSHI WILL SUFFER IRREPARABLE HARM WITHOUT INJUNCTIVE RELIEF, AND THE EQUITIES FAVOR KALSHI.

Irreparable Harm: Defendants' claim (at 23) that Kalshi "cannot show that irreparable harm is likely" is nothing short of astonishing.  Defendants have filed *criminal charges* against Kalshi in response to Kalshi's federal lawsuit.  The *threat* of criminal prosecution alone is irreparable harm.  *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("credible threat of prosecution" under a preempted state statute amounts to irreparable harm).  The *certainty* of prosecution makes the harm indisputable.

Absent relief, Kalshi faces a "Hobson's choice."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  If Kalshi exercises its federal right to operate in Arizona, it faces criminal prosecution and "potentially huge liability."  *Id.*  But if Kalshi abides by preempted Arizona law to avoid criminal jeopardy, it will "suffer the injury of obeying [state] law during the pendency of the proceedings and any further review."  *Id.*  The injury of obeying state law would be both substantial and irreparable.  Geofencing would cost Kalshi tens of millions of dollars.  Sottile Decl. ¶ 28.  Because Defendants have damages immunity, Kalshi could not recoup those funds if it prevails.  *See California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) ("[e]conomic harm" is "irreparable" where the party "will not be able to recover monetary damages").  Defendants assert (at 23) that geofencing "is just the cost of doing business for state-regulated sportsbooks."  But it is not the cost of doing business for DCMs.  And while Defendants imply (at 23) that Kalshi has already

4931-4614-2108

geofenced in Nevada pursuant to an *ex parte* TRO, that is incorrect. Kalshi is complying with the TRO by ceasing to offer certain contracts to Nevada residents based on know-your-customer information it already possesses, but it has not been ordered to geofence, which would require Kalshi to undertake a complex and difficult process to monitor the real-time location of its users (which it does not currently do) and use that real-time data to exclude users from trading (a feature it would have to build). And geofencing Kalshi's nearly 100,000 users in Arizona would also subject Kalshi to a loss of business, harm Kalshi relative to its competitors, jeopardize Kalshi's compliance with the Core Principles, and create an obvious loss of goodwill on the part of Kalshi users forced out of open positions—all clear irreparable harms. *Morales*, 504 U.S. at 381-82; *see* Sottile Decl. ¶¶ 18-19, 31; *see Orgel*, 2026 WL 474869, at *10 (holding that Kalshi has "met its burden to show a likelihood of irreparable injury without an injunction").

Balance of Equities: The balance of harms and public interest strongly favor Kalshi. A state has no cognizable interest in enforcing preempted law. *See Arizona Dream Act Coal. v. Brewer,* 757 F.3d 1053, 1069 (9th Cir. 2014). While Defendants maintain (at 24) an injunction "would infringe on Arizona's sovereignty and intrude on the democratic will of the people," Arizona has no right to subject Kalshi to preempted laws, and "preventing a violation of the Supremacy Clause serves the public interest." *United States v. California*, 921 F.3d 865, 894 (9th Cir. 2019). The Sixth Circuit recently rejected an argument much like Defendants' in upholding the injunction of preempted Michigan gambling laws, explaining that it is "always in the public interest" to "enjoin[] the enforcement of a law that violates constitutional rights," and that the injunction did not impair Michigan's right to "regulate gambling" apart from what was preempted. *Churchill Downs*, 162 F.4th at 643. The same is true here.

Defendants tout (at 25) consumer protections imposed by Arizona law, including prohibitions on bets on high-school sports and on individual performance of college players. But Kalshi likewise does not offer trades on high school games or on college players' performance. Defendants also cite Arizona's "Self-Exclusion program," but

- 14 -

4931-4614-2108

Kalshi, too, has a self-exclusion program, as well as voluntary opt-outs and other consumer protection measures.[3]

Defendants imply that Kalshi is unregulated. But Kalshi is extensively regulated by the CFTC, which imposes myriad requirements to prevent "price manipulation, cornering and other market disturbances." *Am. Agric.*, 977 F.2d at 1151. These protections reflect fundamental differences between DCMs like Kalshi and sportsbooks. Kalshi is an exchange that facilitates trades between counterparties at prices set by market forces. Kalshi's exchange is not the "house," never sets the prices of any contract, does not win when its customers lose, and has no incentive or ability to stack any odds. By contrast, many state gambling protections guard against the risk of abuse that arises for sportsbooks that bet against their customers and win when their customers lose. Those protections simply do not apply to Kalshi. The question is not whether Kalshi should be regulated, but by whom. The answer is clear: The CFTC has "exclusive jurisdiction."[4]

### **CONCLUSION**

For the foregoing reasons, the Court should grant Plaintiff's Motion for Preliminary Injunction.

---

[3] *Voluntary Self-Exclusion*, Kalshi, https://perma.cc/QY8W-TG2Y (Mar. 11, 2026); *Trading Break*, Kalshi, https://perma.cc/8CZZ-RQV6 (Mar. 11, 2026); *Personalized Funding Cap*, Kalshi, https://perma.cc/RKH5-ZN8U (Mar. 11, 2026); *Responsible Trading*, Kalshi, https://perma.cc/9F92-Y5MU (Mar. 17, 2026).

[4] Defendants request (at 26 n.15) a bond of "10% of [Kalshi's] annual adjusted gross event wagering receipts in Arizona." It is unclear what this would mean for Kalshi, which does not have "wagering receipts" and which facilitates trades between users that are typically located in different states. Accordingly, Defendants' requested bond is unsupported. *See Planned Parenthood Arizona, Inc. v. Betlach*, 899 F. Supp. 2d 868, 887-88 (D. Ariz. 2012) (citing *Save our Sonoran, Inc. v. Flowers*, 408 F.3d 1113, 1126 (9th Cir. 2005) ($100 bond appropriate where preliminary injunction "will not cause the Defendants to suffer any monetary damages")). But Kalshi does not wish the bond amount to be a barrier to an injunction. *See Flaherty*, 2025 WL 1218313, at *7-8 (requiring $100,000 bond); *Orgel*, 2026 WL 474869, at *12 (requiring $500,000 bond).

- 15 -

DATED: March 31, 2026

Respectfully submitted,

**SNELL & WILMER L.L.P.**

*/s/ Adam E. Lang*

Adam E. Lang (#022545)
Matt Jarvey (#031350)
Derek C. Flint (#034392)
Taryn J. Gallup (#035002)

and

Neal Katyal (*pro hac vice*)
Joshua B. Sterling (*pro hac vice*)
William E. Havemann (*pro hac vice*)
**MILBANK LLP**
1101 New York Avenue NW
Washington, DC 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586

Grant R. Mainland (*pro hac vice*)
Andrew L. Porter (*pro hac vice*)
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219

*Attorneys for Plaintiff KalshiEX LLC*

- 16 -

4931-4614-2108