Joseph H. Webster (*pro hac vice* forthcoming)
Elizabeth A. Bower (*pro hac vice* forthcoming)
Jens W. Camp (*pro hac vice* forthcoming)
Alexandra K. Holden (*pro hac vice* forthcoming)
**HOBBS, STRAUS, DEAN & WALKER LLP**
1899 L Street NW, Suite 1200
Washington, DC 20036
Telephone: (202) 822-8282
Email: jwebster@hobbsstraus.com
        ebower@hobbsstraus.com
        jcamp@hobbsstraus.com
        aholden@hobbsstraus.com

*Counsel for Tribal Amici*

Scott Crowell (#009654)
**CROWELL LAW OFFICE**
**TRIBAL ADVOCACY GROUP PLLC**
1487 W State Rte 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
Email: scottcrowell@clotag.net

*Counsel for Rincon Band of Luiseño Indians,*
*Santa Ynez Band of Chumash Mission Indians,*
*and Spokane Tribe of the Spokane Reservation*

Javier Ramos (#017442)
**GILA RIVER INDIAN COMMUNITY**
Post Office Box 97
Sacaton, AZ 85147
Telephone: (520) 562-9760
Email: Javier.Ramos@gric.nsn.us

*Counsel for Gila River Indian Community*

Bryan Newland (*pro hac vice* forthcoming)
**POWERS, PYLES, SUTTER & VERVILLE PC**
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
Telephone: (202) 349-4265
Email: Bryan.Newland@powerslaw.com

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 1-

*Counsel for Bay Mills Indian Community,*
*Mohegan Tribe of Indians of Connecticut,*
*Rincon Band of Luiseño Indians,*
*and Santa Ynez Band of Chumash Mission Indians*

Michael Hoenig (*pro hac vice* forthcoming)
**YUHAAVIATAM OF SAN MANUEL NATION**
422 1st Street SE
Washington, DC 20003
Telephone: (909) 936-9684
Email: Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San Manuel Nation*
*and San Manuel Gaming and Hospitality Authority*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| KALSHIEX LLC, | Civil Action No: 2:26-cv-01715-MTL |
| *Plaintiff*, | |
| v. | |
| JACKIE JOHNSON, et al., | March 31, 2026 |
| *Defendants*. | |

**BRIEF OF INDIAN GAMING ASSOCIATION, NATIONAL CONGRESS OF AMERICAN INDIANS, UNITED SOUTH AND EASTERN TRIBES SOVEREIGNTY PROTECTION FUND, ARIZONA INDIAN GAMING ASSOCIATION, WASHINGTON INDIAN GAMING ASSOCIATION, MINNESOTA INDIAN GAMING ASSOCIATION, CALIFORNIA NATIONS INDIAN GAMING ASSOCIATION, OKLAHOMA INDIAN GAMING ASSOCIATION, NATIONAL TRIBAL GAMING COMMISSIONERS & REGULATORS, SAN MANUEL GAMING AND HOSPITALITY AUTHORITY, AND 28 FEDERALLY RECOGNIZED INDIAN TRIBES AS AMICI CURIAE IN SUPPORT OF DEFENDANTS**

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 2-

The Indian Gaming Association ("IGA"), National Congress of American Indians ("NCAI"), United South and Eastern Tribes Sovereignty Protection Fund ("USET SPF"), Arizona Indian Gaming Association ("AIGA"), Washington Indian Gaming Association ("WIGA"), Minnesota Indian Gaming Association ("MIGA"), California Nations Indian Gaming Association ("CNIGA"), Oklahoma Indian Gaming Association ("OIGA"), National Tribal Gaming Commissioners & Regulators ("NTGCR"), San Manuel Gaming and Hospitality Authority ("SMGHA"), and 28 federally recognized Indian tribes ("Amici Tribes")[1] (collectively, "Tribal Amici") respectfully submit this brief in support of Defendants' response to KalshiEX LLC's ("Kalshi") motion for preliminary injunction.

**INTRODUCTION**

Kalshi asks this Court to override the unique tribal-state regulatory structure of

---

[1] The Amici Tribes include: Agua Caliente Band of Cahuilla Indians; Ak-Chin Indian Community; Bay Mills Indian Community; Cocopah Tribe of Arizona; Elk Valley Rancheria; Gila River Indian Community; Jamul Indian Village of California; Kaibab Band of Paiute Indians; Kickapoo Traditional Tribe of Texas; Lytton Rancheria; Mashantucket Pequot Tribal Nation; Mohegan Tribe of Indians of Connecticut; Morongo Band of Mission Indians; Pascua Yaqui Tribe of Arizona; Pechanga Band of Indians; Pokagon Band of Potawatomi Indians; Pueblo of Acoma; Pueblo of Sandia; Rincon Band of Luiseño Mission Indians; Salt River Pima-Maricopa Indian Community; San Juan Southern Paiute Tribe; Santa Ynez Band of Chumash Mission Indians; Seminole Tribe of Florida; Shingle Springs Band of Miwok Indians; Spokane Tribe of the Spokane Reservation; Tohono O'odham Nation of Arizona; Tunica-Biloxi Indian Tribe; and Yuhaaviatam of San Manuel Nation.

sports betting in Arizona, abandon the national policy of state and tribal sports-betting regulation, and turn decades of federal law on its head.  The Court should not do so.

America's history is replete with prospectors taking resources from Indian lands without permission from Tribes.  But Congress put a stop to that practice long ago.  Yet Kalshi would have this Court believe that, without so much as a whisper of legislative intent, Congress gave it permission to enter Indian lands and siphon gaming revenues away from tribes over such tribes' objections.  Congress did no such thing.

When Congress adopted the Indian Gaming Regulatory Act ("IGRA"), it sought to "promot[e] tribal economic development, tribal self-sufficiency, and strong tribal governments[.]" 25 U.S.C. §2702(1).  IGRA has been incredibly successful on that front.[2] Since IGRA's passage in 1988, tribes across the United States have lifted entire generations out of poverty through tribal gaming.  Gaming revenue supports thousands of jobs in hundreds of communities and provides critical funding to tribal, state, and local governments through revenue-sharing agreements, taxes, and economic stimulus.

Arizona is home to 22 tribes ("the Arizona Tribes"), 16 of which operate casinos in the state.[3]  IGRA's framework has allowed the Arizona Tribes and State of Arizona to

---

[2] *See, e.g.*, Nat'l Indian Gaming Comm'n, FY 2023 Gross Gaming Revenue Report 4–5 (Jul. 2024), available at https://www.nigc.gov/wp-content/uploads/2025/02/GGR23_Final.pdf.

[3] *See*, Ariz. Dep't of Gaming, Tribal Gaming Regulation in Arizona, https://gaming.az.gov/tribal-gaming-page.  The remaining six tribes "possess slot machine rights that they may lease to other tribes through Transfer agreements."  *Id.*

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 4-

forge a historic and unique regulatory relationship over sports betting throughout the state and to protect their sovereign interests. It also promotes the health, safety, and welfare of each sovereign's citizens through comprehensive gaming regulation and ensures that gaming revenue is used for the public's benefit. Importantly, in 2021, the United States Department of the Interior ("DOI") affirmatively approved 21 amendments to compacts between Arizona and the Arizona Tribes, allowing for sports wagering and providing revenue sharing of tribal gaming revenue to the State premised on substantial exclusivity (i.e., to be offered only by Arizona Tribes and professional sports franchises), to the exclusion of prediction market platforms, like Kalshi.

In contrast, Kalshi, without any license or approval by the Arizona Tribes or the State, brazenly entered onto state and tribal lands to conduct unregulated gaming with its so-called "legal sports betting" app. In doing so, Kalshi is siphoning away vital tribal and state governmental revenue to its owners' pockets. For tribes, gaming is not just a commercial endeavor but an existential one.

Tribes have primary jurisdiction over their lands and activities occurring thereon. Tribes, like states, also have a strong sovereign interest in determining what gaming activities may take place on their lands. Thus, tribal jurisdiction extends to gaming, which has long been recognized by the Supreme Court. *See California v. Cabazon Band of Mission Indians*, 480 U.S. 202, 218–22 (1987); 25 U.S.C. § 2701(5). In 1988, Congress enacted IGRA to provide a "statutory basis for the regulation of gaming by an Indian tribe…to ensure that the Indian tribe is the primary beneficiary of the gaming operation,

and to assure that gaming is conducted fairly and honestly by both the operators and players[.]" 25 U.S.C. § 2702(2).

Kalshi asks this Court to subvert this longstanding and comprehensive regulatory regime. The consequences of Kalshi's arguments are difficult to overstate. Its reading of the CEA would amount to a *sub silentio* reversal of congressional policy and Supreme Court precedent; undermine existing tribal-state gaming compacts and regulatory frameworks; allow Kalshi—not states or tribes—to regulate its own sports-betting activity on Indian lands; permit Kalshi to siphon gaming revenues from tribal and state governments; and diminish tribal self-determination. In Arizona in particular, Kalshi's theory would undermine the Tribal-State Gaming Compacts ("Compacts") between the Arizona Tribes and State, approved by the United States, that carefully balance tribal and state interests over the regulation of gaming throughout Arizona.

Accordingly, this Court should deny Kalshi's motion for preliminary injunction.

**ARGUMENT**

**I.      Congress Did Not Impliedly Repeal IGRA or the Compacts.**

**A.      IGRA's Structure**

In IGRA, Congress explicitly stated that no class III gaming can occur on "Indian lands" unless it is authorized by the tribal government and is in a state that permits such gaming. 25 U.S.C. § 2710(d). Class III gaming—including sports betting—is authorized on Indian lands only where tribes and states have entered into a compact to regulate that gaming. 25 U.S.C. § 2710(d)(1); *see also* 25 C.F.R. § 502.4(c). The Secretary of the Interior must review and approve these agreements in order for them to take effect, and

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 6-

for lawful class III gaming to occur on tribal lands. 25 U.S.C. § 2710(d)(8). These core provisions have remained unchanged since 1988.

Under this regime, regulation of class III gaming on Indian lands is shared between tribes, states, and the federal government. Congress crafted this comprehensive regulatory regime to advance clearly-articulated policy goals to: (1) "promot[e] tribal economic development, self-sufficiency and strong tribal governments"; (2) "provide a statutory basis for regulation" that protects tribes' ability to be the primary beneficiary of gaming on their lands; and, (3) create a federal regulatory agency to adopt federal standards and protect tribal gaming as a means of generating tribal revenue. 25 U.S.C. § 2702. Congress made it abundantly clear that tribes—not private entities—must benefit from any gaming conducted on their Indian lands. *See, e.g.,* 25 U.S.C. §§ 2710(b)(2)(A), (d)(2)(A). For many tribal governments, gaming is not merely a commercial endeavor; rather, it is essential to their self-determination. *See Chicken Ranch Rancheria of Me-Wuk Indians v. California*, 42 F.4th 1024, 1032 (9th Cir. 2022).

### B.    Arizona's Cooperative Sports-Betting Regulatory Structure.

Working within IGRA's comprehensive regulatory scheme, the Arizona Tribes and the State have developed a cooperative model of gaming regulation that protects consumers, layers regulatory responsibility, and provides significant revenues to governments serving tribal members and Arizona's citizenry.

Within the first decade of IGRA's passage, the State entered into Compacts with 17 tribes. Ariz. Dep't of Gaming, Tribal Gaming History, https://gaming.az.gov/tribal-gaming/history. Now, all of the Arizona Tribes have Compacts with substantially

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 7-

identical terms, including provisions authorizing on-reservation sports betting. *Id.*; Amended Arizona Tribal Gaming Compact, § 3(a)(1) (2021), https://gaming.az.gov/sites/default/files/2021%20Amended%20and%20Restated%20Compact%20-%20EXEMPLAR%20COPY_0.pdf.

In 2021, Arizona legalized sports betting and allowed for a maximum of 20 sports betting licenses in the state, 10 of which are reserved for Arizona Tribes and the other 10 for Arizona professional-sports-team owners, among others. A.R.S. § 5-1304 (2021). Arizona law expressly defines sports betting, called "event wagering," to include exactly the type of wagering that Kalshi offers. *See* A.R.S. § 5-1301(4)(a) ("event wagering" means "accepting wagers on sports events[,] … portions of sports events[,] … the individual performance statistics of athletes in a sports event or combination of sports events"). Sports betting may be conducted "only to the extent that it is [licensed and otherwise] conducted in accordance with" Arizona gaming laws. *Id.* § 5-1303(A) (2021). Currently, nine tribes have active licenses to offer off-reservation sports betting.[4] The regulatory framework governing tribal sports betting in Arizona is comprehensive: federal, tribal, and state regulations apply to every aspect of online sports wagering, and the Compacts ensure that there are no jurisdictional gaps.

---

[4] Ariz. Dep't of Gaming, EWFS General Information, https://gaming.az.gov/ewfs/general-information.

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 8-

Importantly, in 2021, the DOI affirmatively approved 21 amendments to the compacts between Arizona and the Arizona Tribes, allowing for sports wagering. The DOI reviews compact amendment provisions that provide for revenue sharing to be paid to the State or political subdivisions of the State, and approves them only if the State provides a meaningful concession (e.g., substantial exclusivity) with a value commensurate to the revenue share. Accordingly, the DOI's approval of the 2021 compact amendments constitutes the United States' approval of statewide mobile sports wagering to be offered only by Arizona Tribes and professional sports franchises—to the exclusion of Kalshi and other prediction market operators.

Consistent with IGRA, the Arizona Tribes use their gaming revenue for the public benefit, such as "help[ing] fund operations of local government agencies" and "tribal government operations [and] programs." *See* 25 U.S.C. §§ 2710(b)(2)(B), 2710(d)(2). The Arizona Tribes also use gaming revenue to help fund State government services through revenue sharing provisions. In FY 2025, for example, Arizona Tribes contributed $163,568,927 of gaming revenue toward key State governmental services, including education, emergency services, and problem gambling programs.[5]

The Arizona Tribes and State also designed their sports betting regulatory system to protect consumers. This system prohibits anyone under the age of 21 or those on college

---

[5] *See*, Ariz. Dep't of Gaming, World-Class Gaming Regulation Benefiting All of Arizona FY 2025 Annual Report 4, https://gaming.az.gov/sites/default/files/FY2025%20Annual%20Report%20Arizona%20Department%20of%20Gaming_0.pdf.

campuses from creating accounts or placing sports bets with event wagering operators ("EWOs"). *See* A.R.S. § 5-1311(B).  Nor can EWOs "target minors in advertising or promotions," a practice in which Kalshi has reportedly engaged.[6]  *See id.* at § 5-1311(B)(3).  The lack of responsible gaming measures and consumer protections applicable to prediction markets is dangerous and contrary to the public interest.  *See KalshiEX, LLC v. Schuler*, No. 2:25-cv-1165, 2026 WL 657004, *10 n.9 (Mar. 9, 2026).

Under IGRA, however, Kalshi may not operate class III gaming activities—including sports betting—on the Arizona Tribes' Indian lands unless, among other things, its gaming activities are conducted in conformity with a tribal-state compact.  *See* 25 U.S.C. § 2710(d)(1); 25 C.F.R. § 502.4(c).

### C. Congress Did Not Repeal IGRA When It Enacted the CEA's Definition of a "Swap" in 2010.

Kalshi does not assert that its conduct complies with IGRA.  In fact, Kalshi has made no attempt to ensure that its sports betting activities on Indian lands—in Arizona, and across the country—comply with IGRA.  Instead, Kalshi argues that Congress's definition of a single term—"swaps"—within a statute whose entire purpose is to address the risk, discovery, and dissemination of commodity prices, 7 U.S.C. § 5(a)–(b), preempts the field of what is unequivocally sports betting, and therefore effectively repealed core provisions of IGRA.  *See* Pl. Mot. for Prelim. Inj. at 11–18, *KalshiEX LLC v. Johnson*, et

---

[6] *See* Frank Landymore, *Kalshi Sent Bizarre Message to Underage Streamer*, Futurism (Mar. 8, 2026), https://futurism.com/future-society/kalshi-message-underage-streamer.

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 10-

al, No. 2:26-cv-0175-MTL (D. Ariz. Mar. 16, 2026), Dkt. No. 11 [hereinafter Kalshi PI Motion].   Under this theory, Congress silently stripped away tribes' and states' longstanding authority over sports betting[7] while allowing for-profit companies like Kalshi to run internet casinos pursuant to their own private oversight.

Contrary to what Kalshi maintains, *id.* at 11, if sports-betting contracts are "swaps" subject to the exclusive jurisdiction of the CFTC, then all sports betting—including sports betting conducted by the Arizona Tribes and other tribes under IGRA—is governed by the CEA. *See KalshiEX, LLC v. Hendrick*, No. 2:25-cv-575, 2025 WL 3286282, at *1 (D. Nev. Nov. 24, 2025), *appeal filed*, No. 25-7516 (9th Cir.).  As discussed below, Kalshi's interpretation of "swaps" is so broad that it necessarily consumes all sports betting (and potentially other kinds of gaming).   And with one inapplicable exception, the CEA prohibits off-market swaps.  *See* 7 U.S.C. § 2(e).  Consequently, if all sports-betting contracts are swaps, "then all sports betting must be done on a [Designated Contract Market ('DCM')]." *N. Am. Derivatives Exch., Inc. v. Nevada Gaming Control Bd.* (*Crypto.com*), No. 2:25-CV-00978, 2025 WL 2916151, at *9 (D. Nev. Oct. 14, 2025).

---

[7] Kalshi also suggests that its sports-event contracts are not sports betting because there is no betting against the house. Compl. at 10, *KalshiEX LLC v. Johnson*, No. 2:26-cv-0175-MTL (D. Ariz. Mar. 12, 2026).  Rather, Kalshi claims that "traders do not take a position against the exchange itself."  Not so.  Kalshi operates "Kalshi Klear," a clearinghouse that places wagers *on Kalshi's exchange*.  Further, a "house" is not a necessary element of gaming.  For example, pari-mutuel wagering—a type of betting system where all bets or wagers are pooled and players bet against each other rather than a "house"—is considered gaming. *See* 25 C.F.R. § 502.4; A.R.S. § 5-101(23); A.R.S. § 5-111.

Kalshi's argument thus does double violence.  First, by permitting Kalshi to offer sports betting on Indian lands, its argument sweeps aside Congress's recognition that "Indian tribes have the exclusive right to regulate gaming activity on Indian lands."  25 U.S.C. § 2701(5).  Indeed, its sweeps aside the DOI's affirmative approval of an agreement that allows only Arizona Tribes and certain professional sports franchises to operate mobile sports wagering, to the exclusion of Kalshi.  Second, it would prohibit tribes from offering sports betting that IGRA plainly authorizes.  *See* 25 C.F.R. § 502.4(c).

Moreover, if Kalshi's position is adopted, the reach of this definition would extend beyond sports betting to encompass other forms of gaming because Kalshi's preemption argument depends on embracing an interpretation of "swap" that has "no limiting principle."  *Hendrick*, 2025 WL 3286282, at *6; *see Crypto.com*, 2025 WL 2916151, at *9.  Kalshi's definition of "an event or contingency associated with a potential financial, economic, or commercial consequence" is so broad that it necessarily includes betting on other casino games.  This means that that virtually all gaming activity across the country must be offered on a DCM.  The irony of this result is that the gaming conducted pursuant to tribal-state gaming compacts or state law provides significantly more consumer protection than the unregulated sports betting offered by Kalshi, which allows users as young as 18 years old to engage in practically limitless betting with few, if any, guardrails.  *See Schuler*, 2026 WL 657004, at *10 n.9.

Further, if the CEA governs Kalshi's sports-betting contracts on Indian lands, then Congress must have intended to repeal other key provisions of IGRA that expressly grant regulatory authority over such activity to tribes, states, the National Indian Gaming

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 12-

Commission, DOI, and Department of Justice. *See* 25 U.S.C. §§ 2701(5), 2710(d); 18 U.S.C. § 1166(d). Congress also must have intended to completely override the entire purpose and function of IGRA, which is to recognize tribal sovereignty to conduct and regulate gaming activity that occurs on Indian lands. *See* 25 U.S.C. § 2701(5). No amount of judicial gymnastics can turn the insertion of the term "swap" in the CEA into such a radical transformation of IGRA.

This Court should therefore reject Kalshi's boundless interpretation of a "swap" and give effect to both statutes by excluding sports-betting contracts, such as Kalshi's, from the CEA's definition of "swap." Such an interpretation is also more faithful to the CEA's statutory language and legislative intent. *See* 156 Cong. Rec. S5907 (2010) (statement of Sen. Lincoln) ("It would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts … would be used solely for gambling.").

**D. Kalshi's Theory Does Not Meet the Standard for Implied Repeals.**

Kalshi's preemption argument, which relies on its overly broad interpretation of "swap," must be rejected because it would manufacture an implied repeal of IGRA where none exists. Kalshi cannot meet the heavy burden of proving Congress intended to repeal IGRA because there is a reasonable interpretation of the CEA that gives full effect to both statutes: the CEA's definition of "swap"—and thus the CFTC's jurisdiction over such transactions—simply does not extend to Kalshi's sports bets.

Courts apply the "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its

normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (citation modified); *see also Shoshone-Bannock Tribes of Fort Hall Rsrv. v. U.S. Dep't of the Interior*, 153 F.4th 748, 759 (9th Cir. 2025). Congress's intent to repeal must be "clear and manifest." *Epic Sys.*, 584 U.S. at 510 (citation modified). "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Id.* (citation modified).

Here, IGRA and the CEA can easily be harmonized by reading the CEA to exclude sports betting, consistent with longstanding CFTC regulations.

### 1.     Kalshi's sports-betting contracts are not "swaps."

As relevant here, the CEA defines "swap" as "any agreement, contract, or transaction … that provides for any purchase, sale, payment, or delivery … that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). Kalshi's sports-betting contracts simply do not fall under this definition and Congress therefore could not have intended to repeal IGRA.[8]

---

[8] Alternatively, Kalshi argues that its sports-betting contracts are options on "excluded commodities." Kalshi PI Motion at 12. But the CFTC does not have exclusive jurisdiction over such contracts under the CEA (at 7 U.S.C. § 2(a)(1)(A)), and, regardless, sporting-event outcomes do not "inherently have a financial consequence" and thus are not "excluded commodities." *See Hendrick*, 2025 WL 3286282, at *11 (citing 7 U.S.C. § 1a(19)(iv)).

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 14-

First, looking at the plain language of the CEA, Kalshi's sports-betting contracts are not dependent on the *occurrence*, *nonoccurrence, or extent of the occurrence* of a sports event—i.e., whether the sports event occurs—but rather on the *outcome* of the sports event (or parts thereof)—i.e., which team wins.  In three recent decisions, the Nevada District Court held that sports bets are not swaps for precisely this reason. *Hendrick*, 2025 WL 3286282, at *3, *8–*9.  The Southern District of Ohio also rejected Kalshi's theory, in part, because "absurd results would flow from defining a 'swap' to include a sports-event contract." *KalshiEX LLC v. Schuler*, No. 2:25-cv-1165-SDM-CMV, 2026 WL 657004, at *6 (S.D. Ohio Mar. 9, 2026).

Second, there is no "financial, commercial, or economic consequence" associated with Kalshi's sports-betting contracts.  Aside from whether the purchaser wins or loses their bet, Kalshi's sports-betting contracts have no direct financial consequences for the purchaser.  To constitute a swap, the underlying event itself "must be inherently associated with a potential financial consequence." *Hendrick*, 2025 WL 3286282, at *7.  "[E]xternalities like whether people bet on the event or contingency, or whether the event's occurrence or nonoccurrence causes downstream financial consequences, are not sufficient." *Id.*  Kalshi's sports-betting contracts do not satisfy this requirement and therefore do not qualify as swaps.

> 2.    *Congress did not manifest clear intent to repeal IGRA or to make the CFTC a gaming regulator.*

Congress did not repeal IGRA and grant the CFTC the exclusive authority to regulate nationwide sports betting.  In fact, Congress expressed the opposite intent and

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 15-

went out of its way to prevent event-contract markets from being used to conduct gambling.  *See* 156 Cong. Rec. S5906-07 (colloquy between Sens. Feinstein and Lincoln). Specifically, Congress enacted the "Special Rule" authorizing the CFTC to "determine that such agreements, contracts, or transactions are contrary to the public interest" and to *disallow* any "gaming" activity on DCMs at all.  *See* 7 U.S.C. § 7a-2(c)(5)(C)(i)–(ii).  The CFTC acted consistently with Congress's intent by promulgating its blanket prohibition of event contracts involving gaming.  17 C.F.R. § 40.11(a)(1).  In promulgating its rule, the CFTC explained that its "prohibition of certain 'gaming' contracts is consistent with Congress's intent to 'prevent gambling through the futures markets' and to 'protect the public interest from gaming and other events contracts.'"  76 Fed. Reg. 44776, 44786 (Jul. 27, 2011).  Thus, the CFTC recognized that the Special Rule reinforced Congress's existing policy *against* sports betting.

Kalshi even acknowledged this fact in a brief filed with the D.C. Circuit.  *See* Appellee Br. at 41, *KalshiEX LLC v. CFTC*, No. 24-5205 (D.C. Circ. Nov. 15, 2024) ("An event contract thus involves 'gaming' if it is contingent on a game or game-related event. The classic example is a contract on the outcome of a sporting event; as the legislative history directly confirms, *Congress did not want sports betting to be conducted on derivatives markets*." (emphasis added)).  The Special Rule and the CFTC's regulations undermine any claim that Congress intended to repeal IGRA and legalize sports betting.

That the CEA and IGRA overlap here is due only to Kalshi's backdoor attempt to evade comprehensive gaming regulations.[9]

Furthermore, only Kalshi (a private company with a direct financial interest in offering unregulated sports betting), not Congress, claims that the CEA's definition of "swap" displaces tribal, state, and federal regulation of sports betting. The text and legislative history of the 2010 CEA amendments, confirm that the CFTC was not established to regulate sports betting, let alone assume the role of the nation's sole sports-betting regulator. And, historically, the CFTC likewise did not assert such authority itself. *See* Event Contracts, 89 Fed. Reg. 48968, 48982–83 (Jun. 10, 2024) ("The [CFTC] is not a gaming regulator … and the [CFTC] does not believe that it has the

_____

[9] Under Kalshi's theory, simply calling a sports wager a "swap"—regardless of whether it is actually a valid "swap"—and listing it for trade on a DCM automatically grants the CFTC exclusive jurisdiction, to the detriment of all other regulatory authorities. *See* Kalshi PI Motion at 12–14. What, then, would prevent Kalshi from calling "contracts" on other traditional forms of gaming, like roulette and lotteries, "swaps" and subjecting them to the exclusive jurisdiction of the CFTC? According to Kalshi, CFTC inaction— despite banning "gaming" contracts via 17 C.F.R. § 40.11(a)(1)—is all that is required to bless contracts blatantly designed for no other purpose than to enable gambling.

Kalshi's theory would likewise strip this Court of its own jurisdiction to interpret what constitutes a "swap." Kalshi has previously argued that such determination is exclusively up to the CFTC and would only be judicially reviewable pursuant to an Administrative Procedure Act challenge. *See, e.g.*, Pl.-Appellant Br. at 44, *KalshiEX, LLC v. Hendrick*, No. 25-7516 (9th Cir. Dec. 26, 2025), Dkt. No. 20.1. But, as the Nevada District Court properly held, "[T]he CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap. … It is emphatically the province and duty of the judicial department to say what the law is." *Crypto.com v. Nevada*, No. 2:25-cv-00978, 2025 WL 2916151, at *6 (D. Nev. Oct. 14, 2025).

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 17-

statutory mandate nor specialized experience appropriate to oversee [gambling], or that Congress intended for the [CFTC] to exercise its jurisdiction or expend its resources in this manner.").

Though the CFTC's recent amicus brief before the Ninth Circuit broadly defends prediction markets' offering of sports-betting subject to the CFTC's exclusive jurisdiction, its claims are unpersuasive and should be rejected.  *See* Amicus Br. of CFTC at 19, *Crypto.com v. Nevada*, No. 25-7187 (Feb. 17, 2026), Dkt. No. 37.2.  Strikingly, in defending the legality of sports-betting contracts, the CFTC makes no mention of the Special Rule, and for good reason: the CFTC already promulgated regulations effecting a blanket ban of gaming contracts, like Kalshi's sports-betting contracts.  *See* 17 C.F.R. § 40.11(a).  Moreover, the CFTC fails to acknowledge that the preemption argument now made by Kalshi necessarily means the implied repeal of IGRA and other applicable federal laws.  Further, the power to interpret statutes ultimately belongs to the courts, not the CFTC.  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 385–86 (2024).

This Court should reject Kalshi's efforts to expand the CFTC's jurisdiction to a vast new area of regulation.

> 3. *The Indian Canons of Construction require this Court to resolve any ambiguity in favor of tribes.*

Even if there were ambiguity as to whether Congress intended to repeal IGRA when it amended the CEA in 2010 (there is not), the Indian Canons of Construction require courts to resolve statutory ambiguities in favor of tribes.  *See, e.g.*, *Bryan v. Itasca Cnty.*, 426 U.S. 373, 392 (1976).  Federal courts have consistently applied these canons to ensure

that later-enacted statutes of general applicability cannot repeal earlier-enacted legislation specifically designed to advance the United States' special relationship with tribes, without a clear statement from Congress. *See, e.g.*, *Morton v. Mancari*, 417 U.S. 535, 550–51 (1974); *Swinomish Indian Tribal Cmty. v. BNSF Ry. Co.*, 951 F.3d 1142, 1159–60 (9th Cir. 2020); *Shoshone-Bannock Tribes*, 153 F.4th at 765.

This Court should therefore reject Kalshi's preemption argument requiring an implied repeal of IGRA.

**E.      IGRA Regulates Online Gaming on Tribes' Indian Lands—Including Kalshi's Sports-Betting Contracts.**

Kalshi has tried to argue that IGRA is not relevant because its online activity does not occur on "Indian lands." *See* Pl. Opening Brief at 55, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir. Oct. 15, 2025), Dkt. No. 16. However, this is plainly wrong. IGRA allows states and tribes to allocate jurisdiction over the regulation of internet gaming conducted by a tribe throughout the state, including on its Indian lands. *See W. Flagler Assocs., Ltd. v. Haaland*, 71 F.4th 1059, 1061–62, 1066 (D.C. Cir. 2023), *cert denied*, 144 S. Ct. 2671 (2024). IGRA's implementing regulations also expressly state that tribes can regulate online gaming pursuant to the terms of their IGRA compacts. *See* 25 C.F.R. § 293.26.

Kalshi has also argued that the Unlawful Internet Gaming Enforcement Act ("UIGEA"), not tribal-state gaming compacts or state gaming law, solely governs the online gaming aspect of its sports-betting contracts, and UIGEA excludes DCM transactions from its definition of "bet or wager." *See* Pl. Opening Br. at 54–55, *Martin*,

No. 25-1892 (4th Cir. Oct. 15, 2025), Dkt. No. 16.  Kalshi claims that Congress's exclusion of DCM transactions from the definition of "bet or wager" in 31 U.S.C. § 5362 "reflects Congressional intent" that UIGEA preempts IGRA and all tribal-state IGRA agreements.  Pl.'s Resp. in Opp. to Emergency Mot. to Dissolve Prelim. Inj. at 16, *Hendrick*, No. 2:25-cv-00575 (D. Nev. Oct. 31, 2025), Dkt. No. 183.  But this ignores UIGEA's own language that "[n]o provision of this subchapter shall be construed as altering, limiting, or extending any Federal or State law or Tribal-State compact prohibiting, permitting, or regulating gambling within the United States."  31 U.S.C. § 5361(b).  UIGEA[10] "prevents using the internet to circumvent existing state and federal gambling laws, but it does not create any additional substantive prohibitions."  *California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960, 965 (9th Cir. 2018).

## II.     The Major Questions Doctrine Forecloses Kalshi's Theory.

In 2010, federal law—namely, the Professional and Amateur Sports Protection Act ("PASPA")—largely prohibited sports betting nationwide.  Kalshi's position thus requires interpreting the CEA not only to eradicate state and federal gaming laws by preemption or implied repeal, but also to reverse the federal policy that, at the time, prohibited sports

---

[10] The CFTC raises a similar UIGEA argument in its amicus brief.  Amicus Br. of CFTC at 24 n.15, *Crypto.com v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026), Dkt. No. 37.2.  Unlike Kalshi, however, the CFTC makes no attempt to explain how the 2010 amendments to the CEA silently overrode other federal gaming law with longstanding restrictions on sports betting, including IGRA.  This is for good reason: Congress did not express sufficient intent to repeal key components of other federal and state statutes regulating sports betting.  *See Epic Sys.*, 584 U.S. at 510.

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 20-

betting—turning it instead into a nationwide authorization of such betting under the jurisdiction of the CFTC.[11]  Whether Congress did so is a major question.

Under the Major Questions Doctrine, courts have "reason to hesitate before concluding that Congress meant to confer" agency authority in cases where the agency has asserted a "breadth" of authority over matters of "economic and political significance." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).  In such cases, considering "both separation of powers principles and a practical understanding of legislative intent," there must be "clear congressional authorization."  *Id.* at 723 (citation modified).  Further, "Congress [does not] typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme."  *Id.* (citation modified); *see also Learning Res. v. Trump*, 146 S.Ct. 628, 642 (2026).

In effect, Kalshi contends that the 2010 CEA amendments displaced state and tribal gaming regulations, undermined tribal-state gaming compacts, legalized sports betting nationwide, and placed sports betting under the regulatory jurisdiction of the CFTC, all at a time when federal law broadly prohibited sports betting.  This is unquestionably a "radical" and "fundamental" overhaul to both PASPA and IGRA, and certainly raises concerns of "economic and political significance."  *West Virginia*, 597 U.S. at 721.  This

_____

[11] Kalshi's sports-betting contracts also violate other federal laws, including the Wire Act, 18 U.S.C. § 1084, the Illegal Gambling Business Act, 18 U.S.C. § 1955, and the Travel Act, 18 U.S.C. § 1952(a).  If Congress authorized sports betting via the CEA in 2010, then it also effectively limited the scope of these federal laws.

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 21-

Court therefore has significant "reason to hesitate" and should require "clear congressional authorization" before even considering Kalshi's preemption argument. *Id.* at 721, 724.

First, Congress must be clear when it "alters the federal-state framework by permitting federal encroachment upon a traditional state power." *Solid Waste Agency v. U.S. Army Corps of Eng'rs*, 531 U.S. 159, 172–73 (2001). Here, gaming regulation, and even sports-betting regulation specifically, has been understood to be within traditional state power. *See Murphy v. NCAA*, 584 U.S. 453, 474, 481–85 (2018); *see also Artichoke Joe's*, 353 F.3d at 737 ("the regulation of gambling lies at the heart of the state's police power."). As the Supreme Court noted in *Murphy*, Congress has long structured federal criminal law to "respect the policy choices of the people of each State on the controversial issue of gambling." 584 U.S. at 484; *see also Chicken Ranch*, 42 F.4th at 1032 (IGRA "strike[s] a delicate balance" between tribal and state sovereignty over gaming). And even when Congress chose to prohibit sports betting nationally through PASPA, it did so *through* state regulation, rather than by directly regulating private actors. *See Murphy*, 584 U.S. at 484–85.

Similarly, courts have long recognized tribes' inherent sovereign authority to regulate gaming on their lands. *See Cabazon*, 480 U.S. at 207–214. Though it imposes limited restrictions on this authority, IGRA still broadly advances tribes' "exclusive right to regulate [and offer] gaming activity" (including sports betting) on their Indian lands as a means of promoting tribal economic development and self-determination. *See* 25 U.S.C. §§ 2701(5), 2702(2); *W. Flagler*, 71 F.4th at 1062–63. And later-enacted statutes of

general applicability—like the CEA—cannot repeal earlier-enacted legislation that is specifically designed to advance the United States' special relationship with tribes—like IGRA—without a clear statement from Congress. *See, e.g., Mancari*, 417 U.S. at 550.

Accordingly, because regulating gaming (including sports betting) has long been a traditional state and tribal power, Kalshi must show clear congressional language overturning federal policy. But it cannot because no such language exists. Rather, the CEA *reinforces* the federal policy in favor of state gaming regulation by disclaiming preemption of state gaming laws. *See* 7 U.S.C. § 16(e). And nothing in the definition of "swap" indicates that Congress meant to overturn the entire field of sports-betting regulation or Indian gaming.

Second, sports betting has a "unique place in American history and society," and therefore its own "political history." *See FDA v. Brown & Williamson*, 529 U.S. 120, 159–60 (2000). Given this social and political history, at the time of the 2010 CEA amendments, Congress had already "for better or for worse, … created a distinct regulatory scheme" for sports betting—namely, PASPA. *Id.* The conflict between Kalshi's argument and the existence of PASPA's nationwide sports-betting prohibition in 2010 therefore indicates that Congress could not have intended to regulate sports betting in the way that Kalshi now claims. "Given this history and the breadth of the authority that [Kalshi] has asserted [the CFTC has]," this Court should not defer to Kalshi's "expansive construction" of the CEA. *Id.* at 160.

The Supreme Court eliminated PASPA as a barrier to sports betting in 2018 when it held PASPA unconstitutional. *See Murphy*, 584 U.S. at 486. Since then, several states

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 23-

have established regulatory schemes for sports betting under their traditional police powers, including in Arizona, where Arizona Tribes and the State impose a cooperative regulatory scheme for sports betting.

But that has no bearing on whether Congress's CEA amendments *in 2010* had the effect of obliterating PASPA (and IGRA), and the state laws on which it relied. In holding PASPA unconstitutional, the Supreme Court made no suggestion that Congress had *already* preempted all state gaming laws eight years earlier. *Murphy*, 584 U.S. at 479–80. To the contrary, the majority opinion concluded with an observation utterly incompatible with Kalshi's contention: "The legalization of sports gambling requires an important policy choice, but the choice is not ours to make. Congress can regulate sports gambling directly, but if it elects not to do so, each State is free to act on its own." *Id.* at 486. In other words, Kalshi's deregulatory elephant was hidden in a statutory mousehole far too small for the Supreme Court to notice when deciding whether sports betting would be legal.[12]

Ignoring history, context, and common sense, Kalshi presents an alternate reality in which a statutory scheme whose scope is limited to addressing the risk, discovery, and dissemination of commodity pricing information, *see* 7 U.S.C. § 5(a)–(b), governs nationwide sports betting. Kalshi, therefore, creates a world where Congress repealed the

---

[12] And if sports-event contracts are indeed swaps that must be traded on DCMs, this would "have a seismic impact on Indian tribes' authority to regulate gaming on tribal land." *See Schuler*, 2026 WL 657004, at *6 n.6.

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 24-

comprehensive regulatory scheme set forth in IGRA, similar structures set up by state law and the then-federal policy requiring states to prohibit sports betting, as codified in PASPA. And Kalshi incredibly argues all of this happened without even a whisper of legislative intent.

Kalshi's revisionist history cannot withstand even the slightest scrutiny. As the Nevada District Court aptly stated, "It is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal when Congress added swaps to the CEA in 2010." *Hendrick*, 2025 WL 3286282, at *9.

### III.    Kalshi's Preemption Argument Would Violate the Private Nondelegation Doctrine.

Kalshi's preemption argument turns on the extraordinary claim that Congress delegated the power to preempt state law to an interested private party simply by self-certifying its own sports-betting contracts and listing them on its exchange. The private non-delegation doctrine, however, guards against precisely the type of unchecked, privately exercised powers upon which Kalshi relies. *See Carter v. Carter Coal Co.*, 298 U.S. 238, 311 (1936).

While the Supreme Court upholds congressional delegations of power to federal agencies with an intelligible principle, it applies a different standard when those delegations are to private entities. "[A] law … violates the private nondelegation doctrine when it allows non-government entities to govern." *FCC v. Consumers' Rsch.*, 606 U.S.

656, 697 (2025). Recently, the Supreme Court found that the permissibility of a private delegation depends on whether the agency retains oversight and ultimate decision-making authority over the private entity's actions. *Id.* at 693. There, the Court upheld the delegation to a private entity, but only because it merely played "an advisory role" and the final decision-making authority rested with the agency. *Id.*

In contrast, under Kalshi's theory, the CEA's self-certification provisions empower Kalshi—a private, for-profit entity—to oversee its own sports-betting enterprise, yet simultaneously fail to provide any mechanism for advance public comment, mandatory agency oversight, or standards by which the CFTC may implement its discretion.[13]

Further, even according to Kalshi, its self-certifications are not merely advisory. Rather, they have the force of law and CFTC inaction is sufficient to trigger preemption. Kalshi PI Motion at 5. "The result of this regulatory scheme is that [Kalshi] can, without any [CFTC] review of its decision on the merits, effectively decide" to offer sports betting free from tribal and state regulation. *See Alpine Sec. Corp. v. Fin. Indus. Regul. Auth.*, 121 F.4th 1314, 1328 (D.C. Cir. 2024). Consequently, construing the CEA to attribute legal effect on state law via Kalshi's self-certification would be unconstitutional—a

---

[13] *See* Farewell Address of Commissioner Kristin N. Johnson, CFTC (Sep. 3, 2025), https://www.cftc.gov/PressRoom/SpeechesTestimony/opajohnson25?utm_source =substack&utm_medium=email (warning that the CFTC has "too few guardrails and too little visibility into the prediction market landscape").

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 26-

construction that must be avoided.  *See United States v. Metcalf*, 156 F.4th 871, 881–82 (9th Cir. 2025).

Moreover, Kalshi has a financial interest in self-certifying its own sports-betting contracts, regardless of such certifications' verity.  And this financial interest is directly adverse to the sovereign and economic interests of the Arizona Tribes, as well as other tribes and states offering sports betting.  The effects of Kalshi's self-certification go even further; in Kalshi's view, it can block tribes and states from regulating that which has long been within their sovereign authority to regulate simply by listing sports-betting contracts on its exchange.  As the Supreme Court has stated, "[t]his is legislative delegation in its most obnoxious form; for it is not even delegation to an official or an official body, presumptively disinterested, but to private persons whose interests may be and often are adverse to the interests of others in the same business." *Carter Coal*, 298 U.S. at 311.

**CONCLUSION**

For the foregoing reasons, the Tribal Amici respectfully request that the Court deny Kalshi's requests for injunctive and declaratory relief.

Dated: March 31, 2026                                  Respectfully submitted,

/s/ *Scott D. Crowell*
Scott Crowell (#009654)
**CROWELL LAW OFFICE**
**TRIBAL ADVOCACY GROUP PLLC**
1487 W State Rte 89A, Suite 8
Sedona, AZ 86336
Telephone: (425) 802-5369
Email: scottcrowell@clotag.net

*Counsel for Rincon Band of Luiseño Indians, Santa Ynez Band of Chumash Mission Indians, and Spokane Tribe of the Spokane Reservation*


Joseph H. Webster (*pro hac vice* forthcoming)
Elizabeth A. Bower (*pro hac vice* forthcoming)
Jens W. Camp (*pro hac vice* forthcoming)
Alexandra K. Holden (*pro hac vice* forthcoming)
**HOBBS, STRAUS, DEAN & WALKER LLP**
1899 L Street NW, Suite 1200
Washington, DC 20036
Telephone: (202) 822-8282
Email: jwebster@hobbsstraus.com
         ebower@hobbsstraus.com
         jcamp@hobbsstraus.com
         aholden@hobbsstraus.com

*Counsel for Tribal Amici*

Javier Ramos (#017442)
**GILA RIVER INDIAN COMMUNITY**
Post Office Box 97
Sacaton, AZ 85147
Telephone: (520) 562-9760
Email: Javier.Ramos@gric.nsn.us

*Counsel for Gila River Indian Community*

Bryan Newland (*pro hac vice* forthcoming)
**POWERS, PYLES, SUTTER & VERVILLE PC**
1250 Connecticut Ave N, 8th Floor
Washington, DC 20036
Telephone: (202) 349-4265
Email: Bryan.Newland@powerslaw.com

*Counsel for Bay Mills Indian Community, Mohegan Tribe of Indians of Connecticut, Rincon Band of Luiseño Indians, and Santa Ynez Band of Chumash Mission Indians*

Michael Hoenig (*pro hac vice* forthcoming)
**YUHAAVIATAM OF SAN MANUEL NATION**
422 1st Street SE
Washington, DC 20003
Telephone: (909) 936-9684

BRIEF OF TRIBAL AMICI IN SUPPORT OF DEFENDANTS - 28-

Email: Michael.Hoenig@sanmanuel-nsn.gov

*Counsel for Yuhaaviatam of San Manuel Nation and San Manuel Gaming and Hospitality Authority*