TIMOTHY COURCHAINE
U.S. Attorney for the District of Arizona
40 N. Central Avenue, Suite 1800
Phoenix, AZ 85004
(602) 514-7500

BRETT A. SHUMATE
Assistant Attorney General
YAAKOV M. ROTH
Principal Deputy Assistant Attorney
General
TIBERIUS DAVIS
Counsel to the Assistant Attorney
General
U.S. Department of Justice
Civil Division
P.O. Box 878, Ben Franklin Station
Washington, D.C. 20044-0878
Email: Tiberius.Davis@usdoj.gov
Phone:  (202) 514-2000

*Attorneys for the United States*

TYLER S. BADGLEY
General Counsel
M. JORDAN MINOT
Deputy General Counsel
ANNE W. STUKES
Senior Assistant General Counsel
CARLIN METZGER
Assistant General Counsel
U.S. Commodity Futures Trading
Commission
Three Lafayette Center
1155 21st Street, NW
Washington, DC 20581
Email:  JMinot@cftc.gov
Phone:  (202) 418-5000

*Attorneys for the Commodity
Futures Trading Commission*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

_____

KalshiEX LLC,

      Plaintiff,

THE UNITED STATES OF
AMERICA; and COMMODITY
FUTURES TRADING
COMMISSION

      Consolidated Plaintiffs,

v.

Jackie Johnson, *et al.*,

      Defendants,

STATE OF ARIZONA, *et al.*

      Consolidated Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No:
 CV-26-01715-PHX-MTL

Hon. Michael T. Liburdi

**CONSOLIDATED
PLAINTIFFS' MOTION
FOR PRELIMINARY
INJUNCTION AND
TEMPORARY
RESTRAINING ORDER**

TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................1

BACKGROUND ......................................................................................2

    A.   The Commodity Exchange Act provides the regulatory framework for commodity derivatives markets in the United States, including event contract markets .................................................................2

    B.  Arizona unlawfully attempts to apply state gambling laws to CFTC-regulated derivatives markets ................................................5

LEGAL STANDARD ..............................................................................6

ARGUMENT............................................................................................6

    I.     PLAINTIFFS HAVE STANDING .........................................6

    II.   PLAINTIFFS ARE LIKELY TO SUCCEED IN ESTABLISHING THAT FEDERAL LAW PREEMPTS STATE LAW AS TO COMMODITY DERIVATIVES TRANSACTIONS ON CFTC-REGULATED DCMs...................................................................8

        A.   The challenged Arizona statutes are preempted as applied to commodities derivatives contracts...................................................10

           1.   Event contracts are "swaps" under the CEA...........................10

           2.   The CEA expressly preempts state law..................................14

           3.   The CEA occupies the field of derivatives trading regulation, preempting application of state law .....................15

           4.   Arizona's application of its state laws conflicts with the CEA.................................................................................17

    III.  THE REMAINING FACTORS FAVOR GRANTING PRELIMINARY RELIEF .................................................................19

CONCLUSION........................................................................................20

TABLE OF AUTHORITIES

Cases

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,*
458 U.S. 592 (1982) ....................................................................................7

*Altria Group, Inc. v. Good,*
555 U.S. 70 (2008).......................................................... 17, 18-19

*American Agriculture Movement, Inc. v. Board of Trade of Chicago,*
977 F.2d 1147 (7th Cir. 1992)....................................................10

*American Insurance Association v. Garamendi,*
539 U.S. 396 (2003) ...................................................................20

*American Trucking Associations, Inc. v. City of L.A.,*
559 F.3d 1046 (9th Cir.2009) .....................................................20

*Arizona v. United States,*
567 U.S. 387 (2012) ..............................................7, 8, 16, 17

*Arizona v. Yellen,*
34 F.4th 841 (9th Cir. 2022) .........................................................6

*Arizona Alliance for Retired Americans v. Clean Elections USA,*
638 F. Supp. 3d 1033 (D. Ariz. 2022)...........................................6

*Armstrong v. Exceptional Child Center, Inc.,*
575 U.S. 320 (2015) ...................................................................19

*Boomer v. AT & T Corp.,*
309 F.3d 404 (7th Cir. 2002) .................................................10, 15

*Chamber of Com. of U.S. v. Edmondson,*
594 F.3d 742 (10th Cir. 2010) ....................................................20

*Cothran v. Ellis,*
16 N.E. 646 (Ill. 1888)................................................................15

*Crosby v. National Foreign Trade Council,*
530 U.S. 363 (2000) ..............................................................19, 20

*Effex Cap., LLC v. National Futures Association,*
933 F.3d 882 (7th Cir. 2019)......................................................10

*Gade v. National Solid Wastes Mgmt. Association,*
505 U.S. 88 (1992)......................................................................10

*Goldie's Bookstore, Inc. v. Superior Court of State of California,*
739 F.2d 466 (9th Cir. 1984)......................................................19

*Hines v. Davidowitz,*
312 U.S. 52 (1941).....................................................................16

ii

*Hoagland v. Town of Clear Lake,*
  415 F.3d 693 (7th Cir. 2005) ..................................................................14

*In re Debs,*
  158 U.S. 564 (1895) ...................................................................................7

*Irwin v. Williar,*
  110 U.S. 499 (1884) ............................................................................ 14-15

*KalshiEx, LLC v. Flaherty,* No. 25-1922,
  2026 WL 924004 (3d Cir. Apr. 6, 2026) ....................... 1, 12-13, 15-16, 17, 20

*Leist v. Simplot,*
  638 F.2d 283 (2d Cir. 1980) .....................................................................10

*Lujan v. Defenders of Wildlife,*
  504 U.S. 555 (1992) ...................................................................................6

*McCulloch v. Maryland,*
  17 U.S. (4 Wheat.) 316 (1819) ...................................................................7

*Merrill Lynch, Pierce, Ferner & Smith, Inc. v. Curran,*
  456 U.S. 353 (1982) .................................................................................17

*Morales v. Trans World Airlines, Inc.,*
  504 U.S. 374 (1992) .................................................................................19

*North American Derivatives Exchange, Inc. v. Nevada,* No. 2:25-cv-00978,
  2025 WL 2916151 (D. Nev. Oct. 14, 2025) ...............................................12

*Rice v. Santa Fe Elevator Corp.,*
  331 U.S. 218 (1947) .................................................................................19

*S.E.C. v. Gaspar,* No. 83 Civ. 3037,
  1985 WL 521 (S.D.N.Y. Apr. 16, 1985) .......................................................7

*Spokeo, Inc. v. Robins,*
  578 U.S. 330 (2016) ...................................................................................6

*Stuber v. Hill,*
  170 F. Supp. 2d 1146 (D. Kan. 2001) ........................................................17

*Time Warner Cable v. Doyle,*
  66 F.3d 867 (7th Cir. 1995) ......................................................................10

*United States v. Alabama,*
  691 F.3d 1269 (11th Cir. 2012) ........................................................7, 19, 20

*United States v. Gear,*
  9 F.4th 1040 (9th Cir. 2021) .....................................................................11

*United States v. Missouri,*
  114 F.4th 980 (8th Cir. 2024) .....................................................................7

*United States v. South Carolina,*
  720 F.3d 518 (4th Cir. 2013) ......................................................................7

*Vermont Agency of Nat. Res. v. United States ex rel. Stevens*,
    529 U.S. 765 (2000) ...................................................................................7

*Winter v. Natural Resource Defense Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................6

*Wisconsin Department of Industry v. Gould Inc.*,
    475 U.S. 282 (1986) ...................................................................................8

Statutes

7 U.S.C. §§ 1 et *seq.*, CEA §§ 1 *et seq.*...............................................................1

7 U.S.C. § 1a, CEA § 1a ...........................................................................3, 11, 12

7 U.S.C. § 2, CEA § 2................................................................1, 7, 9, 10, 14, 17

7 U.S.C. § 5, CEA § 3...........................................................................................3

7 U.S.C. § 6, CEA § 4...........................................................................................4

7 U.S.C. § 6c, CEA § 4c .......................................................................................4

7 U.S.C. § 7, CEA § 5...........................................................................................4

7 U.S.C. § 7a-2, CEA § 5c..................................................................................15

7 U.S.C. § 7b-3, CEA § 5h ...................................................................................4

7 U.S.C. § 13a-1, CEA § 6c.............................................................................2, 7

U.S. Const. art. VI, cl. 2 .....................................................................................10

Future Trading Act of 1921,
    Pub. L. No. 67-66, 42 Stat. 187 (1921) ...............................................18

Grain Futures Act of 1922,
    Pub. L. No. 67-331, 42 Stat. 998 (1922) .............................................18

Commodity Futures Trading Commission Act of 1974,
    Pub. L. 93-463, 88 Stat. 1389 (1974) ..................................................14

Dodd-Frank Wall Street Reform and Consumer Protection Act,
    Pub. L. No. 111-203, 124 Stat. 1376 (2010) .......................................15

Regulations

17 C.F.R. § 32.2 ...................................................................................................4

17 C.F.R. § 37.3 ................................................................................4

17 C.F.R. § 38.151 .........................................................................8, 18

17 C.F.R. § 38.200 ............................................................................5

17 C.F.R. § 38.250 ............................................................................5

17 C.F.R. § 38.500 ............................................................................5

17 C.F.R. § 38.550 ............................................................................5

17 C.F.R. § 48.3 ................................................................................4

17 C.F.R. § 150 ...............................................................................4, 5

Legislative Materials

120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974)
  (Statement of Sen. Curtis) ...............................................................14

Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on
Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d
Sess. 685 (1974) (statement of Sen. Clark) .........................................15

H.R. Rep. No. 67-1095 (1922) (Conf. Rep.) .........................................18

H.R. Rep. No. 93-1383 (1974) (Conf. Rep.),
  *reprinted in* 1974 U.S.C.C.A.N. 5894 ...........................................16

S. Rep. No. 95-850, at 111-12 (1978),
  *reprinted in* 1978 U.S.C.C.A.N. 2087 ............................................16

H.R. Rep. No. 97-565, at 44-45 & 102-103 (1982),
  *reprinted in* 1982 U.S.C.C.A.N. 3871 ......................................... 16-17

Other Authorities

Ariz. Dep't. of Gaming, Fiscal Year 2025 Annual Report,
  *https://gaming.az.gov/resources/reports#tribal-gaming-report-archive* ........14

Ariz. Dep't. of Gaming, Fiscal Year 2024 Annual Report,
  *https://gaming.az.gov/resources/reports#tribal-gaming-report-archive* ........14

Ariz. Dep't. of Gaming, Fiscal Year 2023 Annual Report
  *https://gaming.az.gov/resources/reports#tribal-gaming-report-archive* ........14

CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/ CFTCGlossary/index.htm ................................................................................2, 11

Transcript: Governor Hobbs 2026 State of the State Address, Office of Gov. Katie Hobbs (Jan. 12, 2026), https://azgovernor.gov/office-arizona-governor/news/2026/01/ transcript-governor-hobbs-2026-state-state-address .......................................13

William McBride, et al., "Kamala Harris Tax Plan Ideas: Details and Analysis," Tax Foundation (Oct. 16, 2024), https://taxfoundation.org/research/all/federal/kamala-harris-tax-plan-2024...13

**PRELIMINARY STATEMENT**

Plaintiffs United States of America ("USA") and Commodity Futures Trading Commission ("CFTC"), a federal executive agency, seek a temporary restraining order and a preliminary injunction from this Court to halt Defendants' ongoing attempts to assert jurisdiction over federally regulated interstate commodity derivatives markets, thus unconstitutionally intruding on the CFTC's exclusive regulatory jurisdiction. Defendants (or "Arizona") first issued cease and desist letters to CFTC-regulated "designated contract markets" ("DCMs") demanding that they cease operating in Arizona or face civil penalties. Then, after the commencement of a civil lawsuit by a CFTC-regulated DCM, KalshiEx LLC, Arizona, attempting to subvert this Court's jurisdiction, filed criminal charges against Kalshi, alleging violations of Arizona gambling laws. An arraignment in the criminal case against Kalshi is currently scheduled for April 13, 2026. *See* ECF No. 42-1 at 4.

Arizona's use of ever-escalating action against a CFTC-regulated DCM that is engaging in federally regulated activity violates the Supremacy Clause. The Commodity Exchange Act ("CEA" or the "Act"), 7 U.S.C. §1, *et seq.*, expressly and implicitly preempts state gambling laws as applied to CFTC-regulated markets and market participants. The CEA provides a comprehensive framework for the regulation of derivatives transactions in the United States and designates the CFTC as the federal agency with "exclusive jurisdiction" over the regulation of commodity futures, options, and swaps traded on federally regulated exchanges. 7 U.S.C. § 2(a)(1)(A). And the event contracts offered by Kalshi and other CFTC-regulated DCMs—including event contracts where the underlying event relates to sports or politics—are "swaps" under the plain meaning of the CEA. *See KalshiEx, LLC v. Flaherty*, No. 25-1922, 2026 WL 924004, at *3 (3d Cir. Apr. 6, 2026) ("Because Kalshi's sports-related event contracts are traded on a CFTC-licensed DCM and depend on event outcomes associated with economic consequences, they

fit within the Act's definition of 'swaps' subject to the CFTC's jurisdiction.").

Reading the CEA's definition of "swap" to be more circumscribed than the plain text would allow Arizona to regulate developing event contracts markets and would risk state regulation of event contracts that have long been traded uncontroversially on CFTC-regulated DCMs, like contracts on the weather or agricultural production.  Subjecting those markets to a patchwork of 50 state regulations is precisely what Congress sought to avoid with the CEA, including with decades of amendments to the Act that enhanced the CEA's preemptive effect.

Because the CEA preempts the application of Arizona gambling laws to CFTC-regulated markets and market participants, this Court should halt Arizona's increasingly aggressive enforcement of its inapplicable laws against DCMs by entering a temporary restraining order and a preliminary injunction.

## BACKGROUND

**A. The Commodity Exchange Act provides the regulatory framework for commodity derivatives markets in the United States, including event contract markets**

The CEA provides a comprehensive framework that governs transactions in United States commodity derivatives markets.  The CFTC is the federal executive agency that administers the CEA, enforces its provisions in federal courts,[1] and regulates derivatives markets.  A "derivative" is a financial instrument, such as a future, option, or swap, for which the price is directly dependent upon—that is, "derived from"—the value of something else, such as an agricultural or financial commodity.[2]  An "event contract" is a type of swap that provides for payment that

---

[1] The CFTC has statutory authority to "bring an action in . . . [a] district court . . . to enjoin . . . or enforce compliance with [the CEA]" if "it shall appear to the Commission" that any "person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order thereunder, or is restraining trading in any commodity for future deliver or any swap." 7 U.S.C. § 13a-1(a).

[2] CFTC, *Futures Glossary: A Guide to the Language of the Futures Industry*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAndArticles/CFTCGlossary/index.htm.

2

is "dependent on the occurrence, non-occurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii).[3] For example, an event contract might be based on the occurrence, nonoccurrence, or extent of an occurrence of a weather event such as snowfall or rainfall, a Federal Reserve Board rate increase, a particular election result, or the result of a sports event.

The CEA and CFTC regulations establish important protections for derivatives markets, market participants, and the public by creating uniform regulations of nationwide—and often international—markets. The CEA's purpose is to "serve the public interests . . . through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission," as well as "to deter and prevent price manipulation or any other disruptions to market integrity; to ensure the financial integrity of all transactions subject to [the Act] and the avoidance of systemic risk; to protect all market participants from fraudulent or other abusive sales practices and misuses of customer assets; and to promote responsible innovation and fair competition among boards of trade, other markets and market participants." 7 U.S.C. § 5(b).

Transactions subject to the CEA "are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities." 7 U.S.C. § 5. In other words, Congress specifically identified a public interest in federal regulation of derivatives markets because those markets provide a means to "hedge" economic risks. "Hedging" is generally understood to be the use of derivatives to manage the various price risks incidental

---

[3] Depending on their structure, event contracts may also satisfy other prongs of the swap definition—for example, as "option[s] of any kind" that are "based on the value" of an index, quantitative measure, or other financial or economic interest. 7 U.S.C. § 1a(47)(A)(i).

3

to commercial activity.[4]  Like securities markets, the derivatives markets also include "speculators" who trade to profit from price movements, despite having no use for the underlying commodity.  Speculators are important because they help ensure that hedgers can find counterparties with whom to trade.

Many derivatives are required to be traded on a designated contract market (DCM), the statutory term for a derivatives exchange registered with, and regulated by, the CFTC.  Futures contracts must be traded on a DCM or a registered foreign board of trade (see 7 U.S.C. § 6 and 17 C.F.R. § 48.3); many swaps must be traded on a registered swap execution facility or a DCM (see 7 U.S.C. §§ 2(e) and 7b-3(a) and 17 C.F.R. § 37.3); and commodity options must likewise be conducted on a DCM (see 7 U.S.C. § 6c(b) and 17 C.F.R. § 32.2).

DCMs are national boards of trade or exchanges that operate under the regulatory oversight of the CFTC pursuant to Section 5 of the CEA, 7 U.S.C. § 7. The CFTC designates a board of trade as a contract market through a formal application process through which an applicant must demonstrate its ability to comply with detailed statutory requirements called "core principles."  7 U.S.C. § 7(d).  These core principles require, for example, that DCMs:

- establish, monitor, and enforce compliance with the rules of the market including access requirements, the terms and conditions of any contracts to be treaded, and rules prohibiting abusive trade practices, 17 C.F.R. § 38.150(a) (Core Principle 2),
- have the capacity to detect, investigate, and apply appropriate sanctions to any person that violates any rule of the market, 17 C.F.R.

[4] For instance, airlines that need to buy jet fuel in the foreseeable future might manage the risk that the price will increase by entering into a derivative contract, *e.g.* a futures contract, to hedge against that risk.  It would take a "long" position, *i.e.*, a futures contract that will increase in value if the price of the airline's fuel increases.  On the other hand, a fuel supplier might manage the risk that the price of oil will decline by taking a "short" position, *i.e.*, a futures contract that will increase in value if the price of fuel goes down.

4

§ 38.150(b) (Core Principle 2),

- list only contracts that are not readily susceptible to manipulation, 17 C.F.R. § 38.200 (Core Principle 3),

- have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement practices and procedures, including methods for conducting real-time monitoring of trading and comprehensive and accurate trade reconstructions, 17 C.F.R. § 38.250 (Core Principle 4),

- provide a competitive, open and efficient market and mechanism for executing transactions that protects the price discovery process, 17 C.F.R. § 38.500 (Core Principle 9),

- maintain rules and procedures to provide for the recording and safe storage of all identifying trade information in a manner that enables the contract market to use the information to assist in the prevention of customer and market abuses and to provide evidence of any violations of the rules of the contract market, 17 C.F.R. § 35.550 (Core Principle 10).

Today 25 exchanges in the United States have active designations from the CFTC to operate as a contract market.  These DCMs include KalshiEx LLC.

**B. Arizona unlawfully attempts to apply state gambling laws to CFTC-regulated derivatives markets**

On May 21, 2025, the Arizona Department of Gaming, through its Chief Law Enforcement Officer, Douglas Jensen, issued a cease-and-desist letter to a CFTC-regulated DCM, KalshiEx LLC and its CEO.  The letter accuses Kalshi of accepting illegal wagers in violation of Arizona law.  USA Compl. ¶ 59.  Ten months later and two months after Kalshi filed suit against Arizona and the Department of Gaming, see ECF No. 1, Arizona filed a criminal information,

5

charging KalshiEx LLC and Kalshi Trading LLC with violations of Arizona gambling laws including charges of "Betting and Wagering" in violation of various state laws. *See* USA Compl. ‖ 61.

## LEGAL STANDARD

A plaintiff seeking a preliminary injunction must establish that it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The standard for issuing a temporary restraining order is the same as the standard for issuing a preliminary injunction." *Arizona All. for Retired Americans v. Clean Elections USA*, 638 F. Supp. 3d 1033, 1039 (D. Ariz. 2022).

## ARGUMENT

This Court should enter a temporary restraining order and a preliminary injunction because Arizona gambling laws are preempted as applied to federally regulated DCMs listing swaps, and Arizona's aggressive enforcement of its preempted state laws—including through its unprecedented use of criminal law to intimidate federally regulated entities and, ultimately, disrupt the operation of federally regulated markets—causes irreparable harm to the federal plaintiffs.

### I.    PLAINTIFFS HAVE STANDING

Standing requires Plaintiffs to "have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). To establish an injury in fact, Plaintiffs must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical[.]" *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)

Plaintiffs have at least two legally protected "sovereign injuries" that Defendants' conduct have invaded. *Arizona v. Yellen*, 34 F.4th 841, 852-53 (9th

6

Cir. 2022); *see also In re Debs*, 158 U.S. 564, 586 (1895); *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982). First, the Supreme Court stated that "[i]t is beyond doubt" that a complaint "asserts an injury to the United States" if it alleges an "injury to [U.S.] sovereignty arising from violation of its laws." *Vermont Agency of Nat. Res. v. United States ex rel. Stevens*, 529 U.S. 765, 771 (2000). For example, "when the SEC brings a civil enforcement action or the United States brings a criminal action under the securities laws, 'issues such as standing . . .' are irrelevant." *S.E.C. v. Gaspar*, No. 83 Civ. 3037, 1985 WL 521, at *16 (S.D.N.Y. Apr. 16, 1985). This is true even though the United States is not injured in a traditional sense when it brings a criminal or civil enforcement action to vindicate federal law and the public interest. *See United States v. Missouri*, 114 F.4th 980, 984-85 (8th Cir. 2024) ("The United States has a legally protected interest in enforcing federal law."). As noted, the CFTC has the "exclusive jurisdiction" to regulate DCMs, 7 U.S.C. § 2(a)(1)(A), and can likewise bring civil suits to enforce its authority, 7 U.S.C. § 13a-1(a). Defendants are violating this exclusive jurisdiction and the Supremacy Clause by stepping into a realm that Congress expressly and implicitly reserved solely for the CFTC.

Second, and relatedly, "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012); *see also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 361 (1819) ("states are prohibited from passing any acts which shall be repugnant to a law of the United States."). Indeed, the United States regularly brings preemption lawsuits to invalidate state laws that are contrary to federal law. *See, e.g., id.; Arizona v. United States*, 567 U.S. 387, 394 (2012); *United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013). Here, Arizona's attempts to regulate DCMs undermines and conflicts with the CFTC's exclusive and preemptive jurisdiction. It thus undermines the agency's regulatory authority, the uniformity of federal law, and

7

can subject DCMs to a patchwork of 50 state regulations contrary to Congress's goals.  In doing so, Arizona at least directly violates and undermines the CFTC's regulation requiring "impartial access" to all eligible participants nationwide.  17 C.F.R. § 38.151(b).  Arizona's disruption of this regulatory authority constitutes a cognizable injury.

Even if more was required, however, this patchwork makes it much more difficult for the agency to uniformly regulate DCMs.  Because Congress granted the CFTC "exclusive authority" over DCMs, it is not equipped to manage markets that are subject both to the CEA and to a patchwork of state regulations.  As a result, Defendants' actions undermine CFTC's authority and require additional agency resources to engage in regulatory oversight of these DCMs.  That is a classic Article III injury.

These injuries are caused by Defendants' attempts to regulate CFTC regulated DCMs under state laws in violation of CFTC's "exclusive jurisdiction" and the Supremacy Clause.  An injunction against Defendants' efforts to apply its laws to those federally regulated DCMs would redress the Plaintiffs' sovereign injury.

## II.    PLAINTIFFS ARE LIKELY TO SUCCEED IN ESTABLISHING THAT FEDERAL LAW PREEMPTS STATE LAW AS TO COMMODITY DERIVATIVES TRANSACTIONS ON CFTC-REGULATED DCMs

The United States and its agencies are entitled to a preliminary injunction against a State when federal plaintiffs establish a likelihood to succeed in establishing state law is preempted.  *Arizona,* 567 U.S. at 394 (upholding a preliminary injunction against an Arizona immigration law because the federal government occupies the field of immigration).  Where Congress makes "a single sovereign responsible for maintaining a comprehensive and unified system" of regulation, allowing states to regulate the same field "'detract[s] from the "integrated scheme of regulation" created by Congress.'"  *Id.* at 401-02 (quoting

8

*Wisconsin Dept. of Industry v. Gould Inc.*, 475 U.S. 282, 288-89 (1986)).

Arizona's attempt to shut down federally regulated DCMs intrudes on the federal scheme Congress designed to oversee national swaps markets. Prompted by the evolution of national financial markets and repeated conflicts with a patchwork of state laws, Congress enacted the CEA, granting the CFTC exclusive jurisdiction to regulate those markets and enacting a comprehensive federal regulatory framework that expressly preempts state laws that attempt to regulate the operation of, or transactions on, CFTC-regulated exchanges. *See* USA Compl. ¶¶ 38-54. This comprehensive federal regulatory scheme preempts Arizona law as applied to event contracts traded on federally regulated exchanges.

By describing event contracts as "bets" or "wagers," see, *e.g.*, ECF No. 18 at 16, 18, Arizona misconstrues both the nature of these contracts offered on CFTC-regulated DCMs and the federal regulatory framework. Arizona's limited and superficial review of fundamentally different products explains much of the confusion. *Id.* at 16-17. Contracts where the underlying event is a sporting event or an election function no differently than event contracts predicated on the weather, or the price of oil rising above a certain level.

And the CEA is clear that the CFTC has "exclusive jurisdiction" over event contracts that are swaps. 7 U.S.C. 2(a)(1)(A). Event contracts, including sports-related or political event contracts that are listed on DCMs, are covered by the CEA, and the CEA prohibits States from invading the CFTC's exclusive jurisdiction over event contract transactions offered by and executed on federally regulated DCMs. By prohibiting these DCMs from operating in Arizona without an Arizona license or by conditioning their operation on compliance with Arizona laws and regulations, Arizona directly interferes with the CFTC's authority pursuant to the federal scheme imposed by Congress through the CEA.

Arizona's interference with federally regulated DCMs is preempted. This Court should halt the ongoing efforts by Defendants to undermine the uniform

application of federal law by enjoining Arizona from applying laws related to betting and wagering to event contract swaps listed for trading on CFTC-regulated DCMs.  Unless restrained and enjoined by the Court, Defendants are likely to continue their attempts to subvert federal law and the exclusive jurisdiction to regulate event contract swaps conferred on the CFTC by Congress.

### A.   The challenged Arizona statutes are preempted as applied to commodities derivatives contracts

The Constitution's Supremacy Clause mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

The CEA, as continuously refined over more than a century, gives the CFTC "exclusive jurisdiction" over futures and swaps traded on a DCM.  7 U.S.C. § 2(a)(1)(A). The CEA "preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980).   "[P]reemption is appropriate '[w]hen application of state law would directly affect trading on or the operation of a futures market.'" *Effex Cap., LLC v. National Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (quoting *Am. Ag. Movement v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156-57 (7th Cir. 1992)).

"[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield." *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (internal citation omitted); *Time Warner Cable v. Doyle*, 66 F.3d 867, 874 (7th Cir. 1995) ("Congress, in the exercise of the legislative authority granted to it by the Constitution, may preempt state law." (citation omitted)). "A federal law may preempt a state law expressly, impliedly through the doctrine of conflict preemption, or through the doctrine of field (also known as complete) preemption." *Boomer v. AT & T Corp.,* 309 F.3d

10

404, 417 (7th Cir. 2002).  Arizona's laws as applied to federally regulated DCMs are expressly and implicitly preempted.

### 1.  Event contracts are "swaps" under the CEA

Event contracts are swaps as defined by the CEA.  "In all cases of statutory interpretation," the analysis must "start with the text."  *United States v. Gear*, 9 F.4th 1040, 1044 (9th Cir. 2021).  The Act defines "swap" to include "any agreement, contract, or transaction . . . that provides for any purchase, sale, payment, or delivery . . . that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency *associated with a potential* financial, economic, or commercial consequence."  7 U.S.C. § 1a(47)(A)(ii) (emphasis added).  Event contracts, including sports event contracts, are settled based on the occurrence or non-occurrence of a specified future event, like the occurrence of a weather event or the outcome of an election or sporting event.  And those occurrences are "associated with [] potential financial, economic, or commercial consequence[s]"—a storm affects shipping and crops; an election affects tax and spending policy; and a sporting event affects ticket and merchandise sales, advertising, brand endorsements, vendors, lodging businesses, and food and beverage services.  *Id.*; *see also KalshiEx*, 2026 WL 924004 at *3 (listing similar examples).

Event contracts often also qualify as binary options under the CEA, which are a "option[s] whose payoff is either a fixed amount or zero."[5]  As binary options, event contracts are also swaps under 7 U.S.C. § 1a(47)(A)(i), which defines "swap," to include "any agreement, contract, or transaction . . . that is a[n] . . . option of any kind that is for the purchase or sale, or based on the value, of 1 or more . . . quantitative measures, or other financial or economic interests or property of any kind."[6]

---

[5] *CFTC Futures Glossary*, https://www.cftc.gov/LearnAndProtect/AdvisoriesAnd Articles/CFTCGlossary/index.htm#B.

[6] *See also* §§ 1a(47)(A)(iv) (including transactions "commonly known to the trade

11

In its brief responding to Kalshi's motion for a preliminary injunction, Arizona attempts to skirt the preemption issue by asserting that event contracts traded on DCMs do not fall under the CEA's definition of swaps. ECF No. 18 at 12-16. Arizona reaches this conclusion by drawing thin, extra-textual distinctions between what is an "event" and what is an "outcome" and inserting limits on what qualifies as a "potential, financial, economic, or commercial consequence" that appear nowhere in the CEA. *Id.* at 13-14.

That torturing of the CEA's text is unnecessary. Nowhere in the "swap" definition did Congress draw a distinction between an "event" and "outcome." Nor does such parsing make sense. Arizona explains that an "'event would be 'the sporting event itself, not who wins it.'" ECF No. 18 at 13-14 (quoting *North Am. Derivatives Exch., Inc. v. Nevada*, No. 2:25-cv-00978, 2025 WL 2916151, at *8 (D. Nev. Oct. 14, 2025)). But it is difficult to see how that distinction doesn't also apply to contracts that Arizona concedes are swaps. For example, Arizona appears to agree that "[a]n event contract on the Fed raising interest rates" would be a swap. *Id.* at 14. Using Arizona's framework, however, the Federal Reserve Board's rate decision is an "outcome" of the "event" that is a meeting of the Federal Reserve Board's Open Market Committee. Under the plain text of the CEA, whether the Fed sets rates at a certain level, whether a storm hits at a particular time, or whether a certain team wins a sporting event are all "events" upon which a DCM could list a swap.

Event contracts based on sports or elections also implicate "potential financial, economic, or commercial consequence[s]" under the CEA. 7 U.S.C. § 1a(47)(A)(ii). Arizona's more limited, atextual view ignores that the definition applies to events even "associated with a potential" consequence. *Id.* As the Third Circuit held, a sports event affects "numerous . . . stakeholders, including sponsors,

as swaps") and (vi) ("any combination or permutation of, or option on, any agreement, contract, or transaction described in any of clauses (i) through (v)").

12

advertisers, television networks, franchises, and local and national communities." *KalshiEX*, 2026 WL 924004, at *3. It is not true that an economic consequence must be "inherently joined with a financial consequence." ECF No. 18 at 14. Otherwise, the CEA would prohibit DCMs from listing event contracts that they have offered for decades, like contracts on the weather.

Further, it is not true that there "is no genuine basis to hedge against" events that are traded on the DCMs that Arizona seeks to shut down. Many of the stakeholders to a sport event, see *KalshiEX*, 2026 WL 924004, at *3, may wish to hedge against a team's or participant's performance. And the same is true for political event contracts: any number of stakeholders may want to hedge against an expected tax change,[7] or parents who participate in Arizona's school choice program may wish to hedge against the reelection of Governor Hobbs, who has promised to roll back the program.[8]

The only difference between a sports or political event contract and the types of event contracts on the weather or corn production that have traded on DCMs for decades is the underlying event, but Arizona lacks any textual basis to justify carving out some events and not others, and Arizona offers no limiting principle to avoid undermining decades of well-regulated markets. Carving out sports and political event contracts from the CEA's definition of "swap," would destabilize those previously uncontroversial markets, potentially subjecting them to a patchwork of state gambling regulations. By contrast, adhering to the plain text of the CEA does nothing to limit Arizona's existing authority to regulate gambling—indeed, Arizona's gambling industry and related state revenue continues to grow

---

[7] William McBride, et al., "Kamala Harris Tax Plan Ideas: Details and Analysis," Tax Foundation (Oct. 16, 2024), https://taxfoundation.org/research/all/federal/kamala-harris-tax-plan-2024/ (describing various proposals and their likely effects).

[8] Transcript: Governor Hobbs 2026 State of the State Address, Office of Gov. Katie Hobbs (Jan. 12, 2026), https://azgovernor.gov/office-arizona-governor/news/2026/01/transcript-governor-hobbs-2026-state-state-address.

rapidly.[9]  The plain text reading of the CEA is also the least disruptive to both federal futures regulation and the typical application of Arizona's gambling laws.

### 2. The CEA expressly preempts state law

"Express preemption occurs when a federal statute explicitly states that it overrides state or local law." *Hoagland v. Town of Clear Lake,* 415 F.3d 693, 696 (7th Cir. 2005).  Congress explicitly preempted state regulation of commodity derivatives transactions, vesting the Commission with "exclusive jurisdiction," except as otherwise expressly provided by Congress, over all "accounts, agreements . . . , and transactions involving swaps or contracts of sale of a commodity for future delivery."  7 U.S.C. § 2(a)(1)(A).

This "exclusive jurisdiction" provision was first enacted by the Commodity Futures Trading Commission Act of 1974, Pub. L. 93-463, 88 Stat. 1389 (1974) ("CFTC Act of 1974").  Preemption was the primary goal of the "exclusive jurisdiction" provision.  Indeed, potentially limiting language was stricken from the statute "to assure that Federal preemption is complete."  120 Cong. Rec. S 30458, 30464 (daily ed. Sept. 9, 1974) (Statement of Sen. Curtis).  Preemption of state law was necessary because, for decades, states had attempted to apply state gambling laws to derivatives trading.  By the mid-nineteenth century, commodity exchanges in major trading hubs like New York and Chicago had organized trading to facilitate price discovery (information exchange), risk management (hedging), and speculation.  But many states prohibited futures trading as a form of gambling. *See, e.g., Irwin v. Williar*, 110 U.S. 499, 508-09 (1884) (describing futures

---

[9] *Compare* Ariz. Dep't. of Gaming, Fiscal Year 2025 Annual Report (reporting $8,536,032,607 in gross event wager receipts and $724,392,332 in aggregate gross licensing revenue) *with* Ariz. Dep't. of Gaming, Fiscal Year 2024 Annual Report (reporting $7,069,600,694 in gross event wager receipts and $619,618,574 in aggregate gross licensing revenue) *and* Ariz. Dep't. of Gaming, Fiscal Year 2023 Annual Report (reporting $6,148,868,887 in gross event wager receipts and $516,158,558 in aggregate gross licensing revenue), *https://gaming.az.gov/resources/reports#tribal-gaming-report-archive*.

14

contracts as "nothing more than a wager"); *see also Cothran v. Ellis*, 16 N.E. 646, 647 (Ill. 1888) (describing futures as "gambling in grain"). Congress recognized the need for uniform, nationwide regulation of futures and options markets because concurrent regulation by the states or other federal regulators such as the Securities and Exchange Commission could lead to "total chaos." *See* Commodity Futures Trading Act of 1974: Hearings Before the S. Comm. on Agric. & Forestry on S. 2485, S. 2578, S. 2837, H.R. 13113, 93d Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).

As financial derivatives markets have developed and grown, Congress has steadily expanded the CFTC's jurisdiction to include commodity swaps and event contracts. In 2010, Congress amended the CEA to add "transactions involving swaps" to the CFTC's § 2(a)(1) exclusive jurisdiction. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010); 7 U.S.C. § 2(a)(1)(A). In the same legislation, Congress emphasized the CFTC's exclusive jurisdiction over event contracts by adding the "Special Rule," CEA § 5c(c)(5)(C) to the Act. *See* 7 U.S.C. § 7a-2(c)(5)(C). In § 5c(c)(5)(C), Congress granted the CFTC specific oversight and prohibitory authority over event contracts by providing that the CFTC "may determine" event contracts involving certain categories "are contrary to the public interest" and may not be listed on CFTC-regulated markets. 7 U.S.C. § 7a-2(c)(5)(C)(i)-(ii). By creating a specific public interest review process, Congress clearly signaled that these contracts are within the CFTC's exclusive regulatory purview, not the States'.

### 3. The CEA occupies the field of derivatives trading regulation, preempting application of state law

Even without the express language of the CEA preempting state regulation, state laws prohibiting or purporting to regulate transactions listed by or executed on CFTC-regulated DCMs are preempted because Congress "occupied the field"

15

of regulation of event contracts traded on CFTC-regulated DCMs. *See KalshiEX*, 2026 WL 924004, at *4; *Boomer,* 309 F.3d at 417. In general, state law must give way if "Congress, acting within its proper authority, has determined [that a category of conduct] must be regulated by its exclusive governance" or where "the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona*, 567 U.S. at 399 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

When Congress amended CEA § 2(a)(1) in 1974 to give the CFTC "exclusive jurisdiction" over futures transactions, it did so with the intent that the CEA would "preempt the field insofar as futures regulation is concerned" such that "if any substantive State law regulating futures trading was contrary to or inconsistent with Federal law, the Federal law would govern." H.R. Rep. No. 93-1383 (1974) (Conf. Rep.), *reprinted in* 1974 U.S.C.C.A.N. 5894, 5897.

Over the years, amendments to the CEA repeatedly reinforced the CFTC's exclusive jurisdiction over the field of futures derivatives trading. In 1978, proposals to carve off pieces of the CFTC's "exclusive" jurisdiction were rejected, because "[t]he nature of the underlying commodity is not an adequate basis to divide regulatory authority." S. Rep. No. 95-850, at 111-12 (1978), *reprinted in* 1978 U.S.C.C.A.N. 2087, 2110-11. That "a futures contract market does not fit into the traditional mold where there are both hedging and price-discovery functions should not be the determining factor in whether the contract is to be regulated by the CFTC." *Id.* Congress also underscored the importance of the CFTC's exclusive jurisdiction over commodity derivatives, citing concerns over "costly duplication and possible conflict of regulation or over-regulation." *Id.* When amending the CEA in 1982, Congress "continue[d] to support the idea of a single unified program of regulation and exclusive CFTC jurisdiction over exchange-traded futures," "recognizing the somewhat esoteric nature of the commodity futures markets and the desire to have knowledgeable and uniform

enforcement of the Act." H.R. Rep. No. 97-565, at 44-45 & 102-103, *reprinted in* 1982 U.S.C.C.A.N. at 3893-94, 3951-52.

A field is preempted from state regulation "if the scope of the statute indicates that Congress intended federal law to occupy the legislative field." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008). The scope of the CEA and the long history of Congress's amendments to ensure federal law captured the evolving futures and derivatives markets makes clear that Congress intended to occupy the field. With 7 U.S.C. § 2(a)(1)(A), Congress intended the CEA to occupy the field of "accounts, agreements . . . and transactions involving swaps or contracts of sale of a commodity for future delivery . . . traded or executed on a contract market . . . or any other board of trade, exchange, or market." When an instrument is trading on a CFTC-regulated market as a "swap" or "future," state gambling laws do not apply.

**4. Arizona's application of its state laws conflicts with the CEA**

Offering event contracts on a DCM cannot, in and of itself, be an activity that is unlawful under any state law because such an application of state law would conflict with the CEA. "Congress's intent was to provide the CFTC with exclusive jurisdiction to regulate commodities" and "[s]uch exclusive jurisdiction precludes states from exercising supplementary regulatory authority over commodity transactions." *Stuber v. Hill*, 170 F. Supp. 2d 1146, 1151 (D. Kan. 2001); *see also KalshiEX*, 2026 WL 924004, at *5 ("[C]onflict preemption also prohibits New Jersey from regulating sports-related event contracts on CFTC-licensed DCMs.").

A State applying local gambling laws to federally regulated DCMs "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona*, 567 U.S. at 399 (internal citation omitted). The CEA presents a "comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex." *Merrill Lynch, Pierce, Ferner & Smith, Inc. v. Curran*, 456 U.S. 353, 356 (1982). State gambling laws often require local

17

licensing, fees, enforcement, and specific hardware. Applying state-by-state local requirements to national commodity exchanges would create the very "patchwork" that Congress set out to prevent in these complex markets. Indeed, the history of the CEA demonstrates repeated efforts by Congress to protect nationwide markets under uniform federal regulation as those markets evolve and as states attempt to limit them.

What's more, complying with both state and federal law regulating event contracts traded on CFTC-regulated DCMs would be impossible because a DCM is required by federal law to provide "impartial access" to all eligible participants nationwide. 17 C.F.R. § 38.151(b). If a state bans the contract, the DCM cannot fulfill its federal mandate to provide impartial national access. Other state-imposed restrictions on access to markets would similarly make it impossible for the regulated DCMs to comply with federal regulations. The CEA reflects Congress's understanding that commodity derivatives markets require nationally uniform rules governing the listing, trading, clearing, settlement, and surveillance of financial instruments traded in these markets to prevent the type of fragmented oversight at risk in this case. Complying with fractured state regulations would derail that goal.

Congress has consistently chosen centralized, federal oversight and regulation of derivatives markets, recognizing the negative effects of a patchwork of state regulation even in the predecessor statutes to the current CEA. *See* Future Trading Act of 1921, Pub. L. No. 67-66, 42 Stat. 187 (1921); Grain Futures Act of 1922, Pub. L. No. 67-331, 42 Stat. 998 (1922). In passing these laws, Congress recognized the importance of uniform federal regulation of futures markets, even over objections that the new legislation would displace some States' regulations. *Cf.* H.R. Rep. No. 67-1095, at 5 (1922) (Conf. Rep.) (objecting that the bill was "designed to . . . more or less eliminate some of the most important police powers of several sovereign States"). Congress's "clear and manifest purpose" was indeed to preempt these historic police powers. *Altria Grp., Inc.*, 555 U.S. at 77 (noting

18

"the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress") (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). The plain language of the text, underscored by the consistent legislative history to preempt states from applying 50 state requirements on national markets, indicates this "clear and manifest purpose" to preempt state police powers.

### III. THE REMAINING FACTORS FAVOR GRANTING PRELIMINARY RELIEF

Absent an injunction, the United States and the CFTC will suffer irreparable harm. Irreparable harm necessarily results from the enforcement of an unconstitutional state law. *Goldie's Bookstore, Inc. v. Superior Ct. of State of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) ("An alleged constitutional infringement will often alone constitute irreparable harm."). And the United States suffers irreparable harm "when its valid laws in a domain of federal authority are undermined by impermissible state regulations." *Alabama*, 691 F.3d at 1301. The federal government's ability to enforce its policies and achieve its objectives will be undermined by the state's enforcement of statutes that interfere with federal law. *See Crosby v. National Foreign Trade Council*, 530 U.S. 363, 379-80 & n. 14 (2000). "The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). The United States and the CFTC seek to protect their distinct interests in preventing a State from nullifying federal law and evading Congress's intent and direction in the CEA.

Arizona seeks not only to regulate CFTC-regulated DCMs but to criminally prosecute them for trading in markets in compliance with federal law. There is no remedy at law for such an injury. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). The likelihood of irreparable harm to the interests of the United

19

States and the CFTC thus warrants preliminary relief. *See American Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (enjoining permanently the enforcement of a state statute that is preempted by federal law because it interferes with the federal government's ability to enforce its policies); *Crosby*, 530 U.S. at 372, 379-80 (same).

The public interest and equities prongs merge when the United States is a party because "[f]rustration of federal statutes and prerogatives are not in the public interest," and where a state law is preempted, the State is not "harm[ed] from . . . nonenforcement of invalid legislation." *Alabama*, 691 F.3d at 1301. As the Third Circuit recently held in a nearly identical case, allowing a state to enforce a state law in violation of the Supremacy Clause is neither equitable nor in the public interest. *See KalshiEx, LLC*, 2026 WL 924004 at *17; *see also American Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1059-60 (9th Cir. 2009). Arizona's actions to enforce its gambling laws as applied to event contracts trading on CFTC-regulated exchanges interferes with federal policy as set out by Congress. A temporary restraining order and preliminary injunction would allow the federal government to continue to pursue federal priorities, which is inherently in the public interest, until a final judgment is reached in this case. *Id.*

Moreover, it is not in the public interest for Arizona to enforce preempted laws. *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010). Preserving the status quo through a temporary restraining order and preliminary injunction is less harmful than allowing state laws that are likely preempted by federal law to be enforced. See *Am. Trucking*, 559 F.3d at 1059-60.

## CONCLUSION

Arizona's gambling laws are preempted as applied to event contracts traded on CFTC-regulated DCMs. The United States and the CFTC respectfully ask this court to enter a temporary restraining order and preliminary injunction prohibiting Arizona from applying its laws against CFTC-regulated DCMs.

20

Dated: April 8, 2026                    Respectfully submitted,

By: /s/ Tiberius Davis                       /s/ M. Jordan Minot

*Attorneys for the United States*          *Attorneys for the Commodity Futures*
*of America*                               *Trading Commission*

TIMOTHY COURCHAINE                    Tyler S. Badgley
U.S. Attorney for the District of     General Counsel
Arizona                               M. Jordan Minot
40 N. Central Avenue,                 Deputy General Counsel
Suite 1800                            Anne Stukes
Phoenix, AZ 85004                     Senior Assistant General Counsel
(602) 514-7500                        Carlin Metzger
                                      Assistant General Counsel
BRETT A. SHUMATE
Assistant Attorney General            U.S. Commodity Futures Trading
Civil Division                        Commission
                                      Three Lafayette Center
YAAKOV M. ROTH                        1155 21st Street, NW
Principal Deputy Assistant            Washington, DC 20581
Attorney General                      Tel:  (202) 209-1087
                                      Fax:  (202) 418-5567
TIBERIUS DAVIS                        tbadgley@cftc.gov
Counsel to the Assistant              jminot@cftc.gov
Attorney General                      astukes@cftc.gov
450 5th St NW,                        cmetzger@cftc.gov
Washington, DC 20001
Tiberius.davis@usdoj.gov
202-860-8970

21