**KRISTIN K. MAYES**
**Attorney General**
(Firm State Bar No. 14000)

Joshua D. Bendor (Bar No. 031908)
Alexander W. Samuels (Bar No. 028926)
William Y. Durbin (Bar No. 036941)
Joshua A. Katz (Bar No. 039449)
Office of the Arizona Attorney General
2005 N. Central Avenue
Phoenix, AZ 85004-1592
(602) 542-3333
Joshua.Bendor@azag.gov
Alexander.Samuels@azag.gov
William.Durbin@azag.gov
Joshua.Katz@azag.gov
ACL@azag.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| KalshiEX LLC, | No. CV-26-01715-PHX-MTL |
| Plaintiff, | Hon. Michael T. Liburdi |
| THE UNITED STATES OF AMERICA; and COMMODITY FUTURES TRADING COMMISSION, | |
| Consolidated Plaintiffs, | **CONSOLIDATED DEFENDANTS' RESPONSIVE SUPPLEMENTAL BRIEF ADDRESSING FEDERAL GOVERNMENT'S MOTION FOR TEMPORARY RESTRAINING ORDER** |
| v. | |
| Jackie Johnson, et al., | |
| Defendants, | |
| STATE OF ARIZONA, *et al*. | |
| Consolidated Defendants | |

A TRO "is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Friess v. Mortg. Law Firm PC*, No. CV-24-08180-PCT-DWL, 2024 WL 4371713, at *4 (D. Ariz. Oct. 2, 2024) (quoting *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012)).  Like "the same substantive standard[]" for a PI, a movant seeking a TRO must show, among other factors, that it "is likely to succeed on the merits" and "is likely to suffer irreparable harm in the absence of preliminary relief." *Id.* (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)).  CFTC has not made that showing.[1]

## ARGUMENT

**I.     CFTC has not clearly shown a likelihood of success on the merits.**

CFTC cannot satisfy the likelihood of success factor because, at a minimum, there are serious questions about its standing, particularly as to the emergency relief it seeks. Additionally, CFTC's substantive case is meritless.

**A.     CFTC has not shown any injury to itself.**

**1.     Mere allegations of preemption are insufficient.**

Standing requires an "injury in fact." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  That is, "an invasion of a legally protected interest" that is "concrete." *Id.*

That is easiest for regulated parties.  "By contrast, when (as here) a plaintiff challenges the government's unlawful regulation (or lack of regulation) of someone else, standing is not precluded, but it is ordinarily substantially more difficult to establish." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024) (citation and quotation marks omitted).  "When the plaintiff is an unregulated party, causation ordinarily hinges on the response of the regulated (or regulable) third party to the government action or inaction— and perhaps on the response of others as well." *Id.* (citation and quotation marks omitted). "[P]laintiffs attempting to show causation generally cannot rely on speculation about the

---

[1] Regarding the Anti-Injunction Act issue, the Supreme Court held in *Leiter Minerals v. United States*, 352 U.S. 220, 226 (1957), that the Anti-Injunction Act does not apply to suits by the United States.  Defendants have not found subsequent authority to the contrary.

unfettered choices made by independent actors not before the courts." *Id.* (citation and quotation marks omitted).

Like any other plaintiff, "the federal government … must establish its standing to bring a civil suit in federal court." *United States v. California*, --- F. Supp. 3d ---, No. 25-06230, 2026 WL 784514, at *2 (C.D. Cal. Mar. 18, 2026); *see Santana v. United States*, 88 F.R.D. 549, 554 (D. P.R. 1980) ("No federal court can excuse any litigant, whether it be a private citizen or the United States of America, from complying with the constitutional requirements of Article III.").

These principles are well illustrated in *California*, where the United States sought an injunction against a state law regulating the laying conditions of hens, alleging it was preempted by a federal law. 2026 WL 784514, at *1. Because the United States showed no harm to itself, presenting only "undisguised legal conclusions … rais[ing] no inferences about [] sovereign injury," the district court dismissed. *Id.* at *3, *5.

This case is the same because CFTC asserts nothing more than an abstract legal concern about Arizona's (allegedly) preempted law. And CFTC "presents no binding authority holding [otherwise:] that the mere *existence* of a preempted state law creates a sovereign injury to the federal government." *Id.* at *3. While it points to a hodgepodge of cases, none stands for this proposition.

CFTC's reliance on *United States v. Missouri*, 114 F.4th 980 (8th Cir. 2024), is misplaced. The state law there was flagrantly unconstitutional; it declared that certain federal firearms laws "shall not be recognized by this state." *Id.* at 983. Far from establishing a general rule that the United States has standing when it alleges a violation of federal law, that case found standing because "state officials withdrew resources and manpower that further the enforcement of federal law." *Id.* at 984. CFTC does not allege that Arizona has directly taken away any resources.

From *Vermont Agency of Nat. Resources v. U.S. ex rel Stevens*, 529 U.S. 765, 771 (2000), CFTC cherry picks (at 7) "injury to [the United State's] sovereignty arising from

violation of its laws." But that case simply held that a private plaintiff had standing to bring a False Claims Act suit as a relator for the United States. *Id.* at 770.

Nor is enforcement against a private party, by itself, enough to establish an Article III injury to CFTC. Rather, it is only when enforcement "imped[es] the operations or function of the federal government" that, "[p]erhaps [it] could give rise to an injury in fact." *California*, 2026 WL 784514, at *3. But CFTC has not explained how Kalshi's arraignment or trial will actually impede the federal government's operations, other than vague assertions to undermining federal objectives. *Cf., e.g.*, *United States v. King County*, 122 F.4th 740, 751 (9th Cir. 2024) ("substantial risk" that the county would "prohibit" an airport "from servicing" federal "charter flights"). All CFTC alleges is that Arizona is regulating event contracts, which CFTC believes only it may do.

CFTC's other cited cases (at 7) do not address standing. *E.g.*, *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 361 (1819) (state directly taxing a federal bank). CFTC also cites a number of immigration cases, but that unique context, involving "broad, undoubted" federal power, is much different than the present case. *Arizona v. United States*, 567 U.S. 387, 394 (2012); *United States v. South Carolina*, 720 F.3d 518, 528 (4th Cir. 2013); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012).

### 2. CFTC's diversion of resources theory fails.

The closest CFTC comes to alleging some impact on itself from Arizona's enforcement is (at 8) that Arizona's "actions undermine CFTC's authority and require additional agency resources to engage in regulatory oversight." This bare-bones assertion appears to be a diversion of resources argument. But a mere diversion of resources is not enough. *See FDA*, 602 U.S. at 395. CFTC must show more—that the challenged law directly interferes with its core business activities. *Id.* Its decision to file this lawsuit does not suffice; CFTC "cannot manufacture its own standing." *Id.* at 394. Here, CFTC has not alleged, let alone shown, how Arizona's enforcement of its own gambling laws have interfered with CFTC's business activities, especially since event contracts that constitute gambling or that are unlawful under state law are also unlawful under CFTC's

own regulation.  *See* 17 C.F.R. § 40.11.  If anything, enforcement by Arizona will lighten CFTC's load, not increase its burden.

### 3.    CFTC lacks a relevant, statutorily authorized interest to sue.

Even if the CFTC had established a generalized harm, any such harm must be related to a cognizable "legally protected interest."  *Lujan*, 504 U.S. at 560.  Legally protected interests may include "specific statutory authority,"  the protection of federal property, prevention of interference with national security, or interstate commerce. *United States v. Mattson*, 600 F.2d 1295, 1297-99 (9th Cir. 1979).  CFTC points to nothing like that.

The CFTC alleges here only that Arizona's laws violate the Supremacy Clause. They do not, but regardless, the Supremacy Clause is not a law the CFTC enforces; it is a structural element of the Constitution.  *Cf. CFTC v. White Pine Trust Corp.*, 574 F.3d 1219, 1223 (9th Cir. 2009) (CFTC's ability to sue under 7 U.S.C. § 13a-1(a) requires "a violation of the Act or of its regulations").  Contra Mot. at 2 n.1.  The CFTC points to no statutory authority to sue for a naked constitutional violation.

On the contrary, CFTC's own regulations cut against an interest here.  It is hard to see how CFTC is injured by state regulation of activities it itself prohibits.  Under the Special Rule, CFTC "may determine that" event contracts "are contrary to the public interest" if they involve "activity that is unlawful under any Federal or state law" or "gaming."  7 U.S.C. § 7a-2(c)(5)(C)(i)(I, V).  By rule, CFTC used this authority to prohibit all such contracts.  17 C.F.R. § 40.11(a)(1); *KalshiEX, LLC v. Schuler*, No. 2:25-cv-01165-SDM-CMV, 2026 WL 657004, at *9 (S.D. Ohio Mar. 9, 2026).  Contracts over sporting events are definitionally over games.  And many sports contracts, as well as all election contracts, facilitate activity illegal under state law.  *See* A.R.S. § 16-1015.

### B.    CFTC does not meet its merits burden for any injunctive relief.

Once again, Defendants are left to wonder what sort of TRO is sought here.  *See generally* Order, ECF Doc. 51 at 9 (Apr. 8, 2026) ("The precise nature of the relief Kalshi seeks has been the subject of much confusion.").  Depending on the scope, to show a

likelihood of success on the merits, CFTC must show (1) that all of Kalshi's bets charged in the Information are swaps within the meaning of the CEA (if the TRO seeks only to enjoin Kalshi's arraignment); (2) that, as a matter of law, all sports-related bets on DCMs are swaps (if the TRO seeks to enjoin Defendants from enforcing Arizona gambling laws against sports-event contracts); or (3) that, as a matter of law, all bets of any kind on DCMs are swaps.  CFTC cannot meet any of these burdens, and, upon close inspection, has not even attempted to do so.[2]  *See also California Ins. Guarantee Ass'n v. Azar*, 940 F.3d 1061, 1067 (9th Cir. 2019) ("[W]hen the text of a pre-emption clause is susceptible of more than one plausible reading, courts ordinarily accept the reading that disfavors pre-emption.").

### 1.    CFTC cannot show that all of Kalshi's bets charged in the Information are swaps within the meaning of the CEA.

The CEA defines swaps to include certain event contracts.  To meet the statutory definition of swap, an event contract must be "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency" and the event or contingency must be "associated with a potential financial, economic, or commercial consequence."  7 U.S.C. § 1(a)(47)(i).  CFTC must concede that not all events are "associated with a potential financial, economic, or commercial consequence." Otherwise that statutory language would be a nullity.

CFTC asserts (at 12) that "[e]vent contracts based on sports or elections" have potential financial, economic, or commercial consequences.  But the question is not whether *some* event contracts related to sports could have economic consequences.  In order to show that all of the charges against Kalshi are preempted, CFTC must show (among other things) that all of the sports contracts charged in the Information have financial, economic, or commercial consequences.  But CFTC does not even try.  That is no surprise—for the reasons discussed at the April 3 hearing, CFTC simply cannot make

---

[2] Defendants incorporate their previous merits briefing and add a few key discrete points here.

this showing.  *See, e.g.*, Information, Count 9 (Oklahoma City Thunder to beat the Milwaukee Bucks by over 14.5 points), Count 20 (the number of points scored in the Phoenix Suns vs. Indiana Pacers game played on that date, that Devin Booker would score more than 25 points, and Jarace Walker would get more than six rebounds).  Such "spread" and "parlay" bets have no financial, economic, or commercial consequence—except to the gamblers who make them.

In its motion, CFTC links derivatives (whether swap, futures contract, or some other category) to "hedging" economic risk and "price discovery."  As an example, it points to jet fuel futures as a hedge against future price movements (at 4 n.4).  Unlike betting on a sporting event—whether spread, parlay, or "prop" (e.g., whether Steph Curry scores 35 or more points)—there is a real, underlying commodity market that sets the price of jet fuel futures.  Buying futures contracts in jet fuel is "associated with potential financial, economic or commercial consequence[s]," which Congress sought to regulate.  Whether that exchange is a good or bad one depends with how the market moved after they purchased the derivatives contract.

Unlike the price of a commodity, the result of a sporting event is in no way determined or impacted by any market.  There is no prospect for an exchange of money for goods.  Someone wins, and someone loses.  Either way, Kalshi keeps its cut, and there is no commodity that anyone can walk away with.  CFTC cannot say, with a straight face, that spread and parlay contracts hedge real risk.  Likewise, CFTC has not articulated what underlying commodity's price is "discovered" through sports event contracts.  Holding sports event contracts up against true derivatives shows the holes in CFTC's reasoning.

### 2.    CFTC cannot show that all sports bets on DCMs are swaps.

CFTC also cannot make the even broader showing that, as a matter of law, all event contracts related to sports have financial, economic, or commercial consequences.  The number of flips that the Gorilla does at halftime of the Suns game does not have any such consequences.  Nor does the side of the basketball court from which the first shot is taken.  Who wins a particular game does not have "financial, economic, or commercial

consequences" in the way that changes in interest rates or the price of a barrel of oil necessarily do. If Congress wanted to preempt longstanding state gambling laws as applied to any bet related to a sports event, it would have said so, instead of defining a "swap" to be based on the event's "financial, economic, or commercial consequence."

### 3.    CFTC cannot show that all bets on DCMs are swaps.

CFTC also offers no limiting principle for what qualifies as an "event contract based on sports." Is a bet on what Devin Booker will have for breakfast on the morning of a game an "event contract based on sports"? How about a bet on the amount of traffic outside the arena? The music played during halftime?

The phrase "event contract based on sports" is not a legal term. It is not used in the CEA, nor is it elsewhere a term of art. It is not a legal category to which the Court can enjoin the state from applying its gambling laws, either as a matter of logic or with the specificity required by Federal Rule of Civil Procedure 65(d)(1). And much the same reasoning applies to elections—with the additional layer that bets on individual elections trigger serious concerns about corruption and the manipulation of our democracy.

Rather than take on its burden to show what it thinks is really preempted, CFTC incorrectly characterizes Arizona's enforcement efforts. Contrary to CFTC's suggestion, Arizona does not seek to shut down any DCM; it seeks only to prevent companies from acting as unlicensed event wagering operators in violation of Arizona law, whether through DCMs or otherwise. CFTC also describes Arizona's conduct as "ever-escalating" (at 1) or "increasingly aggressive" (at 2). But all Arizona has done is issue cease and desist letters and file a single misdemeanor information against one DCM. CFTC wants to make Arizona the aggressor, but that is simply not the case. Instead, Arizona is practicing dual sovereignty, enforcing longstanding state criminal laws while preserving a DCM's ability to issue compliant contracts.

**II.    CFTC fails to clearly satisfy the remaining equitable factors for TRO.**

"A TRO preserves the status quo pending a hearing on a preliminary injunction motion in order to avoid irreparable harm in the interim." *Daniel D'Agostino v. Circle K Stores Inc.*, No. CV-26-01225-PHX-JAT, 2026 WL 933387, at *2 (D. Ariz. Apr. 7, 2026).

Thus, CFTC must clearly show that it will suffer irreparable harm from the arraignment of Kalshi going forward on April 13, 2026. It has not done so.

**A.    CFTC identifies no irreparable harm to itself.**

The present request for emergency relief—aimed solely at halting an action against a distinct private entity (Kalshi), and not the party asking for relief (CFTC)—is quite unusual in multiple respects. To start, CFTC identifies no harm that *it* will suffer on or after April 13, 2026, before the Court is able to hear a fully briefed motion for a preliminary injunction. Nor can CFTC make that showing. Kalshi's arraignment requires nothing of the CFTC and does not stop the CFTC from doing anything.

Unlike a typical TRO request involving a "business's 'destruction in its current form'" or monetary loss that cannot be remedied with "other corrective relief … at a later date," CFTC has failed to identify any concrete harm that it will suffer before a PI hearing that would "render[] any opportunity for later review at best inadequate and, at worst, moot." *Alpine Sec. Corp. v. Fin. Indus. Reg. Auth.*, 121 F.4th 1314, 1329 (D.C. Cir. 2024) (citations omitted). This situation where a Federal agency is suing to block a state court action involving a private business is so unusual that CFTC cites no case in which the United States has done. And the five cases that CFTC does cite do not help it.

First, CFTC cites the Ninth Circuit's statement that "[a]n alleged constitutional infringement *will often* alone constitute irreparable harm," *Goldie's Bookstore, Inc. v. Superior Ct. of Cal.*, 739 F.2d 466, 472 (9th Cir. 1984) (emphasis added), as support for its assertion that "[i]rreparable harm *necessarily* results from the enforcement of an unconstitutional state law," Doc. 49 at 26 (emphasis added). CFTC's liberal paraphrasing of that case is even less helpful in context. In *Goldie's*, the Ninth Circuit found **no** irreparable injury because the plaintiff—who was the regulated party—had "not even

attempted to prove that [the challenged law was] intentionally utilized to infringe upon free speech," and the "alleged deprivation of equal protection" was "too tenuous to support [an] affirmance." *Id.*

In fact, "[c]ourts have largely rejected presumptions of irreparable harm except in the very narrow context of first amendment challenges … or freedom of religion." Wright & Miller, 11 Federal Practice and Procedure § 2948.1 (2026 Update).  Other exceptions typically involve alleged deprivations of individual rights, with courts often finding irreparable harm only after the movant established likely success on the merits.  *E.g.*, *Baird v. Bonta*, 81 F.4th 1036, 1040, 1042 (9th Cir. 2023) (Second Amendment).

By contrast, courts have found more generalized appeals to structural constitutional violations insufficient.  *E.g.*, *Leachco, Inc. v. Consumer Prod. Safety Comm'n*, 103 F.4th 748, 755 (10th Cir. 2024) (reaffirming that "a mere generalized separation of powers violation, by itself, does not establish irreparable harm").  Alleged structural constitutional injuries—like the preemption and enforcement interests that CFTC asserts—may be sufficient for an Article III injury (though the State certainly does not concede that here).  But that does not automatically establish irreparable harm, otherwise TROs would always flow from standing alone.  *Cf. Care One, LLC v. NLRB*, 166 F.4th 335, 345 n.6 (2d Cir. 2026) ("The Supreme Court has thus consistently explained that finding a 'here-and-now injury' cognizable for jurisdictional purposes is not the same as finding likely irreparable harm warranting interim relief.").

Second, CFTC cites (at 26) *United States v. Alabama*, in which the United States sought to preliminarily enjoin newly enacted state laws that "attempt[ed] to regulate immigration."  691 F.3d 1269, 1279 (11th Cir. 2012).  Only after finding the government was likely to succeed on its preemption theory as to several of the state laws, the Eleventh Circuit stated that "[t]he United States suffers injury when its valid laws in a domain of federal authority are undermined by impermissible state regulations."  *Id.* at 1301.  But brand-new state laws that suddenly "intrude[] into the field of alien registration, which the Supreme Court has confirmed is an area of exclusive federal concern," *id.* at 1282,

9

are far different from the present case. Here, Arizona seeks to enforce longstanding state criminal laws on gambling, in the heartland of state health-and-safety concern. And again, nothing about this single arraignment of a private party obviously or irreparably interferes with federal activities in the way that state action on immigration clearly does.

Third, CFTC makes (at 26) another night-and-day comparison to *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 379-80 & n.14 (2000), which involved a Massachusetts law that "restrict[ed] the authority of its agencies to purchase goods or services from companies doing business with Burma." *Id.* at 366. CFTC does not explain how that lawsuit by private parties supports its generic argument here that "[t]he federal government's ability to enforce its policies and achieve its objectives will be undermined by the state's enforcement of statutes that interfere with federal law," Doc. 49 at 26.

CFTC's burden is not merely to allege direct interference with its objectives (which, as explained above, it fails to do under Article III), but rather to demonstrate why Arizona's arraignment of a private party will so irreparably harm the federal government that such extraordinary relief cannot possibly wait until a PI hearing. Indeed, *Crosby* involved a permanent injunction after summary judgment, not preliminary relief. *Id.* at 371. Similarly unhelpful, CFTC cites (at 27) *American Ins. Ass'n v. Garamendi*, in which private parties obtained a permanent injunction of a state law that interfered with foreign relations. 539 U.S. 396, 401, 412-13 (2003). And finally, *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327 (2015), did not discuss irreparable harm.

In sum, CFTC relies on vague assertions of federal interests, without citing a single case granting the federal government the type of relief that it requests here, and without showing the specificity, immanency, and irreparability required to meet its burden for a TRO. No one disputes that the federal government has a number of important and supreme interests. But general allusions to federal sovereignty and supremacy do not entitle CFTC to emergency relief, particularly given the weighty state interests on the other side of the scale. *Cf. California*, 2026 WL 784514, at *4 ("Without requiring the United States to show some redressable injury, the federal government might initiate a

campaign of preemption suits under the aegis of its sovereignty to bring state laws in line with its own political agenda."). And CFTC's claim of irreparable injury from an Arizona arraignment is even more suspect in light of the TROs issued by other state courts (e.g., in Nevada) which CFTC has not challenged.

**B.      CFTC cannot rely on alleged harm to a private party.**

Nor can CFTC rely alone on the arraignment of a private entity as evidence of irreparable injury to itself, particularly when Kalshi has its own avenues of relief in that state court proceeding. Kalshi can move to dismiss on the basis of preemption. If that motion is denied, it can file a special action petition in the Arizona Court of Appeals, then petition for review to the Arizona Supreme Court. *See* Ariz. R. Proc. Special Actions 11(b). If Kalshi is tried and convicted, it can appeal all the way to the U.S. Supreme Court. Any one of those steps, and perhaps others, could maintain the status quo or otherwise never lead to any direct or secondary effects on CFTC. Simply put, the mere fact of the state court arraignment in no way irreparably harms the federal plaintiffs, let alone in any way that cannot wait until a PI hearing. *See, e.g.*, *L.A. Mem'l Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1203 (9th Cir. 1980) (reversing district court's grant of injunctive relief that took into account injury of a third party).

**C.      CFTC's own delay belies any assertion of irreparable harm.**

Additionally, even if CFTC had explained how Kalshi's arraignment would concretely and irreparably harm the federal government, CFTC's delay in seeking emergency relief proves otherwise. *Lydo Enters., Inc. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A delay in seeking a preliminary injunction is a factor to be considered in weighing the propriety of relief.").

CFTC filed for a TRO on April 8, 2026. That was more than *three weeks* (23 days) after Arizona indicted Kalshi on March 16 and announced the date of the arraignment in open court. And that was more than *ten months* after Arizona sent various cease and desist letters to DCMs in May 2025. *E.g.*, *Friess*, 2024 WL 4371713, at *6 n.3 ("[D]elaying for many weeks before seeking an emergency TRO ... is not the proper way

11

to present a claim for emergency relief based on an alleged threat of imminent, irreparable injury." (citation omitted)); *see also Oakland Trib., Inc. v. Chron. Pub. Co.*, 762 F.2d 1374, 1377 (9th Cir. 1985) ("Plaintiff's long delay before seeking a preliminary injunction implies a lack of urgency and irreparable harm.").

And that delay has harmed Defendants and the Court. CFTC seeks a TRO with just two business days before Kalshi's arraignment on April 13. That prejudices Arizona's enforcement of its criminal laws and its "ability to fully develop facts and arguments for the Court to assess in ruling on whether to grant" the emergency relief. *Ariz. Libertarian Party v. Reagan*, 189 F. Supp. 3d 920, 924 (D. Ariz. 2016).[3]

**D.      CFTC cannot show the balance of equities and public interest favor it.**

CFTC must also establish that the equities and public interest favor enjoining the state court arraignment and thereby interfering with Arizona's enforcement of its gambling law. *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). CFTC cannot do so, because its own regulations provide that the contracts charged in the Information are illegal, both because they involve gaming and are illegal under state law. 17 C.F.R. § 40.11(a)(1). CFTC apparently has abandoned its duty to enforce its own regulation. *See KalshiEX, LLC v. Schuler*, No. 2:25-cv-01165-SDM-CMV, 2026 WL 657004, at *9 (S.D. Ohio Mar. 9, 2026). That is all the more reason why the public interest supports allowing Arizona to enforce its own longstanding gambling laws.

**CONCLUSION**

The Court should deny CFTC's Motion for a TRO.

---

[3] Although laches may not bar suits brought by the United States to enforce its own rights, *United States v. Summerlin*, 310 U.S. 414, 416, (1940), courts recognize the broader equitable principle that delay shows a lack of true urgency and irreparable harm. *See, e.g.*, *N.L.R.B. v. P*I*E Nationwide, Inc.*, 894 F.2d 887, 893-94 (7th Cir. 1990) ("A proper ground for refusing to issue the injunction would be harmful and unjustifiable delay."); *Edge Games, Inc. v. Elec. Arts, Inc.*, 745 F. Supp. 2d 1101, 1117–18 (N.D. Cal. 2010) (seven-month delay weighed against a finding of irreparable harm); *Valeo Intellectual Prop., Inc. v. Data Depth Corp.*, 368 F.Supp.2d 1121, 1128 (W.D. Wash. 2005) (three-month delay); *see also N.L.R.B. v. Searle Auto Glass, Inc.*, 762 F.2d 769, 772 (9th Cir. 1985) (laches can bar the renewal of NLRB enforcement proceedings).

RESPECTFULLY SUBMITTED this 10th day of April, 2026.

**KRISTIN K. MAYES**
**ATTORNEY GENERAL**


By  /s/ *Joshua D. Bendor*
     Joshua D. Bendor
     Alexander W. Samuels
     William Y. Durbin
     Joshua A. Katz
     Office of the Arizona Attorney General
     2005 N. Central Ave.
     Phoenix, AZ 85004

*Attorneys for Defendants*