Sean J. O'Hara (#024749)
Kercsmar & O'Hara
8800 East Raintree Drive, Suite 310
Scottsdale, Arizona 85260
Telephone: (480) 776-3432
sjo@kandolaw.com

*[Counsel Continued on Signature Block]*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| KalshiEX LLC, | No. CV-26-01715-PHX-MTL |
| Plaintiff, | No. CV-26-02246-PHX-DMF |
| The United States of America; and Commodity Futures Trading Commission, | **PROPOSED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Consolidated Plaintiffs, | |
| v. | |
| Jackie Johnson, et al., | |
| Defendants, | |
| State of Arizona, et al., | |
| Consolidated Defendants. | |

Proposed Intervenor-Plaintiff, North American Derivatives Exchange, Inc., d/b/a Crypto.com | Derivatives North America ("CDNA"), by and through its undersigned counsel, brings this civil action for declaratory and injunctive relief, and alleges as follows:

## INTRODUCTION

1.      CDNA seeks declaratory and injunctive relief to restrain the Arizona Department of Gaming ("ADG") from improperly and under color of Arizona state law

assuming jurisdiction over, regulating and terminating CDNA's listing of lawful derivatives contracts on its federally regulated market.

2.    CDNA is a federally regulated designated contract market ("DCM") which lists event contracts for trading in interstate commerce.  In correspondence and a Cease-and-Desist Letter ("C&D Letter"), the ADG has purported to assert jurisdiction over CDNA.  CDNA is regulated by the U.S. Commodity Futures Trading Commission ("CFTC"), and the conduct that the ADG seeks to regulate (and prohibit) involves the listing of contracts that are authorized to be traded under federal law, and that by statute fall within the "exclusive jurisdiction" of the CFTC.

3.    The crux of the ADG's assertion of authority is its conclusion that, notwithstanding federal regulation, contracts traded on CDNA's exchange are "event wagering" subject to Arizona gaming laws.  But the ADG ignores that Congress expressly conferred "exclusive jurisdiction" over DCMs and the products they make available for trading to the CFTC to ensure a uniform national derivatives market.  7 U.S.C. § 2(a)(1)(A). Amendments to the Commodity Exchange Act, 7 U.S.C. §§ 1 et seq. ("CEA") have reinforced that policy decision over many years, with Congress affirmatively excluding state authorities like the ADG from playing any role in overseeing contracts traded on federally regulated derivatives exchanges.  *See infra* ¶¶ 29-41.  And federal courts have long recognized that the CFTC's regulation of the national derivatives market is exclusive and preempts state involvement.[1]  In this action, the CFTC has also confirmed its position

---

[1]    *See, e.g.*, *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003) (finding the CEA preempted California's Bucket Shop Law as

that state law applied against CFTC-designated contract markets violates the Supremacy Clause. *See* ECF No. 1; *also infra* ¶ 40.

4.      CDNA brings this action to obtain declaratory and injunctive relief to protect its right to offer event contracts pursuant to federal law and regulation.

5.      Over the years, many states have sought to regulate trading of such products under their state gaming laws based on their policy judgment that speculation on future events was, in effect, gambling. Congress, however, has always assumed control over the regulation of the derivatives markets at the federal level. And it consistently expanded the scope of the products covered by federal regulation, including to cover swaps and what are known as contracts on "excluded commodities."

---

applied to swaps exempted from coverage by the CEA); *Bibbo v. Dean Witter Reynolds, Inc.*, 151 F.3d 559, 560, 563-64 (6th Cir. 1998) (noting that "[f]utures trading is conducted on exchanges designated as contract markets by the [CFTC], an independent agency created by Congress in 1974 to exercise *exclusive jurisdiction* over accounts, agreements, and transactions involving commodities futures contracts traded or executed on a contract market" and holding that a CEA regulation conflict preempted an Ohio statute that required payment to investors of any interest earned on collateral because it stood "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress, as manifested in the language, structure and underlying goals of the CEA") (emphasis added); *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1155-57 (7th Cir. 1992) (holding the CEA preempted state law whose application "would directly affect trading on or the operation of a futures market"); *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (holding CEA "preempts the application of state law" to futures trading); *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979) (per curiam) (affirming dismissal of a claim that trading in futures contracts violated Georgia gambling statute "on the ground that the Commodity Exchange Act preempts all state laws inconsistent with its provisions").

6. Congress could not have been more clear that its purpose was to create a single, national derivatives market subject to regulation at the federal level. The CEA itself recites Congressional findings that:

> The transactions subject to this chapter are entered into regularly in interstate and international commerce and are affected with a national public interest by providing a means for managing and assuming price risks, discovering prices, or disseminating pricing information through trading in liquid, fair and financially secure trading facilities.

7 U.S.C. § 5. It also cites Congress's intention for creating a regulated national market:

> It is the purpose of this chapter to serve the public interests described [above] through a system of effective self-regulation of trading facilities, clearing systems, market participants and market professionals under the oversight of the Commission.

*Id.*

7. CDNA has operated as a federally regulated DCM since 2004.[2] All of its products are certified pursuant to the CEA and established CFTC rules and are offered in compliance with CFTC regulations, including standards for contract specifications, market integrity, and trader protections. As a CFTC-registered self-regulatory organization, CDNA also administers a comprehensive market regulation program, functioning in a

---

[2] The CFTC's orders approving CDNA's designation as a DCM are publicly available on the CFTC's Industry Filings page. *See Industry Filings, N. Am. Derivatives Exchange, Inc.*, CFTC, https://www.cftc.gov/IndustryOversight/IndustryFilings/TradingOrganizations/34536 ("CFTC Filings") (last visited Apr. 10, 2026).

regulatory capacity to oversee trading in its markets.  This program is subject to CFTC oversight and has been reviewed and approved by the CFTC.

8.      Among CDNA's offerings are "event contracts" defined by the CEA and the CFTC as derivatives or swaps whose returns depend on the occurrence, non-occurrence, or extent of an occurrence of a specified event or contingency.[3]  At issue here are CDNA's event contracts, including its "Sports Event Contracts," with return profiles dependent on the occurrence of specified events associated with a sports event, for example, a certain team or participant winning or losing.

9.      When it granted the CFTC exclusive jurisdiction over DCMs and the contracts traded on them, Congress authorized the agency to review certain event contracts and prohibit them if it determines that their trading would be contrary to "the public interest."  7 U.S.C. § 7a-2(c)(5)(C).  The CFTC has adopted a 90-day review process for assessing whether an event contract should be suspended as contrary to public interest.  *See* 17 C.F.R. § 40.11.  None of the contracts listed on CDNA's market are currently under such review by the CFTC, and none of the Sports Event Contracts offered for trading on CDNA has been prohibited.

10.      Congress has expressly preempted state regulation of trading on DCMs by granting the CFTC "exclusive jurisdiction" to regulate trading on DCMs, including of

---

[3]      *See* Commodity Exchange Act, 7 U.S.C. § 1a(47); *Industry Oversight: Contracts & Products*, CFTC, https://www.cftc.gov/IndustryOversight/ContractsProducts/index.htm (last visited Apr. 10, 2026).  Examples of "event contracts" listed on the CFTC website include predicted corporate earnings, level of snowfall, and dollar value of damage caused by a hurricane.  *Id.*

options and "transactions involving swaps."  7 U.S.C. § 2(a)(1)(A).  A savings clause allows states to regulate conduct that does *not* fall within the CFTC's exclusive jurisdiction, confirming that the CFTC's exclusive jurisdiction is indeed exclusive.  *See id.*

11.    Congress has fully occupied the field of regulating federally registered DCMs, thereby preempting any overlapping state laws.  Because CDNA's Sports Event Contracts are lawfully traded on a CFTC-registered DCM, federal law overrides state licensing or registration conditions that might otherwise apply, including those cited by the ADG in its C&D Letter.  To the extent that Arizona law imposes regulations that overlap with the CEA's framework, it is preempted under Article VI, Section 2 of the United States Constitution ("Supremacy Clause").

12.    Insofar as it would prohibit CDNA from listing contracts that are authorized under federal law, Arizona law is also preempted because it conflicts with the CEA's framework.  CDNA cannot comply with both its federal law obligations and any purported obligations under Arizona law.  Arizona law also undermines the CEA's goals of, among other things, creating a uniform system of derivatives trading.

13.    The ADG's threatened enforcement action poses a direct and imminent threat to CDNA's business and disrupts the comprehensive federal framework that places CDNA exclusively under the CFTC's supervision.

14.    A declaratory judgment and injunction are necessary to prevent further unlawful intrusion by the ADG into a market it has no legal authority to regulate.

**JURISDICTION AND VENUE**

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims in this case arise under the Constitution and the laws of the United States—specifically, whether Arizona law is preempted by the CEA as applied to CDNA's Sports Event Contracts.  The Court also has jurisdiction pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, to declare the rights and legal relations of the parties.

16.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and 1391(b)(2). The individual defendants perform their duties and thus reside in this District.  A substantial part of the events giving rise to the claims occurred in this District.

**PARTIES**

17.    Proposed Intervenor-Plaintiff North American Derivatives Exchange, Inc., doing business as Crypto.com | Derivatives North America, is a financial services company with its principal place of business in Chicago, Illinois.  CDNA operates a DCM and Derivatives Clearing Organization ("DCO") regulated by the CFTC under the CEA, where users can trade financial products, including Sports Event Contracts.

18.    Plaintiff the United States of America regulates U.S. financial markets, and it enforces federal commodity derivatives laws through its agency, the CFTC.

19.    Plaintiff the CFTC is an agency of the United States Government that regulates U.S. financial markets, and it enforces federal commodity derivatives laws through its Executive Agency the Commodity Futures Trading Commission.  The CEA grants the CFTC authority to represent itself through its General Counsel.  *See* 7 U.S.C. § 2(a)(4).

20.	Plaintiff Kalshi is a financial services company with its principal place of business in New York.  Kalshi operates a derivatives exchange and prediction market where users can buy and sell financial products known as event contracts.  Its exchange market is federally regulated by the CFTC pursuant to the CEA, 7 U.S.C. §§ 1 et seq.

21.	Defendant State of Arizona is a state of the United States.

22.	Defendant Katie Hobbs is the Governor of Arizona and is sued in her official capacity.  Under the Arizona Constitution, the Governor of Arizona "shall transact all executive business with the officers of the government, civil and military," and "shall take care that the laws be faithfully executed."  Ariz. Const. art. 5, § 4.

23.	Defendant Kris Mayes is the Attorney General for the State of Arizona and is sued in her official capacity.  The Attorney General of Arizona is the state's chief legal officer.  The Office of the Attorney General has locations in Phoenix, Tucson and Prescott within the District of Arizona.

24.	Defendant Arizona Department of Gaming is the Arizona state agency that regulates gambling in the State of Arizona.  The ADG oversees licensing, regulating, investigating and penalizing casino operators, management companies, holding companies, key employees, casino gaming employees, and gaming-related vendors in Arizona.

25.	Defendant Jackie Johnson is sued in her official capacity as Director of the ADG.

26.	Defendant Douglas Jensen is sued in his official capacity as Chief Law Enforcement Officer of the ADG.

8

27.     Together, Defendants Jackie Johnson, Douglas Jensen, Arizona Department of Gaming, Attorney General Kris Mayes, and Governor Katie Hobbs would be responsible for enforcing the ADG's C&D Letter demanding CDNA comply with Arizona state law that is preempted by federal law.

## FACTUAL ALLEGATIONS

28.     Defendants' effort to regulate and prohibit the trading of Sports Event Contracts listed on CDNA's federally regulated DCM is preempted by federal law and is unlawful.  CDNA is entitled to a judicial declaration that its activities are not subject to Defendants' oversight, regulation, or jurisdiction, as well as an injunction barring the Defendants from any future enforcement efforts.

**A. The CFTC Has Exclusive Jurisdiction to Regulate Derivatives Contracts on Federally Registered Markets.**

29.     Derivatives are financial instruments used to allocate risk between counterparties.  The archetypal example is a grain futures contract, which allows buyers to lock in prices and manage volatility in agricultural markets by agreeing to buy or sell a specified amount of the crop at a fixed price on a future date.

30.     As financial markets have matured, the category of derivatives has expanded significantly beyond futures based on agricultural commodities, enabling participants to hedge against volatility across a wide array of tangible and intangible areas, including commodities like gold, financial benchmarks such as interest rates, and even weather or credit risk.  In principle, nearly any form of risk—economic, environmental, or event-driven—can be hedged if a CFTC-regulated market exists and a contract is available.

31.    For more than a century, the federal government has regulated national derivatives markets in order to promote uniformity and integrity in national trading.

32.    Before the adoption of the CEA and its predecessor, the 1922 Grain Futures Act, futures contracts were often viewed with suspicion by state legislatures.  Because derivatives markets necessarily involve the exchange of money tied to uncertain outcomes, some states equated them to gambling and sought to restrict or prohibit their use.  This led to a disjointed and often conflicting state-by-state approach.

33.    The CEA, enacted in 1936, was intended to replace the fragmented system of state oversight with a uniform federal framework for regulating futures markets.  It extended federal authority beyond grain to a broader class of commodities and created the Commodities Exchange Authority, a division within the Department of Agriculture charged with monitoring trading practices and prosecuting price manipulation.  But the CEA did not initially establish an independent federal agency to comprehensively regulate the nation's derivatives markets.  As markets grew more complex, lawmakers and industry participants became concerned that the lack of centralized enforcement would invite states to regulate futures trading on their own, leading to inconsistent standards across jurisdictions.

34.    In response, Congress enacted sweeping amendments to the CEA in 1974 (the "1974 Act"), which established the CFTC as an independent federal agency charged with regulating the national derivatives markets.  To eliminate the threat of conflicting state regulation, Congress expressly granted the CFTC "exclusive jurisdiction" over derivatives trading on federally regulated exchanges.  7 U.S.C. § 2(a)(1)(A).

35.    Proponents of the 1974 Act warned that, absent a single national regulator, "states . . . might step in to regulate the futures markets themselves," subjecting national exchanges to "conflicting regulatory demands." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1155-56 (7th Cir. 1992).  As one Senator put it, "different State laws would just lead to total chaos."  *Commodity Futures Trading Commission Act: Hearings Before the Senate Committee on Agriculture & Forestry*, 93rd Cong., 2d Sess. 685 (1974) (hereinafter "Senate Hearings") (statement of Sen. Clark).  The House Agriculture Committee stressed the need to bring "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned." H.R. Rep. No. 93-975, at 79 (1974).  To that end, the Senate deliberately removed a provision of the CEA that would have preserved state regulatory authority "in order to assure that [f]ederal preemption is complete."  120 Cong. Rec. 30,464 (1974) (statements of Sen. Curtis, supported by Sen. Talmadge).

36.    Congress's intent to vest the CFTC with exclusive authority over derivatives markets is further demonstrated by subsequent amendments to the CEA, including the 1992 Futures Trading Practices Act ("FTPA").  That law authorized the CFTC, in order to promote innovation, to exempt certain financial instruments from the requirement that they be traded on a registered exchange. *See* 7 U.S.C. § 6(c).  Because the preemption provision in 7 U.S.C. § 2 applies only to derivatives traded on CFTC-registered markets, Congress included a separate provision in the FTPA explicitly preempting "any State or local law that prohibits or regulates gaming" with respect to any agreement, contract, or transaction exempted from the exchange-trading requirement.  7 U.S.C. § 16(e)(2).  That provision

extended the scope of federal preemption to off-exchange transactions under the CFTC's oversight, reinforcing Congress's intent to create a comprehensive and uniform federal framework for derivatives regulation.

37.    The creation of the CFTC and the centralization of derivatives market regulation within a single independent federal agency reflect a clear exercise of Congress's authority to regulate interstate commerce and establish consistent national rules.  As mandated by the CEA, which was significantly amended by the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), the CFTC has adopted regulations setting out "Core Principles" that DCMs must follow.  For example, one Core Principle requires DCMs to offer impartial access to their markets and services to users across the country.  *See* 17 C.F.R. § 38.151(b).  Compliance with a patchwork of differing state regulations would undermine this obligation and make it impossible for DCMs like CDNA to comply with the CFTC's impartial access rule.

38.    Congress's decision to create a national market for derivatives products reflected a federal policy choice to permit their trading even if individual states might have preferred to prohibit them.  Since their inception, derivatives contracts have been the subject of ongoing debate over whether they should be treated as a form of gambling, with some arguing that they should only be permitted where a party to a contract has actual exposure to an underlying commercial risk they are attempting to hedge.

39.    But Congress and the CFTC have entirely rejected this approach.  Instead, the federal policy has been to recognize the legitimacy of speculative trading and its role in supporting market liquidity.  As one scholar observed, this reflects a federal commitment

to "acknowledge the legitimacy of futures contracts" and "the need for speculative capital to provide liquidity to the markets." William L. Stein, *The Exchange-Trading Requirement of the Commodity Exchange Act*, 41 Vand. L. Rev. 473, 477 (1988).

40. The CFTC has confirmed this approach by bringing actions against the states and state regulators in three states, including Arizona here, alleging that federal law preempts state law regulating event contracts traded on federally regulated markets. *See also United States & CFTC v. Connecticut* (D. Conn. Apr. 2, 2026); *United States & CFTC v. Illinois* (N.D. Ill. Apr. 2, 2026). The CFTC has also submitted a brief as an amicus curiae supporting CDNA's action brought against state regulators in Nevada. Brief for CFTC as Amicus Curiae Supporting Plaintiff, *N. Am. Derivatives Exch. Inc. v. Nevada.*, No. 25-7187 (9th Cir. Feb. 17, 2026) (Dkt. No. 38). The CFTC has also issued an Advanced Notice of Proposed Rulemaking Relating to Prediction Markets (CFTC Release No. 9194-26) and a Prediction Markets Advisory (CFTC Letter No. 26-08) explaining that event contracts are "swaps" under the CEA.

41. Congress's longstanding policy of permitting broad market participation is integral to the healthy functioning of these markets. Restricting financial derivatives to participants with a direct risk in the outcome would diminish liquidity, impair price discovery, and undermine the market's essential role in allocating and managing risk. *See* William L. Stein, *The Exchange-Trading Requirement of the Commodity Exchange Act*, 41 Vand. L. Rev. 473, 482-85 (1988) (describing the policy rationale behind restricting futures trading to designated exchanges).

**B. Event Contracts Are Exchange-Traded Financial Instruments Used for Allocating Risk.**

42.    Event contracts are exchange-traded financial instruments, known as derivatives or swaps, that facilitate risk allocation to specified occurrences, non-occurrences, or the extent of occurrences of underlying future events or contingencies. *See* 7 U.S.C. § 1a(47) (defining "swap").

43.    Event contracts typically reference the occurrence or non-occurrence of an event or contingency, represented by "yes" or "no" positions. A trader who takes an event contract with the "yes" position profits if the specified event or contingency occurs by the expiration date, while the "no" position purchaser profits if it does not. An active position may also be closed at a profit or loss prior to the occurrence or non-occurrence of the specified event or contingency.

44.    An event contract might be tied to specified movements of a financial index or a real-world event. For example, an event contract could be tied to changes in the yield on the 10-year U.S. Treasury note, the magnitude of the upcoming hurricane season, or to the events or contingencies associated with political, scientific or live sporting events. But, outside of its authority to prohibit specifically enumerated event contracts that it subsequently determines are contrary to the public interest, the CFTC does not purport to define what events are or are not properly the subject of event contracts. Rather, the regulatory approach that Congress has directed and that the CFTC has pursued is to allow the market to define the nature of the events on which parties wish to contract.

45.    The price of an event contract is determined by market forces, namely the supply and demand for entering into the "yes" and "no" positions of the contract.  An event contract has a set expiration date, and the price of an event contract will fluctuate along with the market's perception of the likelihood of an event's occurrence until settling at a final price on the expiration date.

46.    The operator of a DCM on which event contracts are traded facilitates their trading by matching counterparties to each other.  Unlike casinos, a DCM that lists an event contract does not act as a "bookmaker."  It does not take opposing positions or set odds.  Instead, it facilitates a neutral, transparent marketplace where prices are established openly among participants based on supply and demand.

47.    Event contracts allow market participants, including those with a financial stake in the occurrence or non-occurrence of a particular event or contingency, to hedge against related risks.  These contracts have become a valuable risk management tool because they are linked to real-world events with commercial consequences and offer public utility by reflecting the market's aggregated expectations about whether those events will occur.  Event contracts where the underlying event relates to a sporting event may be used to hedge this type of risk across a variety of commercial scenarios, including:

a.    Media and broadcasting companies that face financial exposure tied to viewership, which can fluctuate significantly depending on how competitive or compelling a game is;

b.      Retailers that sell team merchandise or apparel who see major swings in sales depending on whether a popular team advances or whether a player affiliated with their brand wins a championship;

c.      Travel and hospitality businesses that experience spikes in bookings if a local team advances or hosts a high-profile event, creating exposure to outcomes they cannot control;

d.      Consumer goods companies, especially in the food and beverage industry, that run promotions tied to game results.  These campaigns, while effective for marketing, can carry substantial liabilities if the promotional conditions are met. Advertisers and retailers offering giveaways or rebates based on a team's success face similar exposure; and

e.      Fantasy sports platforms and sports data providers that rely on fan engagement and player performance, where a dull game or early elimination of a key player can significantly reduce user participation and revenue.

48.    These are just a few examples, but they underscore a broader point: Many businesses across diverse industries have meaningful financial exposure to the occurrence, non-occurrence, or extent of occurrence of events or contingencies connected to sporting events and may seek to manage that risk through event contracts.

**C. The CEA and CFTC Regulations Establish a Comprehensive Federal Regulatory Framework for Trading in Event Contracts and Other Derivatives.**

49. The federal regulatory framework governing DCMs and the trading of derivatives contracts on them is longstanding, comprehensive, and well-established.

50. To offer derivatives for public trading, an entity must obtain designation from the CFTC as a contract market. *See* 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a).

51. To receive this designation, an applicant must submit detailed materials demonstrating compliance with the CEA's Core Principles. *See* 17 C.F.R. § 38.3(a)(2); 7 U.S.C. § 7(d). This requires it to show it can and will (1) comply with all CFTC requirements imposed by rule or regulation, (2) establish, monitor and enforce compliance with the rules, (3) list only contracts that are not readily susceptible to manipulation, (4) have the capacity and responsibility to prevent manipulation, price distortion, and disruptions of the delivery or cash-settlement process through market surveillance, compliance, and enforcement, and (5) adopt position limitations for each contract to reduce the threat of market manipulation. *See* 17 C.F.R. §§ 38.100, 38.150, 38.200, 38.250, 38.300.

52. If approved by the CFTC and granted designation as a contract market, a DCM becomes subject to an extensive federal regulatory framework administered by the CFTC. DCMs are required to meet a wide range of ongoing regulatory obligations to remain in good standing, including: prescriptive capital and liquidity requirements, participant eligibility requirements, reporting obligations, recordkeeping requirements, and numerous operational and governance standards directed toward compliance with the CEA

and its Core Principles. *See* 17 C.F.R. §§ 38.1101, 38.604, 38.1051(i), 38.950, 1.31; 38.450, 38.451; 7 U.S.C. § 7(d); *see generally* 17 C.F.R. pt. 38.

53.   Moreover, because of the breadth and depth of the regulatory framework applicable to a DCM, a market that has earned the CFTC's designation is granted the status of a self-regulatory organization under federal law. As such, DCMs are entrusted with front-line responsibilities for establishing rules and enforcing their compliance, detecting and preventing market abuses, and ensuring the integrity of their listed products and intermediaries. *See* 17 C.F.R. § 1.3, pt. 38.

54.   As a registered DCM and self-regulatory organization, CDNA is permitted to list derivatives for trading without obtaining the CFTC's prior approval for each individual contract. However, it must adhere to product-related regulatory standards and certify that each new contract complies with applicable law by filing a written certification with the CFTC prior to the time of listing. *See* 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a).

55.   Written certifications are subject to CFTC regulation, and the CFTC may initiate a formal review of any submitted contract under its authority. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. §§ 40.2, 40.11(c). After a stipulated period of time, if the CFTC does not take action, the contract is deemed "effective" and may be listed on the DCM for trading. *See* 7 U.S.C. § 7a-2(c); *see also* 17 C.F.R. § 40.2 (outlining the process for listing products for trading by certification).

56.   The Sports Event Contracts at issue in this case have all been certified and deemed "effective." *See infra* ¶¶ 67-73.

**D. The CFTC's Enforcement Authority over DCMs and Its Power to Prohibit Contracts Contrary to the Public Interest.**

57.     In addition to regulatory oversight authority, the CFTC possesses exclusive and comprehensive enforcement powers with respect to DCMs, their intermediaries, and market participants.

58.     The CFTC's Division of Enforcement may initiate investigations and, with the approval of a majority of the Commission, bring enforcement actions in federal court or through administrative proceedings.  *See* CFTC Division of Enforcement, Enforcement Manual (2020), at § 3.3.  If the Division concludes that a violation of the CEA has occurred, it may recommend the Commission pursue a broad range of remedies, including civil monetary penalties, restitution, and disgorgement, as well as the suspension, denial, revocation, or restriction of registration and trading privileges.  *Id.*  The Commission may also pursue injunctive relief, including cease-and-desist orders, and can refer criminal violations to the Department of Justice for prosecution.  *Id.*

59.     The scope of the CFTC's authority extends not only to market participants, but also to the types of derivatives products traded on DCMs.  The Commission regulates a broad range of derivatives, including those based on physical commodities like wheat, cotton, rice, corn, and oats, as well as "excluded commodities" that are not tangible such as interest rates, financial instruments, economic indices, risk metrics, and events.  7 U.S.C. § 1a(9), (19)(i)-(iv).

60.     The CFTC regulates event contracts, including the Sports Event Contracts at issue here, as a subcategory of derivatives that reference an "excluded commodity."  *See*

19

*id.* § 1a(47)(A)(ii), (iv), (vi). "Event contracts" are defined broadly under the CEA as relating to any "occurrence, extent of an occurrence, or contingency" that is "beyond the control of the parties to the relevant contract" and "associated with" economic consequences. 7 U.S.C. § 7a-2(c)(5)(C)(i); § 1a(19)(iv).[4]

61.    In 2010, the Dodd-Frank Act amendments to the CEA also specifically addressed event contracts. The amended statute created a "Special Rule" for event contracts that granted the CFTC discretionary authority to determine whether specific event contracts are "contrary to the public interest" and prohibit them from trading on DCMs.

62.    This discretionary authority applies where, in the CFTC's determination, a contract references an underlying activity that falls into one of several specifically enumerated categories listed in the CEA that may warrant further review as to whether allowing them to trade would be in the public interest. These categories include contracts that reference terrorism, assassination, war, gaming, activity that is unlawful under federal or state law, or other similar activity, and is contrary to the public interest. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

63.    This Special Rule does not require the CFTC to disallow event contracts referencing these underlying activities, but grants the agency the discretion to conduct a public interest review based on its own criteria.

64.    The CFTC's authority is focused not on the terms of the event contract itself, but on the nature of the underlying event. While federal law generally authorizes the

---

[4]    Events themselves are an excluded commodity under the CEA. *See* 7 U.S.C. § 7a-2(c)(5)(C)(i).

trading of event contracts, the CFTC may prohibit contracts from being listed or traded on DCMs where the referenced activity (*i.e.*, the "excluded commodity") "involves, or relates to" specifically enumerated conduct that the CFTC determines to be contrary to the public interest.  17 C.F.R. § 40.11.

65.    This framework reflects a deliberate policy choice: Congress did not authorize or delegate to states the power to override or nullify federal authorization of event contracts by deeming them unlawful under state law.  Rather, Congress granted the CFTC exclusive authority to establish the criteria and process for assessing whether a referenced activity should be disallowed from underlying an event contract trading on national derivatives markets as contrary to the public interest.  Pursuant to this authority, the CFTC has promulgated regulations that establish procedures by which the CFTC may determine whether trading in a specific contract should be suspended.  *See* 17 C.F.R. § 40.11.  This includes placing the contract in a 90-day review period, at the conclusion of which the CFTC may determine a contract is contrary to the public interest and order the DCM to suspend its trading.  *See* 17 C.F.R. § 40.11(c).

66.    The Sports Event Contracts at issue and currently being offered in this case have not been subjected to a 90-day review, have not been determined to be contrary to the public interest, and have not been ordered to be suspended from trading by the CFTC.

**E.  CDNA Is a Federally Regulated DCM That Lists Sports Event Contracts.**

67.    CDNA is a federally regulated DCM that provides a market for trading a variety of derivatives products, including Sports Event Contracts that are based on the

occurrence, non-occurrence, or extent of occurrence of events or contingencies associated with live sporting events.

68.    The CFTC first approved CDNA as a DCM in 2004, confirming that its market complied with the CEA.  Most recently in September 2025, the CFTC amended its registration, again confirming CDNA's compliance with the CEA.  For two decades, the entity now known as CDNA has operated continuously as a CFTC-regulated market offering event contracts.

69.    As an early entrant in the regulated event contract space, CDNA specializes in event contract trading and has steadily expanded its offerings over time.  Its market provides a secure, federally approved exchange where individual, retail, and institutional participants can hedge risk tied to event-based outcomes.

70.    On January 30, 2025, pursuant to 7 U.S.C. § 7a-2(c)(1) and 17 C.F.R. §§ 40.2(a), CDNA certified and announced its intention to list a new category of event contracts: "Industry Event - Live Presentations" contracts.[5]  These contracts allow users to trade on the occurrence, non-occurrence, or extent of occurrence of events or contingencies relating to lawful live events in the performing arts, spectator sports, and related industries, provided the users themselves are not participants in the events.  *Id*. at 4-5.

---

[5]    CDNA's January 30, 2025 certification pertaining to the Sports Event Contracts is publicly available on the CFTC's website.  *Industry Filings, Certification of Contingent Derivatives Contract (Industry Event – Live Presentations – NAICS 711) – Submission Pursuant to Commission Regulation 40.2(a)*, CFTC (Jan. 30, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/01/ptc01302514705.pdf

71.     CDNA designed these event contracts to manage the risk of a variety of market participants, whose businesses face economic consequences based on the outcome of a respective Industry Event, and to enable price discovery for related commercial enterprises.  Examples include contracts tied to the winner of an award like "Best Picture," the location of a flagship event or ceremony, or the winner of a live sporting event like the Super Bowl.

72.     CDNA's currently listed "Industry Event - Live Presentations" contracts, became effective under the process described in ¶¶ 54-56.  This includes the Sports Event Contracts at issue in this case, which are the subset of CDNA's "Industry Event - Live Presentations" contracts that reference the occurrence, non-occurrence, or extent of occurrence of events or contingencies associated with live sporting events.

73.     CDNA subsequently certified additional event contracts that reference the occurrence, non-occurrence, or extent of occurrence of events or contingencies associated with live sporting events, including its certification of "Contingent Derivatives Deci Contract (Industry Event – Live Presentations – NAICS 711)," filed on July 30, 2025,[6] and "Derivatives Contract (Industry Event – Live Presentations – Statistics)," filed on August 29, 2025.[7]  As with the Sports Event Contracts certified under CDNA's January 30, 2025

---

[6]     *Industry Filings, Certification of Contingent Derivatives Deci Contract (Industry Event – Live Presentations – NAICS 711) – Submission Pursuant to Commission Regulation 40.2(a)*, CFTC (July 30, 2025), https://www.cftc.gov/sites/default/files/filings/ptc/25/07/ptc07302527650.pdf.

[7]     *Industry Filings, Certification of Derivatives Contract (Industry Event – Live Presentations –Statistics) – Submission Pursuant to Commission Regulation 40.2(a)*, CFTC (Aug. 29, 2025),

23

filing, CDNA identified in these certifications the financial, commercial, and economic consequences associated with the underlying events.

**F. The ADG Demands CDNA Cease Offering Sports Event Contracts in Arizona and Threatens State Civil and Criminal Penalties.**

74.    On May 21, 2025, the ADG sent the C&D Letter to CDNA demanding that it "cease gambling operations in Arizona and desist from engaging in those activities in the future."  May 21, 2025 ADG Cease-and-Desist Letter, attached hereto as Ex. A, at 2.

75.    In the C&D Letter, the ADG asserted that event contracts constitute "taking wagers" as defined by Arizona state law because "[w]hether a contract will pay its buyer depends on whether that person correctly predicted the result of the event and bought a contract for the correct outcome." *Id.* at 1.

76.    The ADG claimed CDNA was "not licensed and its operation of event wagering in Arizona is illegal."  *Id.* (citing A.R.S. §§ 5-1301 et seq.).  The ADG also asserted that CDNA did not meet "the regulatory requirements in Arizona" that included "licensing and background investigations, the prohibition on wagers by persons under twenty-one (21) years of age, and requirements relating to integrity monitoring and problem gambling." *Id.*  The ADG stated that it was a "crime in Arizona to engage in the business of accepting wagers" related to sports events.  *Id.* at 2 (citing A.R.S. § 13-3305(A)).  The ADG also alleged that CDNA may be "subject to a potential restitution award for those who lost money, and an action forfeiting all monies it acquired." *Id.* (citing A.R.S. §§ 13-804 and 13-2314).

https://www.cftc.gov/sites/default/files/filings/ptc/25/08/ptc08292529772.pdf.

77.    In ordering CDNA to "cease gambling operations," the ADG's letter did not specify which of the more than 50 different event contracts offered for trading on CDNA might be considered "gambling operations," but the Letter suggests that the ADG views *all* event contracts as unlawful under Arizona state law, notwithstanding federal law authorizing such contracts and affording the CFTC exclusive jurisdiction over them.  The ADG warned that its "[f]uture actions may include the filing of criminal charges or a civil action against Crypto and/or its principals or employees."  *Id.*

78.    The ADG sent a nearly identical letter to Kalshi on May 21, 2025.

79.    Absent judicial relief, CDNA faces the prospect of imminent criminal enforcement and civil penalties in Arizona as of the date of this filing.

**G. Defendants' Threatened Action Will Imminently and Irreparably Harm CDNA and Interfere with Its Ability to Conduct Federally Regulated Activities.**

80.    CDNA's rulebook sets forth over 50 different event contracts, all of which are subject to federal regulation pursuant to the process described above.

81.    CDNA currently does not offer event contracts in Arizona because of the risk of unlawful prosecution by the state.  A plaintiff suffers irreparable harm if it faces a "Hobson's choice: continually violate the [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review."  *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).

82.    As a result of Defendants' threatened conduct described above, there is an imminent likelihood that Defendants' forthcoming actions will violate the Supremacy Clause of the U.S. Constitution and subject CDNA and its customers to irreparable harm.

25

Being subject to unlawful state enforcement action would cause CDNA irreparable injury, both in economic terms and in terms of being restrained from lawful activity without any monetary recourse.

83.     Ceasing to permit Arizona residents to purchase or sell event contracts on its DCM in order to avoid civil penalties or criminal sanctions pursued by Defendants currently deprives CDNA of the revenue that it would otherwise derive from trading of event contracts by Arizona residents.  These ongoing economic losses are unrecoverable because sovereign immunity bars recovery for monetary damages.  *See Alden v. Maine*, 527 U.S. 706, 712-13 (1999).  Damages that are unrecoverable due to sovereign immunity constitute irreparable harm.  *See Idaho v. Coeur d'Alene Tribe,* 794 F.3d 1039, 1046 (9th Cir. 2015); *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 852 (9th Cir. 2009) ("Because the economic injury doctrine rests only on ordinary equity principles precluding injunctive relief where a remedy at law is adequate, it does not apply where, as here, the [Plaintiff] can obtain no remedy in damages against the state because of the Eleventh Amendment."), *vacated on other grounds*, 565 U.S. 606 (2012).

84.     CDNA is also suffering competitive injury by losing the ability to compete as a market for event contracts against other federally registered DCMs currently operating in the state.

85.     CDNA could not avoid this ongoing impairment to its interests by seeking a sports wagering license in Arizona or by ceasing to offer Sports Event Contracts trading in Arizona.  Obtaining an event wagering license in Arizona may require significant hurdles that could require CDNA to compromise on its CFTC-mandated DCM obligations.  In

addition, it would be entirely impracticable for CDNA to subject itself to the often conflicting regulations of each of the states in which it offers federally regulated event contracts for trading.  Accepting such jurisdiction would subject CDNA to the very patchwork of state regulation (including prohibitions, regulations, reporting obligations, registration costs, and other rules) that Congress expressly preempted under the CEA. Different states have taken different approaches to regulation of online gambling.  Many states permit online gambling, subject to state-level regulation.  Others, such as Utah, prohibit it entirely.  It would be impossible for CDNA to both offer "impartial access" to its DCM as required by 17 C.F.R. § 38.151(b) and simultaneously comply with state gaming laws in 50 states.

86.    CDNA is also irreparably harmed by the regulatory overhang of the ADG's assertion of jurisdiction.  In the C&D Letter, the ADG contends that CDNA and/or its principals or employees may be subject to "criminal charges or a civil action" under A.R.S. § 13-3305(A) and other unspecified "statutes and criminal violations."

87.    Inaction in the face of the ADG's likely assertion of authority to regulate DCMs would threaten the future of CDNA's business in Arizona.  The imminent threat of an enforcement action against CDNA will result in irreparable impairment to CDNA's interests, including, but not limited to, criminal liability, civil liability, economic hardship, and impairment of existing contractual relationships.

88.    If CDNA were to submit to the regulatory oversight of the ADG to avoid an enforcement action, CDNA would be subjected to a regulatory regime inherently in conflict

with CFTC regulations, including its Core Principles, and the very concept of a registered DCM.

89.     CDNA has no plain, speedy, or adequate remedy at law to address the wrongs described herein.  Moreover, because money damages are generally not available in suits against state government agencies, CDNA likely would be left without a remedy in the absence of prospective relief.

90.     CDNA therefore seeks to intervene in this Action to seek declaratory and injunctive relief restraining Defendants from enforcing Arizona law that interferes with the operation and function of CDNA's market described herein.

## COUNT I

### (Express Preemption – Against All Defendants)

91.     Proposed Intervenor-Plaintiff incorporates all prior paragraphs by reference.

92.     Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

93.     An actual controversy exists between CDNA, on the one hand, and the Defendants, on the other, regarding whether the ADG and the Arizona Attorney General's office have legal authority to regulate the trading of Sports Event Contracts not licensed by the ADG.

94.     Title 5, Chapter 11 of the Arizona Revised Statutes §§ 5-1301 et seq., sets out a state regulatory system for event wagering in Arizona.

95.    "Event wagering" is defined as "accepting wagers on sports events or other events, portions of sports events or other events, the individual performance statistics of athletes in a sports event or combination of sports events or the individual performance of individuals in other events or a combination of other events by any system or method of wagering, including in person or over the Internet through websites and on mobile devices." A.R.S. § 5-1301(4)(a).

96.    Arizona event wagering law states that "[e]vent wagering may be conducted only to the extent that it is conducted in accordance with this chapter." A.R.S. § 5-1303(A). Further, "[a] person may not offer any activity in connection with event wagering in this state unless all necessary licenses have been obtained in accordance with federal and state law and any applicable rules of the department." *Id.*

97.    A.R.S. § 5-1314(A) states that "the operation of event wagering is lawful only if the event wagering is conducted in accordance with this chapter and any other relevant laws and rules."

98.    A.R.S. § 5-1315 prohibits certain event wagers, including:

1. Injuries, penalties and other types or forms of event wagering under this chapter that are contrary to law.

2. Individual actions, events, occurrences or nonoccurrences to be determined during a collegiate sports event, including on the performance or nonperformance of a team or individual participant during a collegiate sports event. This paragraph does not prohibit wagers on the overall outcome of a collegiate sports event or seasonal awards based on a player's cumulative overall play.

A.R.S. §§ 5-1315(A)(1)-(2).

29

99.    A.R.S. § 5-1315(B) states: "[a]n event wagering operator may offer only parlay and proposition bets of the type or category as prescribed by the department [of gaming]. The department [of gaming] shall prescribe the types and categories of parlay and proposition bets that may be offered in this state, if any."

100.    The Arizona Criminal Code § 13-3305 makes it an offense to engage in betting or wagering absent an applicable exception.

101.    A.R.S. § 13-3305(A) provides:

> Subject to the exceptions prescribed in section 5-112 and title 5, chapter 11, no person may engage for a fee, property, salary or reward in the business of accepting, recording or registering any bet, purported bet, wager or purported wager or engage for a fee, property, salary or reward in the business of selling wagering pools or purported wagering pools with respect to the result or purported result of any race, sporting event, contest or other game of skill or chance or any other unknown or contingent future event or occurrence whatsoever.

102.    A.R.S. § 13-3305(B) provides:

> Subject to the exceptions prescribed in title 5, chapter 11, a person shall not directly or indirectly knowingly accept for a fee, property, salary or reward anything of value from another to be transmitted or delivered for wagering or betting on the results of a race, sporting event, contest or other game of skill or chance or any other unknown or contingent future event or occurrence whatsoever conducted within or without this state or anything of value as reimbursement for the prior making of such a wager or bet on behalf of another person.

103.    These prohibitions are broad enough to encompass and criminalize as "gambling" many agreements, contracts and transactions offered on CFTC-Designated Contract Markets, including event contract swaps, even though these agreements, contracts and transactions are expressly permitted under the federal Commodity Exchange Act.

30

104.    By threatening to enforce the statutes at ¶¶ 94-103 or any other statutes, and any rules adopted thereunder against CDNA, Defendants are impermissibly intruding on the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

105.    For the reasons described above, without regard to whether the ADG has correctly interpreted Arizona law, CDNA is authorized to list and offer event contracts to Arizona residents (and residents of each of the other states and territories of the United States) pursuant to the CEA.  Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.  7 U.S.C. § 2(a)(1)(A).

106.    To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Arizona law, Arizona law is preempted pursuant to the Supremacy Clause, which provides:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

107.    The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has expressly reserved exclusive authority to the federal government.

108.    The CEA's express preemption of state laws purporting to regulate trading on federally regulated derivatives markets or otherwise under the oversight of the CFTC could not be more clear.  Congress gave the CFTC "exclusive jurisdiction" to regulate

derivatives trading on approved exchanges for on-exchange trading.  7 U.S.C. § 2(a)(1)(A).  Without a unified approach to derivatives regulation, Congress feared that fragmented and uncoordinated state regulation would lead to "total chaos."  Senate Hearings, 93rd Cong., 2d Sess. 685 (1974) (statement of Sen. Clark).  Congress punctuated the importance of preemption of state law by ensuring federal law supersedes and preempts state gaming law as applied to financial instruments the CFTC exempted from the registered exchange requirement.  *See* 7 U.S.C. § 16(e)(2).  Having analyzed the text, purpose, and history of the CEA, courts nationwide have agreed that Congress intended to preempt state law in derivatives trading on CFTC-regulated exchanges.  *See, e.g., KalshiEX, LLC v. Flaherty*, No. 25-1922, 2026 WL 924004, at *2-6 (3d Cir. Apr. 6, 2026); *Thrifty Oil Co. v. Bank of Am. Nat'l Tr. & Sav. Ass'n*, 322 F.3d 1039, 1055-57 (9th Cir. 2003); *Am. Agric. Movement*, 977 F.2d at 1156; *Rasmussen v. Thomson & McKinnon Auchincloss Kohlmeyer, Inc.*, 608 F.2d 175, 178 (5th Cir. 1979); *Paine, Webber, Jackson & Curtis, Inc. v. Conaway*, 515 F. Supp. 202, 205-07 (N.D. Ala. 1981); *Jones v. B. C. Christopher & Co.*, 466 F. Supp. 213, 220 (D. Kan. 1979); *Hofmayer v. Dean Witter & Co.*, 459 F. Supp. 733, 737 (N.D. Cal. 1978).

109.    Defendants may therefore not enforce Arizona's gaming laws against CDNA because CDNA is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 et seq.

## COUNT II

### (Field Preemption – Against All Defendants)

110.    Proposed Intervenor-Plaintiff incorporates all prior paragraphs by reference.

111. Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

112. An actual controversy exists between CDNA, on the one hand, and the Defendants, on the other, regarding whether the ADG and the Arizona Attorney General's office have legal authority to regulate the trading of Sports Event Contracts not licensed by the ADG.

113. By threatening to enforce the statutes at ¶¶ 94-103 or any other statutes, and any rules adopted thereunder against CDNA, Defendants are impermissibly intruding on the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

114. For the reasons described above, without regard to whether the ADG has correctly interpreted Arizona law, CDNA is authorized to list and offer event contracts to Arizona residents (and residents of each of the other states and territories of the United States) pursuant to the CEA. Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

115. To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder overlap with Arizona law, Arizona law is preempted pursuant to the Supremacy Clause.

116. The Supremacy Clause mandates that federal law preempts state law in any field over which Congress has adopted a comprehensive regulatory scheme, thus occupying the field for regulation.

117.    Through the CEA and its amendments, Congress has adopted a comprehensive regulatory scheme regulating derivatives trading on regulated markets, including the trading of event contracts. *See* 7 U.S.C. §§ 1 et seq. That scheme includes creating the CFTC and vesting it with exclusive authority to regulate derivatives trading.

118.    Indeed, federal law authorizes the CFTC to "determine" whether event contracts involving "gaming" should be restricted as "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i)—authority that is completely incompatible with parallel state regulation of the same subject matter. Because federal law occupies the entire field of regulating derivatives trading on regulated markets, the threatened actions are field-preempted under the Supremacy Clause. *See Flaherty*, 2026 WL 924004, at *4.

119.    Defendants therefore may not enforce Arizona's gaming laws against CDNA because CDNA is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 et seq.

## COUNT III

### (Conflict Preemption – Against All Defendants)

120.    Proposed Intervenor-Plaintiff incorporates all prior paragraphs by reference.

121.    Under 28 U.S.C. § 2201(a), the Court may, "[i]n a case of actual controversy within its jurisdiction . . . declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

122.    An actual controversy exists between CDNA, on the one hand, and the Defendants, on the other, regarding whether the ADG and the Arizona Attorney General's

office have legal authority to regulate the trading of Sports Event Contracts not licensed by the ADG.

123.    By threatening to enforce the statutes at ¶¶ 94-103 or any other statutes, and any rules adopted thereunder against CDNA, Defendants are impermissibly intruding on the CFTC's exclusive jurisdiction to regulate derivatives transactions on federally designated contract markets.

124.    For the reasons described above, without regard to whether the ADG has correctly interpreted Arizona law, CDNA is authorized to list and offer event contracts to Arizona residents (and residents of each of the other states and territories of the United States) pursuant to the CEA.  Whether trading in particular event contracts is permitted is a question subject to the "exclusive jurisdiction" of the CFTC.

125.    To the extent that the relevant provisions of the CEA and CFTC regulations adopted thereunder conflict with Arizona law, Arizona law is preempted pursuant to the Supremacy Clause.

126.    The Supremacy Clause mandates that federal law preempts state law where compliance with the state law would conflict with federal law.

127.    Arizona authorities likewise threatened to deploy Arizona law against CDNA in a manner that conflicts with federal law and policy.  Defendants seek to ban event contracts that federal law and the CFTC have authorized or subject them to state regulatory requirements that conflict with federal law, which would plainly frustrate the CFTC's exclusive authority to regulate its designated exchanges.  For that reason among others, the

threatened actions are conflict-preempted under the Supremacy Clause. *See Flaherty*, 2026 WL 924004, at *5.

128.   Defendants therefore may not enforce Arizona's gaming laws against CDNA because CDNA is a federally regulated derivatives market that operates under the exclusive oversight of the CFTC and its enabling statute, the CEA, 7 U.S.C. §§ 1 et seq.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff CDNA requests that judgment be entered in its favor and against Defendants as follows:

1.  That this Court enter a judgment declaring that the challenged provisions, or any other state laws pertaining to gambling or wagering, as applied to CDNA, violate the Supremacy Clause and are therefore preempted, unconstitutional and invalid;

2.  That this Court issue a permanent injunction that prohibits Defendants as well as their successors, agents, and employees, from enforcing the challenged provisions or any other state laws pertaining to gambling or wagering, as applied to CDNA;

3.   Award such other relief within this Court's discretion that it deems just and proper.

36

Dated this 10th day of April, 2026.

                              *s/ Sean J. O'Hara_____*

                              Sean J. O'Hara (#024749)
                              Kercsmar & O'Hara
                              8800 East Raintree Drive, Suite 310
                              Scottsdale, Arizona 85260
                              Telephone: (480) 776-3432
                              sjo@kandolaw.com

                              David Meister (*pro hac vice* forthcoming)
                              Robert A. Fumerton (*pro hac vice* forthcoming)
                              Judith A. Flumenbaum (*pro hac vice* forthcoming)
                              SKADDEN, ARPS, SLATE, MEAGHER &
                              FLOM LLP
                              One Manhattan West
                              New York, NY 10001
                              Telephone: (212) 735-3000
                              david.meister@skadden.com
                              robert.fumerton@skadden.com
                              judy.flumenbaum@skadden.com

                              Shay Dvoretzky (*pro hac vice* forthcoming)
                              Parker Rider-Longmaid (*pro hac vice* forthcoming)
                              Sylvia O. Tsakos (*pro hac vice* forthcoming)
                              SKADDEN, ARPS, SLATE, MEAGHER &
                              FLOM LLP
                              1440 New York Avenue NW
                              Washington, DC 20005
                              Telephone: (202) 371-7000
                              shay.dvoretzky@skadden.com
                              parker.rider-longmaid@skadden.com
                              sylvia.tsakos@skadden.com

Nowell D. Bamberger (*pro hac vice* forthcoming)
Matthew C. Solomon (*pro hac vice* forthcoming)
CLEARY GOTTLIEB STEEN & HAMILTON LLP
2112 Pennsylvania Ave. NW
Washington, DC 20037
Telephone: 202-974-1500
nbamberger@cgsh.com
msolomon@cgsh.com

*Attorneys for North American Derivatives Exchange, Inc., d/b/a Crypto.com | Derivatives North America*